# SUPREME COURT

OF

# ILLINOIS.

---

## FIRST GRAND DIVISION.

NOVEMBER TERM, 1863.

---

THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* HARLESS

*v.*

OZIAS M. HATCH, SECRETARY OF STATE.

SAME, *ex rel.* KEYES

*v.*

JESSE K. DUBOIS, AUDITOR OF PUBLIC ACCOUNTS.

| 33 | 9 |
|---|---|
| 120 | 205 |
| 33 | 9 |
| 137 | 301 |
| 33 | 9 |
| 146 | 538 |
| 33 | 9 |
| 168 | 39 |
| 33 | 9 |
| 81a | 668 |
| 33 | 9 |
| 95a | 3 287 |
| 33 | 9 |
| 97a | 3 432 |
| 33 | 9 |
| 193 | 3 523 |
| f193 | 3 530 |
| 193 | 3 589 |
| 193 | 3 590 |
| 193 | 3 591 |
| 33 | 9 |
| 106a | 3 78 |
| 33 | 9 |
| 112a | 3 5 308 |

1. ALTERNATIVE WRIT OF MANDAMUS, *as a pleading.* The alternative writ of *mandamus* stands in the place of a declaration — it is the declaration of the relator — and, as in an ordinary case, commenced by a declaration, the plaintiff is bound to state a case *prima facie* good. Per Mr. JUSTICE BREESE.

2. DEMURRER TO RETURN *may relate back to the writ.* A demurrer to the return to an alternative writ, may relate back to the writ itself, and bring that before the court for its consideration. Ibid.

3. MANDAMUS — *of the nature of the writ, and in what cases it will be awarded.* The writ of *mandamus* is a high prerogative writ, to be awarded in the discretion of the court, and ought not to issue in any case unless the party applying for it shall show a clear right to have the thing sought by it done, and by the person

or body sought to be coerced, and must be effectual as a remedy if enforced, and it must be in the power of the party, and his duty also, to do the act sought to be done.   It confers upon the party against whom it may be issued no new authority. In a doubtful case, the writ should not be awarded.   Ibid.

4.   AUDITOR — *of his powers and duty in issuing warrants on the treasury.*   The statute requires the speaker of the house of representatives to give a certificate to each member of the amount of compensation to which he is entitled, on presenting which to the auditor, he is authorized to issue his warrant for the amount specified in it, on the revenue fund.   He is not authorized to pay a member in any other way.   Ibid.

5.   But it does not follow that he is bound to pay on such certificate.   He cannot shut his eyes and issue warrants on all certificates that may be presented. Such a certificate would be a proper voucher for him on the settlement of his accounts, but he may take the responsibility of refusing to accredit the certificate, because he is bound to take notice of, and act on, existing facts.   He must know who are the speakers, and also who are the members of the two houses.   He is bound to know who is the governor, who the secretary of state, treasurer and judges of the courts.   Ibid.

6.   The auditor is bound also, to know the fact of a session of the legislature at a particular time.   If a certificate should be presented to him of the attendance of a member on a given day, as at a session then held, the auditor would not be justified in issuing a warrant when the fact was patent that there was no session on that day, nor for weeks previous.   Or, if the certificate should embrace a service of one hundred days, and his own records informed him the session consumed but forty-two days, for which he had settled with the members, he could act on his own knowledge of the facts, and refuse to issue the warrant.   Ibid.

7.   SECRETARY OF STATE — *of his duty in certifying laws, and herein of his powers, and of what facts he shall take notice.*   Under the statute, the secretary of State is obliged, when required by any person so to do, to make out copies of all laws, acts, resolutions or other records appertaining to his office, and attach thereto his certificate, under the seal of State.   But he cannot be compelled to certify any act to be a law, which does not come into his possession as such under and by virtue of the law defining his duties.   Ibid.

8.   So, where a bill was placed in his hands by the lieutenant-governor, with the written objections of the governor thereto, and with the injunction of the lieutenant-governor that he should keep them safely, so that they could be produced on the first day of the next meeting of the general assembly and then be laid before the senate, where the bill originated, it was *held,* the secretary of State was not in possession of the bill as a law, and he could not be compelled by *mandamus* to make a certified copy of it as a law, nor to perform any duty in that regard.   Ibid.

9.   It is not the duty of the secretary of State to certify that a bill has become a law by reason of the failure of the governor to return it, with his objections, to the house in which it originated, within ten days, Sundays excepted, after it was presented to him.   Ibid.

The People, etc., *v.* Hatch. Same *v.* Dubois.

10. The secretary of State has no right to determine any particular bill or act to be the law of the land. He has no right to give a reason why it is a law. He cannot, without the authority of law, declare that any writing in his possession, having the form of an act of the legislature, but bearing no marks of authority, is, for any reason which may suggest itself to him, a law of the land. Ibid.

11. He cannot know, officially, that a bill which has passed the two houses of the general assembly was duly presented to the governor, remained with him ten days, and was not returned by him within the time prescribed in the Constitution to prevent its becoming a law. Ibid.

12. But the fact that a bill may have been procured to be passed through one of the houses of the general assembly by the fraud and misrepresentation of one of its members, will not justify the secretary of State in refusing to give a certified copy of it, after the bill has received the proper authentication, and has been deposited with him as a law. Ibid.

13. OF THE COUNCIL OF REVISION. The council of revision, as such, as a power to revise all laws passed by the general assembly, is not abolished by the present Constitution of the State. The power, instead of being deposited with the governor and justices of the Supreme Court, is now deposited with the governor alone. He is, to all intents and purposes, the council of revision. Ibid.

14. MODE OF AUTHENTICATING A BILL AS A LAW, *which has become such by reason of not being returned by the governor.* The only mode of authenticating a bill which has passed both houses of the general assembly, and been duly presented to the governor, but not returned by him within the ten days prescribed, as a law, is under the provisions of section three, chapter sixty-two, of the Revised Statutes, which requires that it shall be authenticated by the governor causing the fact that the bill had remained with the governor ten days, Sundays excepted, the general assembly being in session, and that it has become a law, to be certified thereon by the secretary of State. Ibid.

15. This authentication, by the statute, must be under the sanction of the executive, and the act must be deposited in the office of the secretary of State, and these make up the evidence, and the only evidence, of the existence of a law thus circumstanced. Such a bill is required to be authenticated by the governor, *he* causing the fact to be certified on the bill by the secretary of State. Ibid.

16. Until the governor acts, the secretary has no power and duty to perform. Without such certificate, the bill could not be certified by the secretary of State, or be published as a law; nor, in such case, could any duty by any possibility devolve on the secretary, if the bill was in his official custody, to certify it as a law, or to give a copy of it to the public printer, to be published in the volume of laws. Ibid.

17. MANDAMUS—*will not issue against the governor.* The governor would have a duty to perform in such case, but he cannot be coerced by *mandamus* to perform any duty. It may be, should the governor obstinately, and without reason, refuse to cause the secretary to place his certificate upon a bill so circumstanced, that the court might declare it to be a law, but not by *mandamus.* Ibid.

18.  IN WHAT MANNER THE QUESTION COULD ARISE, *whether it be a law.*  The question could only properly arise in a case brought before the court for adjudication, the foundation of which should be the assertion of a right or privilege claimed under and by force of such an act, and against one who may have resisted that right.  Ibid.

19.  PRESENTATION OF BILLS TO THE GOVERNOR.— *of the evidence thereof.*  Under the tenth joint rule of the two houses of the general assembly, which has the force of a law, the time of the presentation of a bill to the governor for his consideration, should be carefully entered on the journal of each house.  And by the journal only, can the fact of presentation, during a session of the legislature, be legitimately established.  Ibid.

20.  The entry of the presentation upon the executive journal kept by the private secretary of the governor, is for the convenience of the governor alone.  There is no law requiring the governor to keep such a journal, nor any making it evidence anywhere.  Ibid.

21.  The Constitution requires the secretary of State to "keep a fair register of the official acts of the governor," but this has no relation to duties a standing committee of the two houses is required to perform, as in the presentation of bills to the governor.  Ibid.

22.  PRESENTATION OF BILLS TO THE GOVERNOR — *must be during a legislative session — and of their return.*  The legislature must be in session when a bill is presented to the governor for his consideration, and when it is returned by him with his objections.  Ibid.

23.  WHEN THE FACT WILL BE INQUIRED INTO, *and when not.*  The court will not inquire, when an act has been *approved* by the governor, and deposited in the office of the secretary of State as a law, whether the legislature was in session when it was presented to him, nor whether the time of presentation had been carefully entered on the journal of each house.  Ibid.

24.  But when it is asked of the court to declare an act to be a law which wants the executive sanction, has not been deposited with the secretary of State, and is not authenticated in any manner, in such case, the requirements of the Constitution and law must be looked into and applied.  Ibid.

25.  ADJOURNMENT OF THE LEGISLATURE — *what constitutes.*  The Constitution provides that "if any bill shall not be returned by the governor within ten days, Sundays excepted, after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the general assembly shall, by their adjournment, prevent its return."  To give full effect to this negative power of the governor in legislation, the adjournment, or termination of the session, which shall, practically, deprive the executive of the ability to communicate with the house in which a bill shall have originated, according to legislative or parliamentary usage, must be taken as the adjournment contemplated by the Constitution.  Ibid.

26.  So, when the governor, assuming to act under the power given him in the Constitution to adjourn the general assembly in case of a disagreement between the two houses with respect to the time of adjournment, declared that body

The People, etc., *v.* Hatch.   Same *v.* Dubois.

adjourned, and the members thereupon adopted the act of the governor and dispersed, so that there was no body in session with which the governor could communicate, there was such an adjournment as prevented the return of a bill to either house by the governor, and, therefore, such an adjournment as was contemplated in that clause of the Constitution, and this regardless of the question whether the act of the governor in declaring the general assembly adjourned, was legal or illegal.   Ibid.

27.   LEGISLATIVE JOURNALS—*presumption from the absence of entries therein, as to the fact of there being a session.*   A presumption does not arise in the absence of entries in the journals of the two houses, upon its being shown that there was a regular meeting of the general assembly at the time appointed by law, that it continued in session until an adjourning order shall be entered in the journals.   On the contrary, the journals must show proceedings to establish a legislative session. In the absence of a journal of proceedings there can be no houses.   Ibid.

28.   The journals do not show any proceedings from the tenth to the twenty-third of June, 1863, consequently there was no legislative session during all that time.   By their very silence the journals speak a negative in that regard, against which no presumption can be indulged.   Ibid.

29.   JURISDICTION, *as between the judiciary and the legislature.*   Whether the governor has the power, in a given case, to adjourn the general assembly by reason of an alleged disagreement between the two houses with respect to the time of adjournment, is a question for the legislature to decide when the power is attempted to be exercised, and with which the court cannot interfere.   Ibid.

30.   OF THE POWER *"of a smaller number than a quorum."*   The power of *"a* smaller number than a quorum" in either house of the general assembly, to adjourn from day to day, and compel the attendance of absent members, is plenary, and embraces not only the power of the officers attending upon the respective houses, but through them, the *posse civitatis.*   It implies the power to arrest and imprison members, and to keep them in *arcta custodia,* so that they may have their bodies in the respective houses to which the fugitives may belong, to make up a quorum. These efforts, under this grant of power, may be continued *de die in diem,* up to the time when the general assembly shall expire by lapse of time.   Ibid.

31.   OF RECONVENING THE LEGISLATURE, *after an adjournment or dispersion.* Should a legislative body be dispersed by any sudden irruption or insurrection, or by any external force, the power might, perhaps, remain, the duty also, to reassemble without any previous vote for such purpose.   Ibid.

32.   But when such dispersion is the result of its own action, there is no mode by which it can be brought together again, as a legislative assembly, in the absence of such previous vote, without a call from the executive.   Ibid.

33.   So, when the governor assumes to exercise the power of adjourning the general assembly upon the alleged ground of a disagreement between the two houses with respect to the time of adjournment, though the contingency provided for in the Constitution had not happened, and the act was therefore illegal, yet if the members elect to adopt the act, and disperse, without any previous vote of

adjournment to a given day, and thereby end the session, that is an adjournment *sine die*, and they cannot be reassembled as a legislative body, except upon a call of the executive.   Ibid.

34.   PASSING OF LAWS — *action of the governor — if he do not approve, 'he must return the bill to the house, organized as a body, in which it originated.*   Where a bill which has passed the two houses of the general assembly, is presented to the governor for his consideration, he is not required to return it with his objections within ten days after it is so presented to him, to prevent its becoming a law, unless the general assembly continue in session until the end of that period. Under the provision of the Constitution which gives him that period within which to determine upon his course of action, the general assembly must be in an organized condition, acting as a general assembly, at the end of that period, if not during the whole time, to require the governor to perform the act.   If the members have dispersed, and the officers are not in attendance, he would not be able to return the bill to the house in which it originated.   The Constitution neither requires nor authorizes him to return the bill to the speaker of the house, to the clerk, nor to any other officer, but declares that it shall be returned to the house, and that can only be as a body.   Per Mr. JUSTICE WALKER.

35.   COMPUTATION OF TIME, *within which an act is to be done.*   The correct mode of computing time, when an act is to be performed within a particular time after a specified day, is to exclude the specified day, and to include that upon which the act is to be performed.   Ibid.

36.   APPLICATION OF THE RULE *to the time given the governor for the consideration of bills.*   The same rule applies in computing the ten days allowed the governor to consider bills which have been passed by the general assembly and presented to him.   So where a bill was presented to the governor on Friday, the 12th day of June, that day and the two intervening Sundays being excluded, the last of the ten days would be the 24th day of the same month.   Ibid.

37.   THE TEN DAYS MUST BE NATURAL DAYS.   And the governor had the whole of the 24th within which to return the bill, regarding it not as an artificial or a legislative day, but as a natural day, consisting of twenty-four hours.   Ibid.

38.   So, if the general assembly terminated its session during that day, the bill would not become a law by reason of its not being returned by the governor to the house in which it originated prior to the adjournment; but he would have until the first day of their next assembling to return the bill with his objections.   Ibid.

30.   WABASH RAILWAY COMPANY — *bill to incorporate it did not become a law.*   The bill to incorporate the Wabash Railway Company, which had passed both houses of the general assembly, and was presented to the governor on the 12th day of June, 1863, did not become a law by reason of its not being returned by the governor within proper time during that session, because, at most, the general assembly was not in session after ten o'clock A. M., on the 24th day of that month.   Ibid.

40.   DEMURRER — *what it admits.*   A demurrer to the return to an alternative writ of *mandamus* admits the truth of the facts set out in the pleading; it admits the truth of all the facts that are well pleaded, and that could be proved for any

The People, etc., *v.* Hatch. Same *v.* Dubois.

purpose upon the trial, as well those which rest alone in parol, as those which can be established by record evidence.

Any inferences or conclusions of law stated in the return would not, of course, be admitted. Ibid.

41. ADJOURNMENT OF THE GENERAL ASSEMBLY — *in what mode it may be accomplished.* Our Constitution has prescribed no mode by which the sessions of the general assembly shall terminate. That is left to the two houses to determine; the only check the Constitution has imposed being a prohibition upon either house from adjourning for more than two days without the consent of the other. Ibid.

42. It is true, the joint rules of the two houses provide for an adjournment *sine die* by joint resolution. But this is not a constitutional requirement, and a joint resolution, formally adopted and spread on the journals, is not indispensable to the termination of the session by an adjournment without day. Ibid.

43. Should the two houses adopt such a resolution, and disperse on the day fixed, and the clerks of the two houses, by accident or design, were to fail to enter it upon the journals, still the general assembly would be adjourned. Ibid.

44. While it is laid down by all writers on parliamentary law that when such a body is once organized, the session can be terminated only by the expiration of the time for which the members were elected, by executive action, or by resolution, they do not say that such a resolution must appear on the journals. Ibid.

45. It is usually by such a resolution that the sense of the two houses is obtained, but if that sense is manifested in any other clear and satisfactory mode, it would be as obligatory as if it were reduced to writing and spread upon the journals. If acts of the two houses appear which render it clear that it was their resolution to adjourn, such would be the effect, although a joint resolution did not appear upon the journals. If, simultaneously, each house were to adopt a resolution, or simply vote, that they would adjourn at the same time, and when the period arrived were to act upon it, the session would be terminated. Ibid.

46. So, where the governor, assuming to act under the provisions of the thirteenth section of the fourth article of the Constitution, which declares that "in case of disagreement between the two houses with respect to the time of adjournment, the governor shall have power to adjourn the general assembly," &c., issued his proclamation declaring the general assembly adjourned, which was read to the two houses, and it is seen, from the absence of all entries upon the journals, that the two houses ceased to hold further sessions, that the members drew their pay, returned to their homes, and the halls were closed, this apparent acquiescence on the part of the members of the two bodies in the act of the governor, should be deemed satisfactory evidence that they designed to terminate the session. And such would be the effect of their action, even though the contingency provided for in that section of the Constitution had not actually happened, for by the course pursued by the two houses it would seem they designed to adopt the governor's act, and did in fact adjourn. Ibid.

47. Had the governor, without any pretense of a disagreement, come into the house and declared them adjourned *sine die*, and the speaker had so announced, and

it had been entered on the journals of each house that on that day the general assembly had so adjourned, and the members had dispersed and business had ceased, it would not be contended but what the session was terminated, notwithstanding a want of a joint resolution.   Ibid.

48.   Or if the speakers, independent of all action by the governor, were to declare that the general assembly was adjourned *sine die*, and it should be so entered on the journals, and the members should disperse, and further meetings should cease, the conclusion would be that the two houses had adjourned without day. Ibid.

49.   POWERS OF A LESS NUMBER THAN A QUORUM.   According to legislative usage, any number less than a quorum have no power to perform any legislative function.   But under our Constitution a smaller number may adjourn from day to day, and compel the attendance of absent members.   Ibid.

50.   But for this constitutional provision, if such a body were left without a quorum, and thus with no power to adjourn from day to day, its session must end. This power was conferred upon a number less than a quorum to enable them to prevent a termination of their sessions.   Ibid.

51.   PRESUMPTION AS TO THE FACT OF ADJOURNMENT *from absence of entries on the journals.*   The requirement in the Constitution that "each house shall keep a journal of their proceedings," is peremptory, and it must be presumed that the two houses will, when in session, observe and perform the duty.   Even if they did no business, it would be expected that convening and adjourning orders, at least, would be found, if they were in session, it being the almost uniform custom of such bodies to note every day that portion of their proceedings, if no other transaction. Ibid.

52.   Each house has a right to adjourn from day to day without the consent of the other, and if they do so adjourn it will be expected to appear from the journals.   But neither house can adjourn for a longer period than two days without such consent.   And when the two houses are found out of session for more than two days, it will be presumed it is by consent, rather than in violation of the Constitution.   And when the journals show no adjournment to a specified time, it must be presumed to be *sine die*.   Ibid.

53.   PRESUMPTION *as to the time for which the legislature adjourns.*   If a legislative body rises without coming to a resolution to adjourn to a specified day, it will be presumed that it was intended to be till the next legislative day, if the rising is followed by the body coming together on that day; but if they fail to meet on that day, the presumption is rebutted.   Ibid.

54.   HOW THE LEGISLATURE MAY BE REASSEMBLED *after an adjournment sine die.* A session of the general assembly having once terminated, the members have no power to revive it by assembling themselves together again.   They can only be brought together by executive proclamation.   Ibid.

55.   PAROL EVIDENCE — *acts and resolutions of the general assembly.*   It is not probable that it could be proved by verbal evidence that a resolution of adjournment had been adopted by the general assembly, any more than that a bill had

passed which did not appear from the journals, or that a court had rendered a judgment which the clerk had failed to record. Ibid.

56. SAME — *as to facts dehors the journals.* But it seems parol evidence may be received to prove the occurrence of acts and circumstances outside of the journals, and which are never found upon them, from which inferences may be indulged respecting the fact whether there was an adjournment or not. Ibid.

57. CONSTRUCTION OF THE CONSTITUTION — *as given by the different coördinate branches of the government.* When the legislative and executive branches of the government, by the adoption of an act, give a construction to a provision of the Constitution, if the construction thus given is only doubtful, the courts will not hold the act void. It is only in cases of its clear infringement that the courts will interpose and hold the act nugatory. Ibid.

58. So, when the governor asserts his right to adjourn a session of the general assembly by reason of an alleged disagreement between the two houses with respect to the time of their adjournment, if the two houses acquiesce in it, the court will not say that it did not produce an adjournment, unless it is clear that such is not the effect. Ibid.

59. MANDAMUS — *discretionary.* The writ of mandamus is not a writ of right, but it is discretionary with the court whether it will be awarded. Ibid.

60. SAME — *when there is a remedy at law.* When there is a complete remedy at law it will never be dispensed. Ibid.

61. SAME — *when no substantial interests are involved.* The issue of the writ being discretionary, the court will not entertain jurisdiction where substantial interests are not involved; it would be to encourage petty litigation. So, where the amount involved is only two dollars, the peremptory writ will be denied, even if it be admitted to be just to issue it.

THESE were applications to this court for writs of *mandamus,* in the one case, on the relation of Thomas Harless against O. M. Hatch, secretary of State, to compel him to make a true copy of the act to incorporate the Wabash Railway Company, with his certificate thereto appended, under the great seal of the State, that the same is a law, by reason of the failure of the governor to return the same with his objections to the senate, the branch of the general assembly in which it originated, within ten days (Sundays excepted) after it was presented to him, and deliver the same to the relator. In the other case, on the relation of Charles A. Keyes against Jesse K. Dubois, auditor of public accounts, to compel him to issue his warrant upon the treasurer of the State of Illinois in favor of the relator, for the sum of two dollars, his *per diem* for the 23d and 24th

2 — 33D ILL.

days of June, A. D. 1863, as a member of the house of representatives of the twenty-third general assembly of said State.

The grounds of the application on the part of Harless against the secretary of State, are set forth in the following alternative writ:

*The People of the State of Illinois, to O. M. Hatch, secretary of the State of Illinois:*

Whereas, The People of the State of Illinois, upon the relation of Thomas Harless, of the county of Cook, have given the honorable the judges of the Supreme Court of the State of Illinois to understand and be informed, that the twenty-third general assembly of the State of Illinois, at a regular session begun on the first Monday of January, A. D. 1863, passed in the manner and according to the forms prescribed by the Constitution of the State of Illinois, to wit: The senate on the 22d day of January, and the house of representatives on the 8th day of June in said year, "a bill for an act to incorporate the Wabash Railway Company," which declared the relator, Horace A. Hulburt and Charles Hitchcock, and all such persons as should thereafter become stockholders in the company thereby created a body corporate, by the name and style of the Wabash Railway Company, with the usual powers of corporations, and with authority to construct and operate a railway for the transportation of persons and their ordinary baggage in certain streets in the city of Chicago, and which it was declared should be in force from and after its passage, and that said bill was enrolled, signed by the secretary of the senate, in which branch of the general assembly it originated, and by the speaker of the house of representatives, and the following entry made by the speaker of the senate, to wit: "I sign the within bill with this statement: The same was passed, in my opinion, under a misapprehension on the part of senators, arising out of the statement made by the senator introducing the same previous to the passage of the same," and then signed also by the speaker of the senate, and the said enrolled bill so certified, was, on the 12th day of June, A. D. 1863, presented to the governor for

the purpose and in the manner required by section twenty-one of article four of the Constitution, which said bill so presented to the governor, was not and has not been approved by him. And the said governor has not at any time returned the said bill, with his objections, to the senate, the house in which it originated, unless the facts hereinafter set forth constitute such a return. And more than ten days (Sundays excepted) have elapsed since the same was so presented to him ; and the general assembly did not by their adjournment prevent the return of said bill within ten days (Sundays excepted) after it was presented to him, unless the facts hereinafter set forth constitute such adjournment within the meaning of the Constitution.

The people aforesaid, upon the relation of said Thomas Harless, give the honorable the judges of the Supreme Court further to understand and be informed, that, on the 2d day of June, A. D. 1863, while both branches of the general assembly were in session, Mr. Bushnell, the senator from La Salle, introduced in the senate a joint resolution that the general assembly adjourn *sine die*, on the 10th day of June, 1863, which was laid over under rule 43 of the senate, that " all resolutions presented to the senate shall lie one day on the table, unless otherwise ordered," and no further action was taken thereon, until in the forenoon of June 8th, 1863, when the resolution was called up, and after being amended so as to read, " *Resolved*, by the senate, the house of representatives concurring therein, that this general assembly will adjourn *sine die*, on the 8th inst., at six o'clock P. M.," it was passed by the senate, and a message of such action was delivered by the secretary of the senate to the house of representatives during their forenoon session of that day. The house of representatives adjourned until two o'clock P. M., and immediately after the house was called to order, at the said hour of two o'clock, the said message from the senate was taken up, and upon consideration of the resolution, the same was amended by striking out " 8th," and inserting in lieu thereof, " 22d," and striking out " six o'clock P. M.," and inserting " ten o'clock A. M.," and then passed by the house of representatives as amended, which action

was immediately, on the assembling of the senate at three o'clock p. m., reported by message to the senate, and as soon as the message was delivered the senate took up the same, and the question being, shall the senate concur in the amendment of the house, the vote was taken by yeas and nays, when the question was decided in the negative, as follows, to wit:

*Yeas*—Berry, Blanchard, Gregg, Green, Knapp, Lindsey, Mason, Moffett, Ogden, Vandeveer, and Worcester.—11.

*Nays*—Addams, Allen, Bushnell, Dummer, Funk, Lansing, Mack, Peters, Pickett, Richards, Schofield and Ward.—12;

And that during the afternoon session on the said 8th day of June, the house of representatives passed the following resolution, to wit:

" Whereas, the house desires to recede from its action taken this day, in amending and adopting the senate resolution in relation to adjournment, therefore,

" *Resolved*, That the honorable senate is hereby requested to return said resolution as amended, to the house, for reconsideration," and the house notified the senate of the passage thereof by a message delivered by the clerk of the house immediately after (and before any intervening business had occurred) the vote of the senate to non-concur in the amendment of the house, and after the delivery of such message, there were no other proceedings in either branch of the general assembly, or messages sent or delivered, on the question of an adjournment *sine die*, on that or any other subsequent day; nor had there been any before that day, and at the hour of four o'clock p. m. of June 8th aforesaid, the senate adjourned until ten o'clock the next morning.   The house adjourned at five o'clock p. m., until seven o'clock p. m., when it again convened and adjourned at nine o'clock thirty-five minutes p. m., until nine o'clock June 10th, in pursuance of a prior resolution; and further to understand and be informed, that the senate, in pursuance of adjournment, met at ten o'clock a. m., the 9th day of June, and proceeded as usual with business : and after the reading of the journal, Senator Knapp reported from the committee on town-

The People, etc., *v.* Hatch.　Same *v.* Dubois.

ship organization, a bill in relation to a bridge across Salt Creek, which was ordered to a third reading. Several messages were received from the house of representatives. Senator Green moved to refer the bill for an act in relation to claims allowed by the army board, to the committee on public accounts and expenditures, which was agreed to; when Senator Mack moved to adjourn until ten o'clock next morning, on which the yeas and nays were demanded, when two voted aye, and fourteen nay. Senator Blanchard moved a call of the house, when sixteen senators answered, and the sergeant-at-arms was instructed to bring in absent members, and on motion of Senator Green, the senate adjourned until three oclock P. M., at which hour the senate met pursuant to adjournment, and on motion of Senator Mason adjourned until ten o'clock next morning. That the senate met pursuant to adjournment, at ten o'clock June 10th, when the journal was read and approved, and the senate proceeded with their usual business, in the course of which, bills were reported from several of the standing committees, and ordered to a third reading, and reports made by the committee on engrossed and enrolled bills, after which the speaker of the senate read the following communication, to wit:

"STATE OF ILLINOIS,　}
EXECUTIVE DEPARTMENT.　}

" *To the General Assembly of the State of Illinois:*

"Whereas, On the 8th day of June, A. D. 1863, the senate adopted a joint resolution to adjourn *sine die* on said day at six o'clock P. M., which resolution, upon being submitted to the house of representatives on the same day, was by them amended by substituting the 22d day of June and the hour at 10 o'clock A. M., which amendment the senate thereupon refused to concur in;

"Whereas, The Constitution of this State contains the following provision, to wit:

"'SEC. 13, ART. IV. In case of disagreement between the two houses with respect to the time of adjournment, the governor

shall have power to adjourn the general assembly to such time as he thinks proper, provided it be not a period beyond the next constitutional meeting of the same.'

" Whereas, I fully believe that the interests of the State will be best subserved by a speedy adjournment, the past history of the present assembly holding out no reasonable hope of beneficent results to the citizens of the State, or the army in the field, from its further continuance;

" Now, therefore, In view of the existing disagreement between the two houses in respect to the time of adjournment, and by virtue of the power vested in me by the Constitution aforesaid, I, Richard Yates, governor of the State of Illinois, do hereby adjourn the general assembly now in session, to the Saturday next preceding the first Monday in January, A. D. 1865.

" Given at Springfield, this 10th day of June, A. D. 1863.
  (Signed)  " RICHARD YATES, *Governor*."

And after reading the same vacated the chair. And on motion of Senator Berry, Mr. Underwood, the senator from St. Clair, was elected Speaker *pro tem.*, and on a call of the senate, twelve senators were found to be in attendance, when the sergeant-at-arms was directed to bring in absent members, and afterwards the proceedings under the call were dispensed with, and a message received from the house, that it had appointed their part of a committee of conference on the bill for the relief of sick and wounded soldiers, and asking the senate to concur, and appoint their part of said committee, and the senate concurred in said resolution and appointed their part of said committee. A message was received from the house that they had passed a resolve that a joint committee be appointed to prepare an address to the people of the State, with the reasons why the members of the legislature were not engaged in transacting the legitimate business for which they were elected, and had appointed their part of the committee, which resolution was taken up, concurred in, and the committee on the part of the senate appointed, and then the senate adjourned until 3 o'clock P. M., at which hour it met

pursuant to adjournment, and on call of the senate thirteen senators answered; when Senator Green, from the joint committee of conference on the bill for the relief of sick and wounded soldiers, reported that the committee had agreed to recommend that the house concur in the amendments of the senate. A message was then received from the house, on the passage of a joint resolution, which was concurred in by the senate, and then another message was received that they had adopted a protest and ordered it spread upon the journal, and asked the concurrence of the senate in the same; and on motion of Mr. Green, the protest was taken up, adopted, and ordered to be entered on the journal of the senate, and said protest was signed by thirteen senators and fifty-six representatives, and reads as follows, to wit:

## PROTEST.

Upon this 10th day of June, A. D. 1863, while the general assembly were in session and engaged in the discharge of their constitutional duties, an attempt by the governor of Illinois was made to dissolve this body; which attempt, illegal, unconstitutional, and outrageous as it is, must inevitably result in the cessation of any further legislation at this time.

The circumstances attending this monstrous and revolutionary usurpation of power, and the injurious consequences which must result to the people of the State, demand a brief statement on our part, which we submit with confidence to the consideration of a discerning and candid public, whose rights have thus been ruthlessly invaded, and whose interests have been disregarded and trampled under foot.

The action of the governor in this nefarious attempt to stop the legislation of the State is supposed to be based upon the following provision of the State Constitution.

" ART. IV, SEC. 13.    In case of disagreement between the two houses with regard to the time of adjournment, the governor shall have power to adjourn the general assembly to such time as he thinks proper, provided it be not a period beyond the next constitutional meeting of the same."

And the first question to be determined is, what is such a disagreement under the Constitution as would justify the interposition of the executive? Nor is the answer difficult to arrive at, since this point has been so well and thoroughly settled that it needs but its statement to determine the inquiry beyond cavil or contradiction. When one house amends the resolution or alters legislative action of the other, as to the time of adjournment or any other subject, and the house proposing the resolution or action refuses to concur with the amendments so made, the amending house must be first informed of such nonconcurrence, in order to recede and concur or take such other action in the premises as may tend to an agreement of both on the basis of compromise.

The amending house, being informed of non-concurrence in its action by the other, may either itself recede and concur, or adhere, and propose and appoint a committee of conference, which is the next step to be taken. And it is only when one house refuses to join in a committee of conference, or when such committee, having been appointed, fails to arrive at a common result, or, having so done, the same is not agreed on and adopted by both houses, that the disagreement spoken of in the Constitution has been produced; and the usual parliamentary proceeding is to have two free conferences before final disagreement results. Both houses must be at a dead lock, without hope of or effort towards agreement, before executive action can be invoked or legally taken. Were the rule otherwise, it would require the invariable agreement of each house to whatever the other chose to propose. And until this time it has never been questioned in Europe or this country that such was the rule.

Nor can the executive take action, even where an actual disagreement exists, until officially informed thereof by both houses.

Tested by these principles, we present the facts in the present case, which will demonstrate the indefensible character of the proceeding which we reprobate and condemn.

"*Resolved by the senate, the house of representatives concur-*

*ring therein,* That the general assembly will adjourn *sine die* on the 8th inst., at six o'clock P. M."

Which resolution was at once transmitted to the house, and, being taken up by that branch of the legislature, was amended by the substitution of the 22d day of June instead of the 8th.

The resolution, being thus amended, was returned to the senate for its action, whereupon that body refused to concur in the amendment.

The house was not then, and has not since been, officially informed of the non-concurrence of the senate in the amendment in question, and no opportunity has as yet been afforded that body to recede from its previous action, if it so desired.

The regular parliamentary progression has not been observed; the house has not refused to recede and concur with the senate in its action; no committees of conference have been proposed or appointed; and, in short, no disagreement has existed, or can be presumed as existing in the premises.

Neither has the legal and official notification of a disagreement been laid before the governor, as, indeed, it could not have been, since it was well known and understood that there was no such disagreement in fact.

We have thus briefly stated the position of affairs which the governor of the great State of Illinois has made use of as a pretext for an arbitrary, illegal attempt to bring the deliberations of the general assembly to a close.

By this action he has deliberately and designedly defeated the passage of measures of great public importance, and demanded by the exigencies of the times.

He has defeated the appropriation of one hundred thousand dollars for the gallant sons of Illinois who are bleeding and dying upon the battle-field and in the hospital, and whose terrible condition invites the sympathy of every human heart, and demands the earnest effort in their behalf of every citizen of the State on which they have shed imperishable glory. The bill for that purpose, already passed both houses, and pending simply upon a slight difference of opinion as to some of its details, in the lower house, which difference has now been hap-

pily removed, is defeated merely because the miserable parti-
sanship of the chief executive, who usurps the unmerited title
of the "Soldier's Friend," prevented him from consenting that
a legislature having a majority of his political opponents should
have the honor, as they would enjoy the privilege, of flying
to the rescue of their gallant brethren.

He has defeated the bill for the sale of the coin in the treas-
ury and the payment of our interest in treasury notes, saving
hundreds of thousands to the people, which was on its final
passage as the supporters of this action left the halls of legis-
lation at the bidding of their master.

He has defeated the passage of the general appropriation
bills already passed the senate, and pending in the house and
ready for passage, which the senate had acted on without delay,
and to which no obstruction was intended to be, would or could
have been interposed by the house.

He has defeated the printing of the report of the State
Agricultural Society, an appropriation for which passed the
house, and was on its passage in the senate, and the distribu-
tion of the appropriation for agricultural purposes made by
the general government, and as yet unapplied to the ends for
which it was intended, to the great detriment of the vast agri-
cultural interests of Illinois, for whose benefit the measures
were intended.

He has defeated the appropriation for the State Normal Uni-
versity, and the property will be sold under the existing judg-
ments, and this noble institution be destroyed.

The memory of the great dead could not restrain him, and
the appropriation for the erection of a monument to Douglas
receives its death blow at his hands.

He has defeated the general and local legislation of the
State, for much of which pressing necessity existed, and which
was so fully matured as to require for its completion but slight
farther action.

He has done all this without the shadow of a legal pretext,
and in defiance of a well nigh universal public opinion.

Even partisanship affords no palliation for the pursuit of

such a course, since no political measure has been pressed upon either branch of the assembly during the recent period of its session. Which is the more guilty, the individual who proposes, or the wretched agents who carry into effect, an act so utterly indefensible, it is not for us to determine. It is sufficient that all the actors, aiders and abettors of this scheme to block the wheels of government, will receive the condemnation they deserve from an outraged people.

The manner in which this action was attempted to be taken, deserves a passing notice. The statement by one branch of a government to a coördinate branch thereof, that its action has not been conducive to the public welfare, is disrespectful in terms, and an insult so obvious, that we dismiss it with the remark that if such insinuations could be permitted, or were justifiable in any event, they come with an ill grace from the source of the delays to legislation during the former part of this session, and the entire cessation thereof at the present.

When it is considered that the governor has been absent from his post of duty during the present portion of our session until within the last twenty-four hours, and that members of his political party (who render to his commands the most abject obedience), repeatedly seceded from the senate during the winter session, and have given a quorum of but two days and one-half during the summer continuation thereof, the suggestion that the general assembly have failed in the performance of their duties, deserves only our contempt.

Earnestly protesting against this arbitrary and illegal act of the governor, and insisting that the general assembly has still a legal existence, and has neither been adjourned nor constitutionally dissolved, we ask that this, our protest, may be entered on the journals of the respective houses.

Signed by thirteen senators and fifty-six representatives.

And thereupon the senate adjourned until 9 o'clock the next morning, when it met pursuant to adjournment. And further, to understand and be informed, that on the morning of June 10th, the house of representatives met pursuant to adjournment and proceeded with its usual business, during the course

of which a resolution for a committee of conference upon the bill for the relief of sick and wounded soldiers was adopted; a communication from the governor in relation to the discharge of soldiers from the marine artillery was laid before the house, bills passed, bills introduced and referred, after which a bill for an act to provide for the payment of the interest upon the State debt, and for the sale of certain gold and silver coin, belonging to the State of Illinois, was taken up, when Mr. Lacy, of Mason, moved an amendment, pending which a message from the governor was announced, in regard to which the following is the only entry in the journal: " A message from the governor was announced by the doorkeeper and read, but the bearer of the message was not recognized by the speaker," and thereupon motions were made to adjourn, and withdrawn, when a call of the house was made, and forty-four answering, further proceedings under the call were dispensed with, and a joint resolution passed for the appointment of a committee to prepare an address to the people, on the subject of the governor's attempt to adjourn the general assembly, and then a message was received from the senate that they had concurred in the resolution for a committee of conference on the bill for the relief of sick and wounded soldiers, when the house adjourned until 2 o'clock P. M., at which hour the house met pursuant to adjournment, and the committee of conference on the bill for the relief of sick and wounded soldiers reported a recommendation that the house concur with the amendments of the senate, which was adopted; then a message was received from the senate of concurrence in a resolution of the house, then a resolution was moved by Mr. Keyes, of Sangamon, and adopted, and thereupon the bill for the relief of sick and wounded soldiers was taken up, and on the question, shall the house concur with the senate in its amendments, the yeas and nays were taken, when it appearing that forty-four voted yea and none nay, which being less than a quorum, the bill failed for the want of a quorum; and then the protest hereinafter set forth, signed by thirteen senators and fifty-six representatives as aforesaid, was submitted to the house and ordered to be spread upon the journal, which was done.

And whereas, the people aforesaid, upon the relation afore-
said, have given the honorable the judges of the Supreme Court
further to understand and be informed that the journals of both
branches of the general assembly are silent as to any proceedings
in either branch after the morning of the 11th day of June, as
before recited, until the afternoon of June 23d, 1863, when
at the hour of 3 o'clock P. M., the following entry appears on
the journal of the senate: "The speaker *pro tempore*, Mr.
Underwood, having retired from the chair, on motion of Mr.
Lindsay, the senator from Peoria, Mr. Knapp, the senator
from Logan, was elected speaker *pro tempore*, and thereupon
took the chair," when, on motion, the senate adjourned to 9
o'clock the next morning, at which time the senate met pur-
suant to adjournment, when the journals were read and
approved, when a message was received from the house of repre-
sentatives that they had passed the following resolution, to wit:

"*Resolved by the house of representatives, the senate con-
curring therein,* That the two houses of the general assembly, at
10 o'clock A. M. this day, take a recess until the Tuesday after
the first Monday of January, A. D. 1864, at 10 o'clock A. M.,"
which was concurred in by the senate, and then other resolu-
tions were passed by the senate, and among them the following,
to wit:

"*Resolved by the senate, the house of representatives concur-
ring herein,* That a joint committee of one on the part of the
senate and two on the part of the house of representatives, be
appointed to wait on the governor and inform him that the gen-
eral assembly is now ready to adjourn for the recess, and ask
him if he has any further communication to lay before them."
And Senator Lindsay was appointed a member of said commit-
tee on the part of the senate, and immediately thereafter the
senate received a message from the house of representatives that
they had concurred in the passage of the same resolution, and
appointed Messrs. Fuller and Keyes as their part of said com-
mittee, and thereafter Senator Lindsay reported that the joint
committee had waited on the governor in obedience to the joint
resolution, and that the committee were informed by his excel-
lency that he had no communications to lay before this body,

and that he did not recognize the legal existence of this as a legislative body, and after the receipt of a message from the house of representatives that they were now ready to adjourn for the recess, on motion the senate adjourned until the Tuesday after the first Monday in January next, at 10 o'clock A. M., in pursuance of the joint resolution before passed; and further, that the following entry next after the protest appears on the journal of the house of representatives, to wit:

"On motion of Mr. Fuller, the house, at 2 o'clock and 20 minutes P. M., June 23d inst., adjourned until to-morrow morning at 9 o'clock," and further, that at the hour last mentioned, on the 24th day of June, the house of representatives met pursuant to adjournment, when the reading of the journal was dispensed with, and a message from the senate received that they had passed the joint resolution aforesaid for the appointment of a joint committee to wait on the governor, which, on motion of Mr. Miller, of Logan, was taken up and concurred in, when the speaker appointed Messrs. Fuller and Keyes on said committee, then the house passed the joint resolution for a recess aforesaid, and then passed several resolutions on different subjects, when Mr. Fuller, from the joint committee to wait on the governor, submitted the same report to the house that was made by Senator Lindsay from said joint committee to the senate as aforesaid. A committee was then appointed to inform the senate that the house was now ready to adjourn for the recess, and after receiving a message that the senate was ready to adjourn, and the hour of 10 o'clock having arrived, Mr. Speaker Buckmaster declared the house of representatives adjourned for a recess until the Tuesday after the first Monday of January, A. D. 1864, at 10 o'clock A. M., in pursuance of the joint resolution to that effect.

And the people aforesaid, upon the relation of said Thomas Harless, give the honorable the judges of the Supreme Court further to understand and be informed, that all the facts as hereinbefore recited, do appear on the journals of the respective branches of the twenty-third general assembly of the State of Illinois, as they are hereinbefore recited, except as to the pre-

sentation to the governor of the bill to incorporate the Wabash Railway Company, and that no other facts touching the question of adjournment *sine die* appear on the journals of the proceedings of the 8th day of June, or prior thereto, at the June meeting, and no other proceedings on the days subsequent to the said 8th day of June than are hereinbefore recited, appear on the journals of the proceedings of said general assembly. And further, that the journals of the proceedings of the 23d and 24th days of June, do not show how many senators or representatives were present. And further, that the record of the executive acts, as kept by his private secretary, and deposited in the office of the secretary of State, shows that "the bill for an act to incorporate the Wabash Railway," was presented to the governor for his approval, with other bills passed at the same session, which have been approved, but said record is silent in regard to the disposition of said bill; and further, that the said executive record shows no entry in regard to the adjournment of the general assembly by the governor, or otherwise.

And whereas the people aforesaid, upon the relation aforesaid, protesting and insisting that the facts as before recited, as being evidenced by the journals of the 23d general assembly, are exclusive and conclusive evidence, and that no inquiry can be made as to the proceedings of the general assembly, except in and through its journals, yet for the purpose of presenting all the facts touching the subject matter of this information, whether the same be proper for the consideration of a court or not, and giving the defendants all the benefit therefrom that the law will allow, but still protesting that the relator and his associates are not and cannot be, by the rules of law bound by such facts, appearing otherwise than from the journals, have given the judges of the Supreme Court further to understand and be informed, that, on the said 10th day of June, at 11 o'clock in the forenoon, while the house was considering the senate bill to authorize the treasurer to sell the coin in the State treasury, &c., the private secretary of the governor appeared on the floor of that body, and being announced by the doorkeeper, without addressing the speaker, or being recognized by him, com-

menced to read the proclamation of the governor, purporting to adjourn the general assembly. The speaker rapped continuously with his gavel, until the secretary was about half through, when the secretary persisting in reading, the house and speaker were silent, until he had concluded. The speaker then stated to the house, the secretary being on the floor, that the message was not received by the house, because it was disrespectful in terms, and the secretary had attempted to deliver it without addressing the presiding officer or being recognized by him, and was not delivered to the house through the speaker as established by legislative custom. No action was taken on the matter of receiving the message, and it was not entered on or made a part of the journals; but the paper was carried by a page to the clerk's desk, while the speaker was announcing that it was not received.

After the reading of the governor's proclamation, all the republican members of both branches left their seats and refused to return, after being summoned, thus leaving but 13 senators and 56 representatives, less than a quorum in both houses, at that time, and a quorum was not obtained thereafter. On the evening of that day, the members of both houses left their seats, and did not resume business until June 23d.

The lieutenant-governor remained in Springfield until the 12th of June, but refused to recognize the senate as in session after he had vacated the chair. On the 12th of June he left Springfield, and thereafter was at his home, in Du Page county, and at Chicago, attending to his private business, until after the 24th of June.

On the 19th of June, the governor prepared a message with his objections to the bill to incorporate the Wabash Railway Company, and sent the enrolled act with his original message by private hands to the lieutenant-governor.

The lieutenant-governor resides in Du Page county, about 200 miles from Springfield. The messenger went from Springfield to the residence of the lieutenant-governor, in Du Page county, and on the 20th day of June, delivered the bill with

the veto message to the lieutenant-governor, who was then at his residence engaged in domestic duties.

The lieutenant-governor has not delivered the act and message to the secretary of the senate, or laid it before the senate, or in any way treated the legislature as in session, but denied and denies that it was.

On the 19th and 20th June, there was no actual session of the senate, and the chamber was locked, but the secretary was in Springfield and had possession of the journals and papers of the senate.

On the 23d and 24th days of June there was less than a quorum present in each branch, all of which facts last recited can only be shown by parol evidence, and the relator again denies that said facts, known to exist only by parol evidence outside the journals, are or can be available in the law so as to be considered by a court, but as such question of law, submits the same to the court.

And whereas the people aforesaid, upon the relation of the said Thomas Harless, have given the honorable the judges of the Supreme Court to understand and be informed that afterward, to wit, on the 25th day of June, A. D. 1863, the corporators named in said act to incorporate the Wabash Railway Company, accepted the same and opened books for the subscription of the capital stock which was then and there subscribed, and the company fully organized by the election of the relator as president, Charles H. Ham as secretary, and Benjamin E. Gallup as treasurer, and it is necessary for the said corporation to have and procure a certified copy of the said act from the secretary of State, to be used as evidence of the contents thereof.

And whereas, on or about the 10th day of July, 1863, the said Francis A. Hoffman, lieutenant-governor, as aforesaid, stated to one of the stockholders in said Wabash Railway Company, on application for that purpose, that he had the possession of the said enrolled act, and the message purporting to be said veto message, had sealed them both up and should retain them, and the said relator and his associates therefore supposed that

3 — 33D ILL.

the said enrolled act was still in his possession, until, on the 13th October, A. D. 1863, upon the occasion of serving a copy of petition and notice of motion for an alternative writ of mandamus, on the governor and lieutenant-governor, the said Francis A. Hoffman stated that the said bill was not in his possession, and on the 16th day of October, A. D. 1863, the relator applied to O. M. Hatch, the secretary of State, to learn whether the said enrolled act was in his custody, and was informed that it was, and thereupon the relator demanded a copy of said act, with a certificate thereto, under the seal of his office, that the said act was a law, and had become so because of the failure of the governor to return the same, with his objections, to the senate in which it originated, within ten days (Sundays excepted) after the same was presented to him, and thereupon the said O. M. Hatch, secretary of State as aforesaid, refused to give such copy and certificate, although his fees therefor were then and there tendered him.

The relator further says that the information of the statement of the lieutenant-governor, that the act was not in his custody was first obtained by him on the 15th day of October.

And whereas the people aforesaid, upon the relation of said Thomas Harless, aver that the foregoing is a full, complete, and true statement of all the facts touching the passage of the "Act to incorporate the Wabash Railway Company," and the action of the governor thereon, and the proceedings in and by the general assembly subsequently to the 8th day of June, A. D. 1863.

Wherefore the people aforesaid, by the said Thomas Harless, relator as aforesaid, pray that an alternative writ may be issued to the said O. M. Hatch, secretary of the State of Illinois, commanding him to make a true copy of the act to incorporate the Wabash Railway Company, with his certificate thereto appended, under the great seal of the State, that the same is a law, by reason of the failure of the governor to return the same with his objections to the senate, the branch of the general assembly in which it originated, within ten days (Sundays excepted) after it was presented to him, and deliver the same

to the relator, and that upon a hearing such other order may be made as to your honors seems meet, &c. And it has been made to appear to the court that due notice of the application for said writ has been served on the said O. M. Hatch, secretary of the State of Illinois, more than ten days before the commencement of the present term, and the court, after consideration of the motion of relator for said writ, has ordered that an alternative writ be issued according to the prayer of the relator; returnable on Friday, the 13th day of November, instant, at the hour of three o'clock of that day.

Now therefore, you, the said O. M. Hatch, secretary of the State of Illinois, are hereby commanded to appear before the supreme court of the State of Illinois, now sitting at Mt. Vernon, on or before the 13th day of November, instant, at the hour of three o'clock P. M., and show cause if any you can, why a peremptory writ of mandamus should not be awarded against you, requiring you to make a true copy of the act to incorporate the "Wabash Railway Company," with your certificate thereto appended, under the great seal of the State, that the same is a law, by reason of the failure of the governor to return the same, with his objections, to the senate, the branch of the general assembly in which it originated, within ten days (Sundays excepted) after it was presented to him, and deliver the same to the relator.

> Witness, JOHN D. CATON, Chief Justice of the Supreme Court of the State of Illinois, and the seal of said court, hereto affixed at Mt. Vernon, in the First Grand Division, on this 11th day of November, A. D. 1863.

> > NOAH JOHNSTON, *Clerk.*

The grounds of the application, on the part of Keyes against the auditor, are set forth in the alternative writ in that case, as follows : The relator states that he was duly elected a member of the house of representatives of the twenty-third general assembly of this State, for the twentieth representative district, on the 4th day of November, 1862, and was duly qualified, and

took his seat in that body on the first Monday in January, 1863.

The relator then proceeds to set forth the same state of facts in relation to the sittings of the general assembly during that session, as is given in the preceding alternative writ, with the view to show that the general assembly was in session on the 23d and 24th days of June, 1863, alleging that he was in his seat and discharging his duties as a member of the house on those days, and setting forth the certificate of the speaker of the house, to the effect that there is due to the relator the sum of two dollars compensation as a member of the house, for services and attendance on the two days last mentioned, at the regular session which commenced on the first Monday in January, 1863.

It is further alleged in the alternative writ, that the relator had presented the certificate of the speaker to the auditor, and demanded from him a warrant on the treasurer for the amount therein shown to be due to him, which the auditor refused to issue.

The relator therefore prays that an alternative writ may issue, requiring the auditor to show cause why he refuses to issue his warrant as aforesaid.

The alternative writ was thereupon awarded.

The return of the secretary of State sets forth that the regular session of the twenty-third general assembly of the State of Illinois, was begun and held at Springfield on the first Monday in January, 1863, and alleges that the bill in the writ mentioned, was not passed by that body in the manner and according to the forms prescribed in the Constitution of this State, unless the facts thereinafter set forth, constitute such a passage of the same.

The respondent then states the fact that prior to the 22d day of January, 1863, the said bill was introduced into the senate, and such proceedings were had, that on the day mentioned it was put upon its passage, and received the votes of a majority of the members of that house. But, the respondent alleges, by means of misrepresentations in regard to the purport and object of the bill, the senators voting for the same

were ignorant of its contents at the time of its passage; and alleges other fraudulent acts in connection with its passage, which do not affect the questions considered by the court, and need not, therefore, be stated here.

It is then set forth in the return that the bill mentioned in the writ passed the house of representatives on the 8th day of June, 1863, in the manner and according to the forms prescribed in the Constitution, and was afterwards enrolled and signed by the secretary of the senate, that being the branch of the general assembly in which it originated, and by the speaker of the house of representatives; and that the following entry was made upon the bill by the Hon. Francis A. Hoffman, lieutenant-governor of the State, and speaker of the senate:

" I sign the within bill with this statement: The same was passed, in my opinion, under a misapprehension on the part of senators, arising out of a statement made by the senator introducing the same.

(Signed)        FRANCIS A. HOFFMAN,
                *Speaker of the Senate.*"

It is further stated in the return, that the said enrolled bill, thus certified, was, on the said 12th day of June, presented to the governor, for the purpose required by section twenty-one of article four of the Constitution; but the respondent states that he has no knowledge or official information of the time when the same was so presented.

That he has been informed, and believes, that the bill so presented to the governor was not, and has not been at any time, approved by him, and that he has not at any time returned the said bill with his objections thereto, to the senate, and that more than ten days (Sundays excepted) have elapsed since the presentation of the bill to him.

The respondent returns that on the 10th day of June, 1863, and before the said bill was presented to the governor, the two houses of the general assembly were adjourned until the Saturday next preceding the first Monday in January, 1865, and that no legal session of said houses, or either of them, has been held since the said 10th day of June.

That in the forenoon of the 8th day of June, 1863, the following joint resolution was passed by the senate: *Resolved,* by the senate, the house of representatives concurring therein, that this general assembly will adjourn *sine die* on the 8th instant, at 6 o'clock P. M., and a message of such action was delivered by the secretary of the senate to the house of representatives during their forenoon session of that day. The house of representatives adjourned until 2 o'clock P. M, and immediately after the house was called to order, at the said hour of 2 o'clock, the said message from the senate was taken up, and upon consideration of the resolution the same was amended by striking out "8th" and inserting in lieu thereof "22d," and striking out "6 o'clock P. M." and inserting "10 o'clock A. M.," and then passed by the house of representatives as amended, which action was, soon after the assembling of the senate at 3 o'clock P. M. of that day, reported by message to the senate, and as soon as such message was delivered the senate took up the same, and upon the question being put, "shall the senate concur in the amendment of the house?" the vote was taken by yeas and nays, upon which the question was decided in the negative, eleven senators only voting in the affirmative, and twelve in the negative.

That during the afternoon session of the senate on the said 8th day of June, a message purporting to come from the house was delivered, containing a resolution similar to that set out in the writ, as having passed the house in the afternoon of said 8th day of June, and immediately upon the delivery of such message to the senate that body adjourned.

That at no time on either the said 9th or 10th days of June aforesaid did two-thirds of the senate meet or convene, so that whatever proceedings were had or business done in the senate during either of those days were had and done without a quorum of the senate being present.

The return further shows that on the said 10th day of June, there being a disagreement between the two houses with respect to the time of adjournment, of which the governor was notified by a certificate thereof from the speaker of the senate, officially

communicated, and it appearing to the governor that such disagreement did in fact exist, and that the same would continue, and having the power and authority to determine such case, he did decide and determine that there was such disagreement between the two houses of the general assembly with respect to the time of adjournment of the same as would authorize and require him to adjourn the same, and that the general assembly ought to be immediately adjourned ; whereupon the governor, being duly authorized and empowered so to do, did then and there adjourn the general assembly to a period not beyond the next constitutional meeting of the same ; and in order to manifest such his determination in that behalf, and carry the same into effect, did on the said 10th of June cause the written communication which is set forth in the writ to be published and presented to both houses of the general assembly.

That upon the communication from the governor being made to the general assembly, the members thereof acquiescing in said adjournment, did, all of them, on said 10th day of June, vacate their respective seats in said houses, and both houses of the general assembly became and were closed, and the session ended. That since the said 10th day of June there were no proceedings whatever attempted in either of said houses until the said supposed proceedings on the said 23d day of June, 1863, nor has there ever been a meeting of two-thirds of the members of either of said houses, or any session of either of them at any time whatever from the said 10th day of June hitherto.

That on the said 23d day of June, certain of the members of both of said houses did meet at Springfield, to wit : Two members of the senate and four members of the house, and no more ; and being so assembled, of their own mere motion and without any authority whatever, pretended to go through with the supposed proceedings of said 23d and 24th days of June, in the writ mentioned and set forth, but closing the same and dispersing at ten o'clock A. M. of that day ; and the said supposed journals of the said pretended proceedings on the said 23d and 24th days of June, were wrongfully, willfully and

fraudulently made up in the manner and form as in the writ stated.

That the said bill for an act to incorporate the Wabash Railway Company, was not, as the respondent is informed and believes, presented to the governor until after the close of the said session of the general assembly, as aforesaid, but was so presented, as the respondent is informed and believes, on the 12th day of June, aforesaid, although the respondent has no knowledge or official information of the time when the same was presented. And the same being so presented to the governor, he examined and considered the said bill, and, as the respondent is informed and believes, on the 19th day of June, and within ten days from the time the same was so presented to him (Sundays excepted), having objections to the said bill, decided to veto and return the same to the senate — the house in which the same originated — with his objections thereto; and which said objections the governor then and there set forth in writing in due form of law, and subscribing the same, then and there delivered the bill so presented to him, together with his said objections in writing, to the lieutenant-governor, with express and explicit directions to present, or cause the same to be presented, to the senate on the first day of the next meeting thereof, as had been his custom so to do in cases of return to that body of other bills with objections thereto. That the said bill and objections of the governor thereto, so placed in the custody of the lieutenant-governor, remained in his custody, there having meanwhile been no meeting of the senate, until the 25th day of September, 1863, when the lieutenant-governor placed the said bill and the objections of the governor thereto, in the hands of the respondent for safe keeping merely, until the first day of the next meeting of the senate, when the same would be required to be presented to that body. That the respondent was directed, before receiving the same, to keep said papers in a private and safe place, until such time as the senate should meet. That the respondent accepted and took the custody of said papers for the sole and only purpose of putting and keeping the same in such private and safe place,

and to redeliver them to the lieutenant-governor, or such person as the governor should direct to receive and present the same to the senate.

The respondent further returns, that he received the said bill and veto message on the said 25th day of September, as the mere custodian thereof, until the first day of the next meeting of the senate, when he was to redeliver the same, and in no other manner or for any other purpose whatever. That the governor has at no time communicated with the respondent respecting the said bill or veto message, nor has he at any time directed or requested the respondent to make any certificate upon or concerning said bill, to authenticate the same as having become a law, or otherwise; nor has said bill ever been deposited or filed in the office of the secretary of State as a law, and the respondent has no knowledge or official information that the said bill has ever become a law or not.

For these reasons and causes the respondent insists that he ought not to make or deliver a true copy of the act to incorporate the Wabash Railway Company, with his certificate thereto appended, under the great seal of the State, that the same has become a law, by reason of the failure of the governor to return the same with his objections to the senate within ten days (Sundays excepted) after it was presented to him, and deliver the same to the relator.

The return of the auditor admits that Keyes was duly elected and qualified as a member of the twenty-third general assembly, as set forth in the alternative writ, but denies that there was any session of that body on the 23d and 24th days of June, 1863, alleging its adjournment on the 10th day of that month, in the manner set forth in the foregoing return of the secretary of State, therefore insisting that he should not be compelled to issue a warrant to the relator for *per diem* compensation as a member of the house of representatives for those days during which there was no session.

Mr. W. C. GOUDY, for the relators.

The same questions are presented for the judgment of the court in each of these causes, and therefore I beg leave to consider them together.

It is said " that history repeats itself;" so we are remitted in the course of events to the controversies of former ages. The *magna charta* was the result of a contest between King John and his subjects in regard to the power that ought to be exercised by the royal authority. That was the foundation of English liberty, which has since grown into an edifice which is the admiration of the world. The forms of royal power are maintained, but the people enjoy liberty, and are secure from the encroachments of the executive authority. The government of this country was established on principles inverse to those of England. There the absolute power resided in the crown, and the people struggled through the branches of govment more nearly allied to them to restrain it. Here the people were acknowledged to be the source of power, while in the progress of events the executives have made large inroads, and usurped power never designed by the founders of our system.

The declaration of independence set forth " to a candid world " a list of encroachments by the king of Great Britain, and among them that " He has dissolved representative houses repeatedly, for opposing with manly firmness his invasions on the rights of the people ; " he had combined with others, " for suspending our legislatures and declaring themselves invested with power to legislate for us in all cases whatsoever."

When the different state and federal governments were formed, they were each established with a proper balance between the different branches defined by the several organic laws. But we have retrograded, and are now engaged in a controversy that has cost the blood and treasure of former generations. No appeal has yet been made to the arbitrament of the sword, but, unless these usurpations are checked, they will be met and decided ultimately by the conflict of arms.

The fundamental law intrusts to the judiciary the power and duty of readjusting the disturbed balance, and to that the peo-

ple will cling with the tenacity of life, as their last hope of a peaceful remedy.

The facts presented to the court are without precedent. The questions must be argued and decided upon principle and reason, but the great principles involved are so clear that the conclusion cannot be doubtful.

An affirmative answer to a single interrogatory will dispose of these cases, in the award of writs of mandamus.

That interrogatory is, was the twenty-third general assembly in session on the 23d and 24th days of June, 1863?

Inasmuch as a part of the facts are shown by the journals of the respective houses, and other and additional facts appear to have existed which are not entered on the records of the legislature, it becomes necessary to discuss the rule of evidence.

I.   THE JOURNALS ARE CONCLUSIVE EVIDENCE OF THE PROCEEDINGS OF THE GENERAL ASSEMBLY.

"Each house shall keep a journal of its proceedings."   Const., Art. III, § 13.

The office of the journal is to record the proceedings of the house, and authenticate and preserve the same, and on being deposited in the office of the secretary of State, they become records of his office, and may be certified as such under the seal of State; the journals are the proper evidence of the action of the legislature upon matters before it; they are made up under the immediate direction of each house, and are presumed to contain a full and complete history of its proceedings. When a controversy arises as to the existence of an act as a law, *it must stand or fall upon the evidence contained in the journals. Spangler* v. *Jacoby,* 14 Ill. 297.

Each house may control its own journals, amend them according to the facts, and a court will not inquire as to the correctness of the proceeding. *Turley et al.* v. *Logan Co.,* 17 Ill. 152.

The courts will presume that the legislature complied with the Constitution in the passage of a law from the silence of the journal, unless the fundamental law requires expressly the

action to be entered on the journal. *Sup. Schuyler Co.* v. *People ex rel.*, 25 Ill. 181.

The house keeping the journal is the only tribunal by which it can be corrected, and until corrected by such authority it must be considered *conclusive* as to the facts which it contains. *McCulloch* v. *The State*, 11 Ind. 430; *The State* v. *Moffit*, 5 Ohio, 358; 1 Greenleaf Ev., § 491; 2 Phil. Ev., 4th Am. ed. 274.

Evidence of the proceedings of the house not appearing on the journals cannot be heard, but the court will indulge in the presumption that where any given action is required to support the acts of the legislature, that such proceeding took place, although not appearing by the journal, precisely as the rule is to support the proceedings of courts of record. *Sup. Schuyler Co.* v. *People ex rel.*, 25 Ill. 181; *McCulloch* v. *The State*, 11 Ind. 432; *Miller* v. *The State*, 3 Ohio, 475; *Coleman* v. *Dobbins*, 8 Ind. 162.

And such presumption cannot be contradicted by parol evidence. *People* v. *Supervisors*, 4 Seld. 317.

The journals of the legislature are records, and as such import absolute verity and cannot be contradicted, explained or aided by parol evidence. 1 Greenl. Ev. § 482; *Eld.* v. *Gorham*, 20 Conn. 16; *City Covington* v. *Ludlow*, 1 Met. (Ky.) 295; Jefferson's Manual, § 43; *Blaisdell* v. *Briggs*, 10 Shep. 123; *Taylor* v. *Henry*, 2 Pick. 397; *Garfield* v. *Douglas*, 22 Ill. 101.

No distinction can be drawn in principle between contradicting an entry made in the journal, as was proposed in *McCulloch* v. *The State*, 11 Ind. 430, and supplying omissions by parol proof which would have the effect of making the journals show a different state of facts than exhibited as made up. There is none. Both alike would vary and contradict the journal. Every reason that applies to one does to the other. In the rule in regard to writings or records, it is not permitted to prove and insert a fact alleged to be omitted, any more than to contradict a positive averment.

In England the statutes, enrolled on parchment, authenti-

cated by the signatures of the officers and approved by the
crown, are conclusive evidence, and cannot be impeached.
There parliament is unrestrained by any written constitution,
and the acts of that body as solemnly enrolled are conclusive.

II.  WAS THERE ANY DISAGREEMENT BETWEEN THE TWO HOUSES
WITH RESPECT TO THE TIME OF ADJOURNMENT.

Section 13, article 4 of the Constitution is contained in sub-
stance in the Federal and nearly every State Constitution.

The governors of the colonies had the same power of proro-
gation and dissolution of legislative bodies as the king of Eng-
land had of parliament.

Judge STORY justly says: " Under the colonial government
the undue exercise of this power by the royal governors consti-
tuted a great public grievance, and one of the numerous cases
of misrule upon which the declaration of independence stren-
uously relied.  It was there solemnly charged against the king,
that he had called together legislative bodies at places unusual,
uncomfortable, and distant from the repository of the public
records; that he had dissolved representative bodies for oppos-
ing his invasions of the rights of the people; and after such
dissolutions, he had refused to reassemble them for long periods
of time.  It was natural, therefore, that the people of the
United States should entertain a strong jealousy on this sub-
ject, and should interpose a constitutional barrier against any
such abuse by the prerogative of the executive.  The State
Constitutions generally contained some provisions on the same
subject, as a security to the independence of the legislature.
1 Story on Const. § 844.

By the Constitution, the duration of each session depends
solely on their own will, with the single exception that the
governor shall have power to adjourn in case of a disagreement
with respect to time.

The king of England had power to prorogue and dissolve
parliament, but he could not adjourn.  Although an adjourn-
ment was usually effected at the pleasure of the crown, it was
not because the power was admitted, but to avoid a prorogation
or dissolution.  Parliament insisted in the most vehement man-

ner on the unembarrassed privilege of adjourning themselves. 2 Hatsell, 294, *et seq. ;* 1 Black. 186 ; Jefferson's Manual, § 44.

An adjournment is therefore a legislative power.

Article 2 of the Constitution provides that " The powers of the government of the State of Illinois shall be divided into three distinct departments, and each of them be confided to a separate body of magistracy, to wit: Those which are legislative to one; those which are executive to another; and those which are judicial to another. No person, or collection of persons, being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted, *and all acts in contravention of this section shall be void.*"

In article 3, which defines the legislative power, it is expressly provided by section 12, that " *each house shall   *   * * *   sit on its own adjournments ;*" and in section 19, " Neither house shall, without the consent of the other, adjourn for more than two days, nor to any other place than that in which the two houses shall be sitting."

By the provisions of the organic law, an adjournment is a legislative power. It is, therefore, to be exercised exclusively by the general assembly, " *except as expressly directed and permitted* " in the Constitution.

The only exception is to be found in section 13, article 4, which reads :

" In case of disagreement between the two houses with respect to the time of adjournment, the governor shall have power to adjourn the general assembly to such time as he thinks proper ; *Provided,* it be not to a period beyond the next constitutional meeting of the same."

By the terms of this section, the *power* of the governor to adjourn does not exist until the contingency happens. He cannot exercise this legislative power except as expressly permitted. If he does, the act is void.

The policy which prompted restrictions of the executive authority in the formation of the American government had not changed when the present Constitution of Illinois was

adopted. On the contrary, the fear of encroachments by that department seems to have increased.

The governor was not even allowed a qualified veto on the acts of the legislature, but he was granted a mere power to require another vote in each house; he was deprived of the power of appointing officers of character; indeed, for many years after the adoption of the Constitution, his whole power seemed to be restricted to the signing of commissions of elected officers, appointment of notaries public, granting pardons, and requiring a reconsideration of measures to which he objected. He was practically an ornamental branch of the government.

The evident intent was to make the legislative department independent of the executive. If such was the spirit and purpose of the people in adopting the fundamental law, no construction ought to be adopted which would allow the governor to exercise doubtful powers in derogation of the authority confided to the representatives of the people, in the legislature.

1. WHAT CONSTITUTES A DISAGREEMENT?

Non-agreement is not disagreement. A difference is not a disagreement. Many men are not agreed and differ who do not disagree. One man is of the opinion that treasury notes are not a constitutional legal tender; another thinks they are; that is not a disagreement, for they may have no knowledge of each other's views. An expression of their respective opinions is not a disagreement. There must be a meeting of the two minds, and a conflict, before there can be a disagreement in any sense. In common parlance it is frequently said of a husband and wife, they do not agree; but it requires a quarrel before it is said, they disagree. Again, two men desire to trade; one asks a certain price; the other does not refuse to give that sum, but replies that he will pay a less sum. They have not agreed, but there is yet no disagreement. The vendor replies that he will not accept the lesser sum. There is yet no disagreement, because the purchaser may yet agree to pay the sum demanded; and although the vendor refuses to take the lesser sum, he may be willing to receive less than he at first demanded. The negotiation must proceed so that

there is a mutual refusal to agree on any sum named; and then it may be said, in the usual acceptation of the term, they disagreed as to the price.

Tested by these rules, there was no disagreement as to the time of adjournment between the two houses. The senate proposed to the house to adjourn at 6 o'clock P. M., June 8th; the house returned a proposal to adjourn on the 22d of June; the senate determined not to accept the proposition of the house; but they did not insist on their own proposal, much less adhere to it; nor did they inform the house of the determination not to accept the 22d of June as the day for closing the session. So far, the two houses had not agreed on a day, but it remained to be determined whether they could or would agree. At this point the house informed the senate that they desired to recall their proposal, and reconsider it. Then, clearly, there was not a disagreement. The house desired to reconsider, and act on the day named by the senate, and such action must have resulted in agreeing to the time fixed by the senate, in naming another day, or in repeating their proposal of the 22d of June. The latter could not be expected, because the return of the resolution would not have been requested if it was the intention to repeat it. If another day was to be named, that might have been satisfactory to the senate. If the resolve of the senate had been adopted, there would have been an agreement at once.

But the senate did not desire to inform the house of their vote of non-concurrence; nor did they comply with the request of the house. The conclusion is inevitable that the senate did not continue to desire to adjourn on the evening of that day, because the only way in which it was possible to bring that about they did not pursue. More than that, from the failure to inform the house, according to the usual course of business, of the vote of non-concurrence on the time named by the house, and return the resolution to the house, shows a desire to retain the same within their control; for what purpose? It must necessarily have been either to reconsider their own vote of non-concurrence, or to drop the subject and proceed with the

business. From the action of the senate in not reconsidering and adjourning to the next day, two hours before the time fixed for the *sine die* adjournment by their own resolve, and then again to the next day, proves conclusively that they desired to abandon the further consideration of the question of adjournment and proceed with the business of the session. They did desire, during the morning of June 8th, to adjourn that evening; at 3 o'clock, afternoon, they did not wish to prolong the session to the 22d, and at 4 o'clock they did not desire to close the session at 6 o'clock that evening, but to leave the time for future consideration, because they adjourned to meet again at the usual hour next morning. After the hour of 6 o'clock, afternoon of June 8th, had passed, it was a physical impossibility that the senate should desire to adjourn at that time. There could not in the nature of things be a disagreement between the two houses as to whether the general assembly should adjourn at an hour which had passed.

Will it be said that there was still a disagreement as to whether or not the legislature should adjourn on the 22d? Such a proposition would be equally as plausible as the other. But the senate had said that that day did not suit it, and the house had asked a return of the proposal to decide whether they would make it or not. Was there a disagreement?

2.  WHAT IS A DISAGREEMENT WITHIN THE MEANING OF SECTION 13, ARTICLE 4?

I have so far discussed the question as if the disagreement contemplated by the Constitution was in the ordinary sense of that term in the transactions of life. But the word has a more limited sense in the Constitution.

When the Federal Constitution was under debate in the Virginia convention for its acceptance, it was objected that senators being elected for six years would desire to create perpetual sessions, and as it required the consent of both branches of congress to adjourn for a longer period than two days, that the lower house would be controlled by the senate.

To this objection Mr. Madison replied that in such emer-

gency the president would have power to adjourn congress. 3 Elliott's Debates, 367, 405.

Judge STORY says: "The power to adjourn congress in cases of disagreement is indispensable, since it is the only peaceable way of terminating a controversy which can lead to nothing but distraction in the public councils." 2 Story on Const. § 1563.

Mr. Madison and Judge STORY both understood that there must be an irreconcilable controversy before there could be such a disagreement as the Constitution contemplates.

The word is used with reference to parliamentary proceedings, in which it has a technical and fixed meaning.

Where technical words are used in a constitution, the technical meaning is to be applied, unless repelled by the context. 1 Story on Const. § 453.

Illustrations may be derived from the subject matter, with reference to which the expressions are used. Ibid. § 400.

In the construction of statutes and private writings, whenever a word having a technical meaning, or words of art, it will be intended that the limited meaning is designed, unless inconsistent with the context.

When the Constitution was adopted, it was well known that the proceedings in all legislative bodies were conducted according to known parliamentary laws, and by the Constitution each house was authorized to adopt rules for its own proceedings. Without these usages and rules, the transaction of business would be impossible. Parliamentary law is a branch of learning founded on principles and precedents, as old as civilized government. When, therefore, the Constitution speaks of " a disagreement with respect to the time of adjournment," between the two houses of the general assembly, it is such a disagreement as is known and recognized by parliamentary law.

The legislature had not reached a parliamentary disagreement. The vote of non-concurrence should have been reported to the house of representatives; that branch must then insist on its amendment; the senate must then vote to adhere and ask a conference; the house must join in the conference; the

committee of conference disagree; then follows another conference, and after that two free conferences. All these steps must be either taken or dispensed with before a parliamentary disagreement can be reached.

When the two houses were unable to agree, after the use of these means, then the "controversy" spoken of by Story would exist.

It cannot be supposed for a moment that it was intended to place the legislative department in the control of an executive, circumscribed as he is in the Constitution of this State, under circumstances like those now at bar. A like opportunity for the exercise of the power has existed at every session of congress, and every session of every State legislature that has ever met in this country. Such an interpretation would confer on the executive equally as much power as is possessed by the crown of Great Britain for terminating the sessions of the legislature.

III. THE GOVERNOR HAD NO KNOWLEDGE OF THE PROCEEDINGS TO ADJOURN.

It was a breach of the fundamental principles of parliament for the king to take notice of any proceeding in either branch, unless the same were communicated in the usual and parliamentary manner. 2 Hatsell, 332, *et seq.* 425.

The same rule exists in this country as to the executive. Cushing's L. and P. Leg. Ass. § 737.

The consideration of this rule enables us to arrive at a better construction of the constitutional provision under consideration. If no notice can be taken by the executive of the proceedings in the legislature, it follows that before he can act "in case of a disagreement with respect to the time of adjournment," he must be informed by a committee, according to the usual course of business, of such disagreement. That involves the necessity of a determination by the legislature that "a case of disagreement" exists, and the appointment of a committee to make known the fact. Therefore, the legislature is the judge of the facts, and the governor can only act after his aid is invoked.

The true construction of § 13, Art. IV., is, that there must be a final or parliamentary disagreement with respect to the

time of adjournment, and that when both houses desire to adjourn, but cannot agree on the time, they may call on the governor to act as an umpire to decide between the two houses.

This construction is consistent with the letter and spirit of the fundamental law and the history of republican government. It leaves the legislature independent of the executive, and gives full force to the provision that "each house may sit on its own adjournments."

IV.　The effect of the act of the governor in attempting to adjourn the general assembly will be decided by the courts.

It is claimed that the governor, being authorized to adjourn in case of a disagreement, that his action will not be investigated by the judiciary, as a coördinate branch of the government; that there were in this case facts tending to show a disagreement, and the governor having decided them to constitute the emergency contemplated, the court will not inquire whether the decision was correct, although it may in fact have been erroneous.

I have already said that the governor is not the judge as to the existence of a disagreement, and can only act when that is decided by the legislative department, and his aid invoked. But even if the executive is the proper department to decide, it is not a matter of discretion, and by the provision of the Constitution the act is *void,* unless expressly permitted by the Constitution.

He has no discretion as to the decision as to whether a disagreement existed; that is a matter of fact. If it did exist, he had the power; if it did not, his act is void. If the fact of disagreement does exist, then he has a discretion as to whether he will exercise the power or not. If he refuses, the court will not compel him to act; but if he does act, the court will decide as to its correctness, whenever the question arises affecting private rights. *The People* v. *Bissel,* 19 Ill. 229.

The governor might also use his discretion as to the *time* when he would exercise the power after he once obtained it, by

the happening of the emergency, as a condition precedent to the power, so long as it existed.

V. THE DISAGREEMENT MUST EXIST AT THE TIME OF THE PROCLAMATION.

The governor says in his proclamation, "Now therefore, in view of the *existing* disagreement between the houses," &c. An existing disagreement was clearly necessary to the exercise of the power. He recites in the preamble, "Whereas, on the 8th day of June, A. D. 1863, the senate adopted a joint resolution to adjourn *sine die*, on said day at six o'clock P. M., which resolution, upon being submitted to the house of representatives on the same day, was by them amended, by substituting the 22d day of June, and the hour of 10 o'clock A. M., which amendment the senate thereupon refused to concur in."

Without looking outside of this proclamation, the conclusion is inevitable, that the facts recited could not constitute a disagreement as to the time of adjournment when the proclamation issued. How could there be a disagreement on the 10th of June as to whether the two houses should adjourn on the 8th of June? It is simply absurd.

There would be the same propriety in adjourning the legislature because of a disagreement, if the two houses had by conference agreed upon another day, *e. g.*, the 16th of June, because there had once been a difference. In this case the laws of nature operated so as to eradicate the difference, if any ever existed, before the governor undertook to avail himself of the constitutional provision.

VI. THE GOVERNOR DID NOT ADJOURN THE GENERAL ASSEMBLY.

It follows from the foregoing positions that the governor did not adjourn the legislature for the want of power, and that the proclamation of June the 10th was absolutely *void.*

VII. WAS THE GENERAL ASSEMBLY ADJOURNED OR DISSOLVED BEFORE THE 24TH DAY OF JUNE, BY ITS OWN ACTION?

Under the Constitution of Illinois, the legislature can be terminated in only three methods, to wit:

·1.   By joint resolution passed by both branches.

2.   By the governor in case of a disagreement with respect to the time of adjournment, and

3.   By the expiration of the term for which the members were elected.

There is no pretense that an adjournment was effected before the 24th of June, by the first; I have shown that it was not done by the second; and the third contingency has not yet happened.

The sittings of the English parliament could only be terminated as follows, to wit:

1.   An adjournment, which is no more than a continuance of the session from one day to another, as the word itself signifies. This was done by each house separately, and the adjournment of one house was not that of the other.

2.   A prorogation, which is the continuance of parliament from one session to another.   This was done by royal authority, exercised by the king in person, by commission, or by proclamation.

3.   A dissolution, which is the end of that parliament, and is effected in three ways:  1. By the king's will, who had the sole prorogative of dissolution as well as of prorogation; 2. By the death of the king; 3. By the expiration of the term fixed by statute for its existence.   1 Blackstone, 186; Jefferson's Manual, §§ 44, 45; 2 Hatsell, 924, *et seq.;* Cushing's L. & P., Leg. A. §§ 254, 447.

In this country, the legislative bodies are not subject to the control of the executive authority in any manner, except as power is given in the constitutions to convene on extraordinary occasions, and to fix the time of adjournment in case of disagreement in relation thereto between the two branches. Cushing, §§ 448, 495, 516, 518.

When the legislature is once convened and organized, it continues its existence, *whether in session or not,* until adjourned by joint resolution of the two branches, or by the executive in case of disagreement, or ended by the lapse of the time for which it was chosen.   Cushing, §§ 254, 362, 503, 525, 527; 1 Greenl. Ev. § 41.

An adjournment from day to day is not necessary to keep in existence the legislature.

When either house desires to terminate the present sitting, but not to close the session, it is effected in either of the following ways:

1. By resolution of adjournment to a day named, that is, the next day, or for a week, or a month.    Jefferson's Manual, §§ 44, 45; Cushing, §§ 509, 510, 511.

2. To the next sitting day, which is done by vote, or declaration of the speaker where less than a quorum appears, or *by rising, without either a vote or declaration of the speaker, or from a failure of a quorum to appear*.    2 Hatsell, 106, 167, 199; Jefferson's Manual, §§ 44, 45; Cushing, §§ 361, 364, 509–516; *State* v. *Martin*, 2 Iredell, 101.

It will thus be seen that a resolution or order of adjournment is not necessary to enable the house to meet again.

Parliament never sat during the time a conference was held in the "painted chamber," out of courtesy, but it was usual to rise for a recess without any adjournment, and resume the sitting when the committee was ready to report.    4 Hatsell; Jefferson's Manual, § 44.

A temporary suspension sometimes takes place for other purposes, without adjournment.    The business is to be resumed precisely where it was suspended.    Cushing, § 515.

It is true that the Constitution of this State provides that "Two-thirds of each house shall constitute a quorum; but a smaller number may adjourn from day to day, and compel the attendance of absent members."    Art. III, § 12.

What is the construction of this provision?    Is it mandatory, directory, prohibitory or enabling?    The first branch clearly is both mandatory and prohibitory, for it declares that two-thirds shall be required to constitute a quorum; but the second clause is different.    It does not say that an adjournment from day to day must be made to continue the session; nor does it read that a less number than a quorum shall compel the attendance of absent members.

It might be inferred from this provision, that without such

constitutional authority the house could not adjourn from day to day, and to that extent it was enabling.

The custom in England required the appearance of a quorum before the speaker took the chair, and after waiting till four o'clock, if none appeared, he took the chair and declared an adjournment, which was, under the rule, to the next sitting day, or if no declaration was made, the adjournment was considered to be to the next sitting day. It was not the practice to adjourn by resolve of the house with less than a quorum. 2 Hatsell, 167, 199; Jefferson's Manual, § 3; Cushing.

It may have been the design to confer a power not otherwise existing, but Cushing says that such a power exists as well in those States where the Constitution is silent on the subject, as where this provision is inserted. Cushing, § 254.

Whatever may be said as to the power to adjourn from day to day by resolution, it is clear that the remainder of the sentence—"and compel the attendance of absent members"—is enabling.

When the time arrives to organize a general assembly, less than a quorum could not arrest members and compel their attendance, because the body would not, before its organization, be a legislative body. In such case this provision would authorize those who did appear to organize by the selection of such officers as might be necessary for the purpose of compelling the attendance of absent members, and to accomplish that object to adjourn from day to day. Cushing, §§ 254, 263, 264.

After the legislature is once an organized and constituted body, it has the power to perform all the acts authorized by the rules of parliamentary law. When the number is reduced to less than a quorum, the house may adjourn from day to day; and by this it is not meant that it shall adjourn to the *next sitting*, but it may adjourn *to any day* that those present see fit to name. The words "from *day to day*," have no such hypercritical meaning as from one day to the *next* day. The expression is used to designate an adjournment to any day named in the resolution. Or the house may or may not take steps to compel the attendance of absent members. Or, as in this

country, the speaker having no power to declare the house adjourned (Cushing, § 363), if no resolution is passed, the house stands adjourned to the next sitting day; and if no quorum appears on that day, the like course is repeated until a quorum does appear, when the house resumes its business. Cushing, §§ 510, 525.

VIII.  WHAT BUSINESS CAN LESS THAN A QUORUM DO?

But it may be argued that in this case no quorum has ever appeared since the 10th day of June, and that, therefore, there has been no session capable of transacting business.

I have already shown that, independent of the constitutional provision, a legislative house can be adjourned either by order of the speaker or resolve, when less than a quorum is present.

By the constitutional provision less than a quorum may adjourn and compel the attendance of the absent members. This involves the power to do all acts necessary to the use of the house in its exercise.

Therefore, there was a legislative assembly on the 23d and 24th of June, but with less than a quorum, in fact, although not shown by the journals, because it had not been adjourned by the governor, by joint resolution, or the expiration of the term of office : and less than a quorum could exercise the powers authorized by such number on each day or not, as they pleased. It was not necessary even to appear in the house.  When they did appear, if a quorum, the regular business would proceed; if less than a quorum, such business could be done as that number had a right to transact.

There being, then, a session of the 23d and 24th of June, the question is: Could less than a quorum receive a message from the governor?

The answer is in the affirmative.  No rule or practice of parliamentary law is better settled.

In England the messages of the king were delivered by the knight of the black rod.  While a message from one house to another could not be received when less than a quorum was present, yet whenever the knight of the black rod appeared, it was the duty of the speaker of the commons immediately to

take the chair, receive the message, and attend in the house of lords, even if a quorum is not present.   2 Hatsell, 355; Cushing, § 817 n. 9.

This rule of parliamentary law is unchanged.   The governor can deliver his message to less than a quorum.   It is true that the senate could not reconsider the bill to incorporate the Wabash Railway Company, with less than a quorum, but the objections of the governor with the bill must have been received from the governor if sent.

The Constitution requires the governor to return the bill, with his objections, to the house in which it originated, unless prevented by their adjournment.   The senate had not adjourned. The general assembly had not adjourned; both branches were in session for ten days after the bill was presented to him, and the governor was on the tenth day informed by a committee that the general assembly were ready to receive any message, yet he did not avail himself of the opportunity.   The governor did not know, by the parliamentary law he could not know, that there was not a quorum present.   I must do the governor the justice to say that he did not place his refusal to communicate with the general assembly on any such ground, but merely claimed that the legislature had been adjourned by his proclamation.   He is estopped from setting up any other ground of objection.

IX.   Did the legislature cease to exist by acquiescence in the act of the governor, or by dispersion?

It is insisted that the court must look outside the journals, and that the facts thus disclosed show that the general assembly terminated before the 23d of June.   As I understand it, this position is based, first, on a supposed acquiescence of the legislature in the void act of the executive, and, second, in a supposed civil death of the legislature by a separation and failure to adjourn each day to the next day by vote.

I have in part discussed the principles involved in this proposition.

Did the legislature acquiesce?   If so, how?   Not by vote, but by each member not appearing in his seat to transact busi-

ness ; in receiving pay to that time, and departing from the capitol. But this is a question of fact, as well as law. The question of fact is to be determined on all the evidence.

The acts were accompanied by declarations in the most solemn form, in the shape of a protest, signed by fifty-six members of the house out of eighty-five, and by thirteen senators, out of twenty-five, and entered on the journal, in which they declare, in conclusion : " Earnestly protesting against this arbitrary and illegal act of the governor, and insisting that the general assembly has still a legal existence, and has neither been adjourned nor constitutionally dissolved, we ask that this, our protest, may be entered on the journals of the respective houses."

It is therefore clear that they did not intend to admit the power of the governor or the validity of the act.

Did they, though protesting against the proclamation, intend by their dispersion, to acquiesce in the fact that they had been adjourned ? They declare in the words quoted that they had not been adjourned, or constitutionally dissolved, but that they still had a *legal* existence. But why did they disperse ? They say in the protest that the attempt of the governor to adjourn them " must inevitably result in the cessation of any further legislation at this time." The resolutions for the appointment of the committee to prepare the protest, are authorized to state to the people " why we (the legislature) are not engaged in transacting the legitimate business for which we (they) are elected," and declare that they are without a quorum for the transaction of business, in consequence of the proclamation. A resolution offered by Mr. Keyes, of the house, declares that the legislature is *only* prevented from performing their duties, by the absence of the republican members from their seats, and requests them to return.

These facts cannot be tortured into admissions not intended. The fact is, that a minority of the legislature, of the same political faith as the executive, making the void proclamation a pretext, deserted their seats, thus destroyed the quorum, and rendered it impossible to transact business requiring a

quorum. There was no reasonable hope of a return by the minority to their seats; and they could not be compelled to return, because such a course is practically impossible, and because, further, all the republican senators who had deserted their post of duty, were out of the State, to avoid arrest.

Under these circumstances the majority were compelled to yield to the force of this revolutionary act. They continued the session for a few days and then took a recess to next January, and meanwhile the questions are being presented to the highest judicial tribunal, with the full belief that enough honest members of the minority will be found to obey the law as expounded by the highest judicial tribunal of the State, and appear in their seats next January, and proceed with their sworn constitutional obligations.

It is mockery to claim that the majority intended by a dispersion to acquiesce in the unconstitutional act of the governor. There would have been as much ground to assert that the parliament dispersed by the troopers of Cromwell, by failing to return, intended to assent to his power to dissolve them.

Let us consider the second hypothesis that the dispersion had the effect of adjournment, although not intended. This is a question of law.

I have already shown that the session of a legislative body continues until terminated in one of the three methods known to parliamentary law and the Constitution. The counsel in these cases announce a fourth way; one unknown to the civilized world hitherto. None such exists, or can, in the nature of things exist.

A legislative body declares its will by vote. 1 Blackstone, 181; 4 Iredell, 147.

The vote is ascertained from the journals, either by entry, or the presumption of any entry based on other action shown by the journals. There is no other possible way of collecting and ascertaining the legislative will.

The Constitution of this State prohibits one branch from adjourning more than two days without the consent of the other. Art. 3, § 19.

How is this consent to be obtained? By a vote taken according to the usage of the legislature. If the legislature has adjourned by dispersion, it is for a longer period than two days. When did the senate consent to the act of the house? When did the house consent to the act of the senate? The consent could only be obtained by a majority vote; a majority of each house have declared on the journals that they did not consent.

This constitutional provision is prohibitory. Suppose one branch dispersed entirely and departed to their homes. The Constitution says that each house shall sit on its own adjournments; that is, determine by vote when it will adjourn, but it cannot adjourn by its separate action for a longer time than two days. It cannot by dispersion do that which it cannot by vote.

The session must have some fixed and known time to expire. That is a fact that must be so certain that the court can take judicial notice of it, that can be determined by an inspection of the journal. Rights depend on the termination of the session. The present case is a forcible illustration of the rule.

The Constitution of this State provides that all acts, where it is not otherwise provided, shall take effect and be in force sixty days from the end of the session. How is the time that such acts are to take effect to be ascertained? Property, personal liberty, and life, may depend on the question. If a legislature can be adjourned by dispersion, the only method will be by the calling of witnesses. All the facts with reference to the matter shown in these records would have to be proved. It would be a jury question.

Such a course would overthrow all law, and leave anarchy and confusion.

The adoption of the new mode of adjournment is absurd; it is not only without any authority, but violates all reason.

I therefore insist that, in view of those well established principles, that the general assembly was in session on the 23d and 24th days of June. The act to incorporate the Wabash Railway Company was presented to the governor on the 12th day

of June, and was not returned to the house in which it origin-
ated within ten days (Sundays excepted), with his objections,
and the governor was not prevented by the adjournment of the
general assembly from so returning it.    Therefore the act
became a law on the 24th day of June last.

X. An ADJOURNMENT BY THE GOVERNOR DOES NOT EXCUSE
HIM FROM RETURNING A BILL.

An adjournment by the governor is not in terms within the
language of the Constitution that allows the executive to retain
a bill for more than ten days; nor is it within its spirit.    In
this case the bill in question was legally passed by both houses
before the 10th of June.    It was presented according to the
usage.    In this State it has been usual to present bills after the
adjournment.    If he desired to defeat any bill passed, it was
his duty to exercise that power before an issuance of his proc-
lamation of adjournment.    If he omitted this, he thereby
waived the power to defeat the bill.

If this point is well taken it disposes of the application for
the mandamus, without reference to any other question.

In the case of Keyes against the auditor, Mr. Goudy pre-
sented the following points and authorities:

*I.   The writ will be awarded against the auditor, if a proper
case is made.*

1.   The relator was entitled to a compensation of $1 per day.
Const., Art. 3, § 24.

The per diem allowed shall be certified by the speaker,
entered on the journal and published at the close of the session.
§ 25.

No money shall be drawn from the treasury, but in conse-
quence of appropriations made by law.    § 26.

The appropriation was made by the general assembly of 1861,
for the payment of the members of the legislature in 1863.
Laws 1861, p. 33.

The evidence to be furnished the auditor is the certificate of
the speaker, and upon presentation thereof, "he *shall* draw his
warrant upon the revenue fund."    Laws 1861, p. 34, § 2.

The duty imposed is imperative, and the auditor is without discretion. The certificate is conclusive. He can only determine that it is the certificate of the speaker, and, if the legislature was in session at the time named, draw his warrant.

2. "The executive power of the State shall be vested in a governor." Const., Art. 4, § 1.

"There shall be chosen by the qualified electors throughout the State, an auditor of public accounts, who shall hold his office for the term of four years, and whose duties shall be regulated by law. Const., Art. 4, § 23.

The auditor is not the executive, nor a part of the executive authority.

He is an independent officer, whose duties are fixed by law, some of which are ministerial, some clerical, some financial, some judicial, some executive, but all alike fixed by the statutes of the State.

This court has decided that they will not, by mandamus, compel the governor to perform his duty, because he constitutes the executive department. *People* v. *Bissel*, 19 Ill. 229.

In that case the governor is held to constitute the executive department.

But at the same term a writ was allowed in one case against the auditor, and in another against the secretary.

It has been the practice in this State since the organization of the government, to allow the writ against the auditor. If he is beyond the reach of the court, so is the secretary, treasurer, superintendent of public instruction, mayors of cities, county treasurers, school commissioners, and every officer whose duties properly appertain to the executive department, as contradistinguished from the legislative and judicial.

Such a rule would limit the use of the writ to the officers in the judicial department.

This question has been expressly decided in the case of *Page, 2d Auditor*, v. *Hardin*, 8 B. Monr. 648.

The court in that case ordered a peremptory mandamus against the State auditor to draw his warrant in favor of the relator for his salary as secretary of State. This point was

made.   They say, " by the writ of mandamus it (the court) may coerce a ministerial officer, though of the executive department, to the performance of a legal duty for the effectuation of a legal right."   Id. 637.

That case in *all* its features is conclusive of this, if the court is of the opinion there was not a termination of the session before the 24th day of June.

On the same point I refer to *Marbury v. Madison*, 1 Cranch, 168; *U. S. ex rel. Stokes* v. *Kendall*, 12 Pet. 524; *State* v. *Chase, Governor*, 5 Ohio [N. S.], 528.

The class of cases as to the issue of the writ by the Circuit Court of the District of Columbia against the heads of departments under the president of the United States do not apply to this case.   None of the reasons there exist here.

The fact that the demand is for a warrant to draw money out of the treasury is not an objection to the jurisdiction over the auditor, but goes to the policy of exercising the jurisdiction.

This writ is not a writ of right.   If the court in its discretion refuses the writ, what are the consequences in this case?   To refuse the relator, is to make the legislative department dependent, not on the executive department, but on the auditor. The same rule will apply to every member of the judiciary department.

It will enable the auditor to lock up the treasury, or what is worse, to open it only to those persons he may favor with his benign pleasure.

The case of *Decatur* v. *Paulding*, 14 Peters, 497, was not decided on the question of drawing money from the treasury. Judge CATRON filed a separate opinion taking that view (which is the first we hear of the idea), but it was not concurred in by any other judge.

The case of *Brashear* v. *Mason*, 6 Howard, 92, was not decided on the ground that the warrant to pay money would not be ordered, but because the writ would not be allowed to go against the head of a department.

The case of the *U. S.* v. *Guthrie*, 17 Howard, is claimed to decide the question that the writ will not be allowed to obtain

money from the treasury; but that case was put on the ground that as a matter of safety to the nation it would not do to allow an insignificant court like that of the Circuit Court for the district, to compel payment of a claim by an auditor in one of the departments after it had been refused by the auditor, his decision confirmed by the secretary, and his again by the president. But even this view received the sanction of only four judges. Justices CURTIS, NELSON, GRIER and CAMPBELL, declined to put the case on that ground, but refused the writ because it was not a proper remedy to try the title to an office. Judge McLEAN dissented, and filed an opinion differing from all. So that the doctrine of Judge DANIEL was not concurred in by more than four out of nine judges.

*II.    The return.*

1. Every intendment is to be taken against the return. The allegations of the alternative writ not answered, are admitted. An evasive or insufficient answer admits the statements of the writ purporting to be answered. *People* v. *Kilduff*, 15 Ill. 492; *Harwood* v. *Marshall*, 10 Md. 451; *Page* v. *Hardin*, 8 B. Monr. 666.

2. The demurrer admits the statements of the return; but not all statements, only those that are material, competent, and well pleaded. *People* v. *Compher*, 12 Ill. 290; *State* v. *Stevenson*, 2 Pike, 260; *Coxe* v. *Gulick*, 5 Halst. 328; *Morgan* v. *Ballord*, 1 A. K. Marsh, 558; *Bush* v. *Madeira*, 12 B. Monr. 418.

3. The return states that the certificate of the speaker is not true in fact, and was wrongfully, fraudulently and illegally issued. The certificate, as I have said, is conclusive on the auditor, and made so by the statute. If the object was to avoid it, because of fraud, the particular facts constituting the fraud should be set out. But I suppose the auditor could not have intended to charge the speaker and a representative with the design of stealing two dollars from the treasury and dividing it: he merely wishes to state in strong language that the certificate was illegal and not true, because the session had been adjourned by the governor.

Mr. SAMUEL W. FULLER, for the respondents:

The object of both these cases is the same: to determine whether the Wabash Railway Company has become a body corporate under the laws of this State. It is claimed by the relators that the company has a legal corporate existence under the Constitution and laws of the State; they claim that a bill for an act to incorporate that company passed both houses of the general assembly of this State, at the January and June sessions, 1863.

It was introduced in the Senate, January 21, 1863, and on the day following passed that body. It passed the house of representatives on the 8th day of June, 1863, and was laid before the governor on the 12th day of the same month, for his approval or disapproval.

It is further insisted by the relators, that the bill has become a law, because it was not returned by the governor to the house in which it originated, within ten days after it was presented to him, as provided in the 21st section of article IV of the present Constitution of this State; they denying that the general assembly, by adjournment, prevented its return.

On the other hand, the respondents insist that the general assembly of this State was legally, and in fact, adjourned by the governor, on the 10th day of June, 1863, to the first Monday of January, 1865, pursuant to the provisions of the 13th section of article IV of the Constitution of this State.

We think the records and statements in the several cases named above, state so fully the action of the governor and general assembly, out of which these questions arise, that no more detailed statement of them is necessary in this place, and I proceed to state and discuss them as follows:

1.  Had the governor power, under the circumstances, to adjourn the general assembly on the 10th day of June, 1863?

2.  Was the general assembly, in fact, adjourned, and at that time; and did that adjournment prevent the return of the bill to the house in which it originated, as provided in section 21, article IV of the Constitution?

The 13th section, article IV of the Constitution, empowers the governor, " in case of disagreement between the two houses with respect to the time of adjournment, to adjourn the general assembly to such time as he thinks proper," etc.

Here is a plain grant of power, and the occasion designated in which it may be exercised.   The real question is, was it exercised on such an occasion?   What are the facts?   On the 8th of June, 1863, the senate passed a joint resolution that both houses of the general assembly adjourn, *sine die*, that day, at 6 o'clock P. M.   This resolution was sent to the house of representatives the same day, where it was amended by striking out certain words in the resolution, and inserting others, so as to make it, in effect, a resolution to adjourn, *sine die*, on the 22d of June, 1863, at 10 o'clock A. M., and the resolution returned to the Senate.   On the same day, when it was taken up for consideration, and " the question being on concurring in the amendment of the house, it was decided in the negative."

. It appears that the house sent a message to the senate the same day, saying the house desired to recede from its action, in amending the senate's resolution for adjournment, and asking that it be returned to the house for reconsideration.

This action of the house had no effect on the resolution, or on the parliamentary relations of the two houses upon that subject, because the house had not then possession of the resolution, which was in the senate, and with the amendments wholly under its power; and the senate, alone, could propose a conference between the two houses, to reconcile the disagreement.   Jeff. Manual, § 46; Cushing's Law of Legislative Assemblies, § 2265.

The senate adjourned on that day, without acting on the message of the house.   Although some formal business was done, several calls of the senate were ordered and had on the 9th and 10th days of June, when it appeared there was no quorum present, and no other action appears to have been taken upon the resolution or messages relating to the subject of the adjournment of the two houses, on either of those days,

Was this a case of " disagreement " between the two houses,

"with respect to the time of adjournment?" In one sense, there is no question that it was.

Was it a "disagreement" in a parliamentary and constitutional sense? No work on parliamentary law gives the meaning of the word in those senses. The Constitution does not define it. Definitions are said to be perilous, and they are so, because it is almost impossible to include in them all possible shades of meaning, which may be insisted on, under different circumstances.

We submit, that the two houses "disagree" upon any matter before them, requiring their joint action for its consummation, where each house has acted upon the matter in a different way from the other so as to defeat the measure or proposition, and either house refuses, or neglects to take the usual or any steps to bring about that harmonious joint action, which will secure the passage of the measure or proposition before them.

In a word, it is that diversity of legislative action by the two houses, which defeats legislation upon any given proposition, or measure, before them.

In this case, the action of the two houses, if persisted in, would have prevented an adjournment, for the session, at all.

The senate refused to concur in the house amendment to the adjourning resolution. It thereby disagreed with the house upon that matter. It might have done many things in regard to it, but it practically refused to take up the house message asking a return of the resolution to the house, by summarily adjourning, and it never was called up or acted on.

The senate might have persisted in this action indefinitely, and, so long as it did, the two houses were "disagreed with respect to the time of adjournment." In this predicament they could never adjourn for the session, and neither house could compel any action by the other, because each is independent of the other, as to the order and time of its proceedings.

Having refused to concur in the house amendment, the senate was not bound to take any further action. It might express its disagreement in many ways, and select whichever it

pleased for that purpose; but the question is, whether there was a disagreement between the two houses with respect to the time of adjournment, and such disagreement so persisted in by either house that an adjournment, for the session, could not take place?

Such action, by the two houses, in regard to any measure before them, will defeat it. No bill in the predicament of the adjourning resolution, can ever become a law. All legislation upon that subject, measure, or bill, is stopped, and there is no remedy for it. But the Constitution has provided in case of a disagreement about the time of adjournment, that the governor shall have power to fix the time, and thus prevent the expense of paying a legislative body that cannot agree when it will close its session.

Our proposition is this, based upon the foregoing reasoning, that if the two houses are, in fact, disagreed "with respect to the time of adjournment," at the time the governor exercises his constitutional power to adjourn them, then its exercise is valid and effectual, and puts an end to the session.

By persisting in this disagreement for a long time, or by many and emphatic votes evincing a determination to adhere to it, the evidence of the fact of disagreement may be made stronger; but the fact itself remains the same, and the existence of the fact is all that the Constitution requires to lay the foundation for executive interference, as provided in the 13th section, article IV.

Whether it was discreet or not, judicious, or otherwise, for the exercise of this executive power, is not for the courts, or the legislature, to determine, or even to inquire. *The People, ex rel. &c.,* v. *Bissell,* 19 Ill., 229, Opinions of Caton, C. J., and Breese, J.

But it may be urged, that there are parliamentary proceedings, designed to harmonize existing differences and disagreements between the two houses upon matters of legislation, which were not adopted in this case, and so no parliamentary disagreement existed between the two houses, and would not until all these proceedings had been taken, without producing an agreement.

It is true that there are such proceedings known to parliamentary law, but it is not obligatory on either house to adopt them. It may, or it may not, as it sees fit.

To support this proposition, we must learn, if we can, what is the parliamentary law on this subject.

In considering this point, we must keep in mind the sources of this law. It is not made or declared by the courts, nor is it derived from statutes, but "the high court of parliament, which subsists by its own laws and customs," and in the usages of legislative bodies in this country, and in the rules prescribed in our State constitutions and those adopted by our State legislatures. Preface to Jefferson's Manual; Preface to Cushing's Law and Practice of Legislative Assemblies.

Section 15, article III, of the Constitution of this State, provides, that "each house may determine the rules of its proceedings." These rules, when adopted, are a law governing the proceedings of the house.

The senate and house of representatives adopted a series of rules at their last session, and the 56th rule provided, "that the rules of parliamentary practice comprised in Jefferson's Manual shall govern the senate in all cases in which they are applicable, and not inconsistent with the standing rules and orders of the senate." Rules, pp. 7 and 8.

The first and fifth joint rules adopted by the two houses at the last session, are as follows:

: "1. In every case of amendment of a bill agreed to in one house and dissented to in the other, if either house shall request a concurrence, and appoint a committee for that purpose, and the other house shall also appoint a committee to confer, such committee shall, at a convenient hour, to be agreed upon by their chairman, meet at some convenient place, and state to each other, verbally or in writing, as either may choose, the reason of their respective houses for and against the amendment, and interchange propositions for modifications to meet the sense of the two houses, and confer freely thereon."

"5. After each house shall have adhered to their disagreement, a bill or resolution shall be lost." Rules, p. 11.

Observe the language of these rules : "In case of amendment of a bill agreed to in one house, and dissented to in the other, if either house shall request a concurrence" (conference), "and appoint a committee for that purpose, and the other house shall also appoint a committee to confer, etc."

Here is nothing compulsory or mandatory upon either house, or requiring either to request a conference, or proceed any further after one house has dissented from an amendment agreed to in the other.

These rules are consistent with common parliamentary law and usage. Cushing's Law and Practice of Parliamentary Assemblies, §§ 2232, 2233.

"When a bill is thus passed with amendments, it is returned to the house in which it originated, with a message informing that house that the other has agreed to the bill with an amendment, or with certain amendments, to which it desires the concurrence of the former. On this message being received and reported, the house may suffer the bill to remain on the table without any order, or may order it to lie there till a more convenient time for entering upon the consideration of the amendments, or it may order the amendments to be taken into consideration on a day named; or it may proceed at once to consider them."

All this *may* be done; but no rule, and no writer says it *must* be done ; and the plain reason is, that each house is independent of the other, in determining what business it will consider, and in what order.

In the present case, a refusal of the senate to take up and consider the house message, advising it of the amendment made to the senate's adjourning resolution, if persisted in, as the senate had the right and power to do, would have kept the houses at a dead lock on the question of the time of adjournment; it would have been a "disagreement" that would prevent the joint action of the two houses necessary to effect an adjournment, and required the exercise of the executive power to fix the time of adjournment. The senate went one step further, and refused to concur in the amendments made

by the house, and then stopped, and thus matters stood for two days, thus creating the parliamentary and constitutional "disagreement" between the two houses, contemplated by the Constitution, and warranted the interposition of the executive power.

In sections 2239 to 2275 of Cushing's work on parliamentary law, the steps proper to be taken to bring about an agreement between the two houses, are fully stated, but altogether in the permissive form, and it is nowhere intimated that either house *must* take them.

"The house to which a bill is returned with amendments, though, in strictness, it has no other power over the bill than to pass upon the amendments, and though the proceeding is an unparliamentary one, may, notwithstanding, dispose of the bill, if that is the effect of the order, by ordering it to lie on the table, or by postponing the bill together with the report of a committee of a conference thereon, to a day beyond the session." Cushing L. and P., etc., § 2274.

In the United States house of representatives, June 17, 1842, Mr. White being speaker, the apportionment bill had been passed by the house and sent to the senate, where it was amended, and returned to the house for concurrence.

While the friends of the bill were trying to order the previous question, and thus bring the house to a direct vote upon the question of concurring in the amendments of the house, Mr. Boyd (afterwards speaker of the house) moved to lay the bill and amendments on the table, and called for the ayes and nays, which were ordered.

Mr. Barnard raised the question whether it was in order to move to lay the bill on the table, on the ground that the house, having passed the bill and sent it to the senate, it now had no other control over it than to pass on the senate's amendments.

The speaker overruled the point of order, and the question was taken on Mr. Boyd's motion. 12 Vol. Cong. Globe, 649; see the other authorities cited by Cushing.

It is plain, from these authorities, that the senate had the right to take the course it did in regard to the resolution and

the amendments to it; and it is equally plain, as matter of fact, that it was not compelled by any rule of parliamentary law to proceed further in the consideration of this matter, and that as matters then stood, the two houses "disagreed" in the full parliamentary and practical sense of the term, and while this state of things lasted, were subject to the power of the executive to fix the time of adjournment.

But this is not a question for the judiciary to determine. Courts do not make or declare parliamentary law. That law is made and interpreted by legislative assemblies for themselves. 1 Blackstone's Com. 163, 164; Preface to Cushing's Law and Practice, etc.; *Briggs* v. *McKellar*, 2 Abb. Pr. 27.

It is for the governor and the general assembly to determine whether the occasion had arrived which authorized the action of the governor, and their determination is binding on the judiciary.

This brings me to consider the second question propounded above. Was the general assembly, in fact, adjourned, and did such adjournment prevent the return of the bill in question by the governor, as provided in section 21, article 4 of the Constitution?

Courts will ordinarily take notice of the sittings of the legislature and its established and usual mode of proceeding (1 Greenl. Ev. § 6); and will also judicially notice all the public official acts of the coördinate branches of the government under which they are established. This, in some, if not all cases, will require them to notice as well the times of adjourning as of the meeting of the general assembly, especially for the purpose of determining when laws take effect.

The highest and best evidence of the time, as well as of the fact of adjournment, is, undoubtedly, in ordinary cases, the journals of the two houses, when they adjourn on their own motion. But in cases like the present, the journals will show nothing more than the fact of disagreement between the two houses, with respect to the time of adjournment, and the message or proclamation of the governor adjourning them.

After the delivery of this message from the governor to the

two houses, they are from that instant adjourned, in either of two cases : first, if the occasion provided for by the Constitution then existed, in which case resistance to the executive would be useless ; and secondly, in case of doubt as to the occasion, the general assembly should acquiesce in the action of the governor, and disperse.

In either of these cases, the journals would not show an adjournment by the houses, because they did not adjourn .by their own motion, but would only show the delivery of the message from the executive, which determines the time of adjournment, and the time to which they are adjourned.

In fact the general assembly has no power to keep a journal after it has been adjourned by the governor, for it has no power to do any act, proper to be recorded in it. Its official existence is ended from that moment.

Let us now see what the journals of the two houses, as presented to the court, actually show :

The house journal shows, that on the 10th day of June, 1863, while the house was in session, a message from the governor was announced by the doorkeeper and read, but the bearer of the message was not recognized by the speaker, and thereupon the house adjourned until two o'clock P. M.

No question is or can be made ; indeed, it is admitted by the relators in their petitions, that this message from the governor, was one declaring the general assembly adjourned until the Saturday next preceding the first Monday in January, 1865. Some few entries appear in the journal subsequent to the delivery of this message, principally relating to business theretofore pending before the house, and a protest against the action of the governor.

Whatever weight this protest may be entitled to in determining the questions made in this case, it is pregnant with convincing evidence that, whatever the signers of it might think of the governor's action, the session was thereby practically ended.

This journal closes with the entry of this protest. No motion to adjourn ; no adjournment ; no meeting or anything indicating the existence of the house of representatives appears upon it

until the 23d of June, 1863. This last entry will be considered hereafter. The senate journal differs but little from that of the house. It shows the receipt of the adjourning message from the governor; its reading, and that the speaker vacated the chair.

It also shows some proceedings subsequent to this, such as calls of the house, disclosing the fact that no quorum was afterwards present, the entry of a protest against the governor's action, when the senate adjourned until the next day at nine o'clock, and on the latter day that the senate met pursuant to adjournment. Then follows a blank in the journal until the 23d day of June, 1863, when it is stated that the speaker *pro tem.*, Mr. Underwood, having retired from the chair, another speaker *pro tem.* was elected, and the senate adjourned until the next day.

For eleven whole days in the senate, and twelve days in the house, the journals fail to show any legislative proceedings, no meetings, no debates, no votes, no adjournments.

Is not this conclusive evidence that the general assembly yielded to the action of the executive, and, in fact, adjourned in accordance with his message?

The relators do not say there were any proceedings during the period left blank in the journals; on the contrary, they say business was not resumed until the 23d of June, 1863, and that the senate chamber was locked on the 19th and 20th days of June, 1863, two week days.

In addition to this, it is shown in the cases that the pay rolls of the two houses were made up and certified by the speakers of the respective houses on the 10th of June, 1863, and the signatures of the members appear thereon, as vouchers for their warrants, given them in payment for their attendance at the June session, 1863 — all done as usual at the close of the session.

Here is presented a case of two houses of the general assembly disagreeing about the time of adjournment, lasting but two days — a message from the governor sent to each house, adjourning them to the Saturday next preceding the first Monday in January, 1865 — the cessation of all legislative

proceedings for eleven days in the senate, and twelve days in the house, following the delivery of that message—no action by either of the two houses, to prolong their existence as a legislative body—the pay rolls made up and certified by the speakers, and members drawing their pay as at the close of the session, and yet the relators insist that, notwithstanding all this, the general assembly continued, and was in session, and might during that period have passed laws affecting the property, liberty and lives of the citizens of this State, or else the court must presume, the members sat there in solemn silence, without any proceedings!

Each house shall keep a journal of its proceedings and publish them.  Constitution, Art. III, § 13.

Each house shall judge of the qualifications and election of its members, and sit upon its own adjournments.  Art. III. § 12.

Neither house shall, without the consent of the other, adjourn for more than two days, nor to any other place than that in which the two houses shall be sitting.  Art. III, § 19.

The constitutional provisions are imperative, and must be obeyed.  The court will not and cannot infer, that the members sat in their seats, and were in session during the eleven and twelve days that the journals of the two houses fail to show they were.

The relators insist that nothing can be shown to contradict the journals.  Suppose there cannot.  Then nothing should be presumed contrary to them, and when the journals do not show there was a session, the court will not presume there was one.  This is true even on the theory of the relators.

But when the general assembly is commanded to keep a journal of its proceedings, the presumption is that it did, and no proceedings appearing on the journals, the presumption is inevitable that none were had, and the session of a legislative body without any proceedings is an absurdity that will not be presumed and cannot be proved.

But it is the settled doctrine of this court that the journals must actually show on their face every fact necessary to make valid the proceedings of the general assembly, and that when

they do not show this, no presumption will be made that the fact existed. *Spangler* v. *Jacoby,* 14 Ill. 297.

And the reasons for this are clearly stated in the opinion of the court in the case of *Turley et al.* v. *The County of Logan,* 17 Ill. 151, to be simply these: that it is a constitutional requirement, which the legislature cannot dispense with, and this consideration distinguishes the doctrine of those cases from any which may be cited from other States.

I, therefore, insist that the general assembly was, in fact, adjourned pursuant to the governor's proclamation.

And if this was done; if the general assembly did yield to the executive power, and stand adjourned for any space of time, no matter how long or how short, the session was ended, and the members composing the two houses could not meet again as a legislative body, except pursuant to the provisions of the constitution of this State.

This brings us to consider what are claimed to be legislative proceedings of this general assembly on the 23d and 24th of June, 1863, as they appear on what is called the journals of the two houses, on those days:

"The general assembly shall meet on the first Monday of "January next ensuing the election of the members thereof, "*and at no other period, unless as provided by this Consti-* "*tution.*"    Art. III, § 2, Constitution.

"He (the governor) may, on extraordinary occasions, con- "vene the general assembly by proclamation, and shall state, "in said proclamation, the purpose for which they are to "convene."    Art. IV, § 10, Constitution.

The 23d and 24th days of June, are not the days appointed for the meeting of the general assembly — the general assembly that met at the constitutional time in January, 1863, had not adjourned to either of those days; the session then begun had not continued till that time, as the journals themselves show; the governor had not convened the general assembly on those days, or either of them; there was no constitutional, executive or legal authority, for the legislature to meet at that time; and of all this, the court is bound to take notice, and the so-called

legislative proceedings had on those days, are void; there was, in fact, no general assembly then, known to the Constitution and laws of this State.

We conclude, from these premises and reasoning:

1. That the session of the general assembly was legally, and in fact, ended on the 10th day of June, 1863.

2. That there has been no meeting of the general assembly since then.

3. That the adjournment of the general assembly, on the 10th day of June last, "prevented" the "return" of the bill to incorporate the Wabash Railway Company to the house in which it originated, and, therefore, it has not yet become a law.

From which it follows, further, that the Wabash Railway Company has no legal existence under the laws of this State; that the governor is yet entitled to the possession of the bill in question; that the secretary of State cannot certify a copy of it as a law, and the relator, Keyes, is not entitled to a warrant on the treasurer, in payment for services as a member of the house of representatives on the 23d and 24th of June, 1863, on these grounds, as well as others not noticed.

But there is another view of the main questions involved in these cases, and that is, whether it is competent for the judiciary to review these proceedings of the coördinate branches of the State government, and determine what action should or could have been taken, different from that adopted?

Article II of the present Constitution, is plain in its words and meaning beyond all cavil.

"Sec. 1. The powers of the government of the State of "Illinois shall be divided into three distinct departments, and "each of them be confided to a separate body of magistracy, to "wit: Those which are legislative, to one; those which are exe- "cutive to another; and those which are judicial, to another."

"Sec. 2. No person or collection of persons, being one of "these departments, shall exercise any power properly belong- "ing to either of the others, except as hereinafter expressly "directed or permitted, and all acts in contravention of this "section shall be void."

The periods of the meeting of the general assembly are fixed in the Constitution. The executive is empowered to adjourn the general assembly in a certain contingency. When that contingency arises, is for the governor and the general assembly to determine, and not for the judiciary; and when they have determined it, and the one has exercised his constitutional power, and the other has yielded to its exercise, all the other departments of the government are concluded, and cannot determine that their action was or ought to have been otherwise, than what it appears to have been.

For the court to hold, in view of all the facts in this case, that the general assembly continued in session from June 10th to June 23d, 1863, and that the continuity of legislative existence remained all that time unbroken, is to perform an act of judicial creation both of fact and law, to declare that there may be a legislative session under the Constitution of this State, without members, without officers, in closed and vacant halls, without proceedings, without journals, without any adjournment to bridge over the gulf; in short, to judicially declare against the executive proclamation and the immediate and entire acquiesence of the general assembly, that the session continued.

The entire independence of the several departments of the State government of the others, while acting within the sphere of their constitutional powers, has been emphatically announced by this court in the case of *The People, etc.,* v. *Bissell,* 19 Ill. 229, and we will not lengthen this brief by what seems to us, would be a superfluous discussion of the question. We cite below, cases from other States, which seem to us in point, and to fully support the principle we contend for.

" The governor is the sole judge, under article III, section 12, " of the Constitution, of the ' extraordinary occasions ' for con-" vening the general assembly." . *Whitman's Ex'rs* v. *The W.* " *& S. R. R. Co.,* 2 Harring. 514.

In measures exclusively of a *political, legislative* or *executive* character — as the supreme authority, *as to these,* belongs to the legislative and executive departments, we shall always

refuse, as we now do, to reëxamine them here.   Their mode of executing these powers can never properly become the subject of inquiry and investigation before this or any other tribunal. *Beal et al.* v. *Bealls*, 8 Geo. 210; *Astrom et al.* v. *Hammond*, 3 McL. 107.   See also *Attorney-General* v. *Brown*, 1 Wis. 513.

Mr. THOMAS HOYNE, for the respondent Dubois.

I.   The judiciary is a coördinate branch of the State government under the Constitution, and has no power or jurisdiction over the State auditor acting within the sphere of his official duties, to revise, control or direct his acts.

Under the Constitution of the United States the valid exercise of such a power has been repeatedly denied and overruled by the United States Supreme Court even in respect to the subordinate officers of the different governmental departments. *Decatur* v. *Paulding*, 14 Peters, 497; *Brashear* v. *Mason*, 6 How. 102; *Garcia* v. *Lee*, 12 Peters, 511; *Reeside* v. *Walker*, 11 How. 290; *Ex parte May*, 14 How. 24; *Williams* v. *Suffolk*, 13 Peters, 420; *United States* v. *Guthrie*, 17 How. 303.

The Supreme Court of Illinois decide that wherever final action upon any subject is confided to either of the other departments, there the responsibility rests.   *Ex parte Bissell*, 19 Ill. 231; *Ex parte Wells*, 18 How. 307; *Luther* v. *Borden*, 7 How. 1.

II.   What is an "auditor" under the meaning of the constitutional provision?   The word is defined by lexicographers as "a person appointed and authorized to examine an account "or accounts, compare the charges with the vouchers, examine "the parties and witnesses, allow or reject charges and state "the balance."

The statutes of the State expressly prescribe the duties of the auditor of public accounts.   Revised Statutes, ch. 13.

He is not only to hear and examine, but he also tries and adjudges, so as to allow or reject all claims brought before him. Section 13 says he shall audit all accounts of public officers, and of members of the legislature, and all persons authorized

to receive money out of the treasury by virtue of any appropriation made by law; and section 14 provides that on the ascertaining the amount due, he shall draw his warrant on the treasury for the sum allowed. And further, by an act passed in 1857, the auditor is still further vested with the jurisdiction to state balances with persons who are found indebted to the State, &c.

Thus, by the Constitution and laws of the State, the auditor has a special, but very ample, as well as an exclusive jurisdiction over all claims presented against the State. In the exercise of his judgment within the sphere of his duties he has a discretion, and cannot be coerced by this court. As a branch of the executive department, the auditor is as independent as the governor or members of the legislative department in their respective spheres of action: and he is such a coördinate part of the government. All are made, under the Constitution, responsible for the faithful exercise of their powers and duties, accountable solely to the laws and the people. Courts never compel or direct, even in the cases of inferior officers or tribunals, how or in what manner they shall exercise the judgment or discretion with which the law clothes them. 19 Johns. 414.

And never where a discretionary power is vested, and the officer has already exercised that discretion. 52 Ohio, 16.

III. The relator, as a member of the legislature, has no right to receive the amount which he seeks to recover of the State by this high prerogative writ.

It is an extraordinary feature of all this controversy for the recovery of so insignificant a sum as *two dollars!* that this court should be required to inquire if there was really in session a legal assemblage known as the general assembly of Illinois on the 23d and 24th days of June, A. D. 1863, at which the relator was present as a member entitled to receive his per diem allowance of *two dollars!*

To show that no session convened on the day in question, Mr. Hoyne cited article 3, sections 12, 13 and 21 of the State Constitution, showing that to constitute a lawful house of the

legislature, they must appear to be in session from the journal of the two houses, and that if less than a quorum assembled at the regular periods of assembling fixed by law, it was in the power of the assembly to perpetuate itself by adjournments from day to day and compel the attendance of absent members, and that no bill could become a law without the concurrence of a majority of all the members elect in each house.

In this case the silence of the house journal from the 10th of June and the senate journal after the 11th of June until the 23d and 24th days of June, is the most conclusive proof which the nature of the case admits, to show that the legislature did in fact adjourn itself on the 10th of June previously, although they omitted to enter such an adjournment upon their journals.

That such an entry of formal adjournment, or its omission, cannot change the fact itself that the adjournment did take place on the day admitted by the demurrer to the pleas, and that all the members of both houses dispersed and returned to their several homes. And there is no order upon the journals showing any adjournment over to the 23d and 24th of June, with the consent of the two houses, when, it is pretended, the session was held.

The courts will not presume the legal assemblage of the legislature was continued from day to day in the absence of the evidence which the record should contain, or the facts which should appear on the journals; that the houses continued to constitutionally adjourn themselves, and that the meeting took place in pursuance of the order of adjournment.

The rule of law is, in such cases, that in respect to all records and public documents, in the absence of the proof they are designed to perpetuate, no presumptions will be indulged in to establish any fact which such records are designed to establish and perpetuate. *Brownsend* v. *McKean*, 4 Me. 508; *Hathaway* v. *Clark*, 5 Pick. 490; 1 Greenl. Ev. 490.

It would be contrary to all rules of evidence, that, though the legislature had *in fact* adjourned, yet having omitted to make a formal entry of the fact on their journals, the court must pre-

sume its existence to continue, and any members of the body coming together at intervals, might on such meeting present certificates for payment and demand through this court a warrant or warrants of payment against the treasury.

IV. The legislature was constitutionally adjourned by prorogation of the governor, on the 10th day of June, 1863, upon the *disagreement* of *the two houses*, with respect to the time of adjournment.

The disagreement, as contended, need not be in any sense a technical or parliamentary disagreement, as is insisted. There is no authority to sustain any such position. That the two houses are independent of each other will be admitted. That they can coerce each other into an "agreement" will not be pretended. How far, then, must negotiations proceed to reconcile those who may be irreconcilable? What parliamentary methods are to be resorted to when houses are "at a dead lock" and refuse to move? One house having fixed on the 8th day of June, 1863, as the time of adjournment, the other house refuses to concur and fixes the 22d day of June, and sends back the resolution amended to the first house, but the latter declares it will not concur as to that time. And at this stage the very fact that the latter house refuses to make any overture at conciliation, to resort to *parliamentary methods* for reaching an agreement, is of the highest significance as evidence of the "temper" which prevailed. The "disagreement" may not have been beyond all hope of an ultimate termination. But this is not the question. *The question* is, did the disagreement or controversy arise between the two houses *with respect to the time of adjournment*, which constitutionally authorized the governor to act?

The question is not even whether the power was *properly* exercised under the circumstances; but whether its exercise was authorized at all. The existence of the power is one thing, the manner of its exercise is an entirely different matter.

The existence of the power itself being conceded under the Constitution, with a view, as the writers on constitutional law

84 MT. VERNON,

The People, etc., *v.* Hatch. Same *v.* Dubois.

state, "that there may be a peaceable termination of what "would otherwise be an endless and dangerous controversy" (Story on Const., § 1563), the executive becomes the only proper and exclusive judge of the stage or character of the disagreement which calls upon him to interpose his own authority in terminating the controversy.

It was, then, for the executive, not the court, to here decide whether at that time, partisan feelings having put an end to all hope of parliamentary agreements, or even intercourse between members, the only way of terminating a conflict of opinion which obstructed all further legislation did not require the exercise of the power opportunely vested, to prorogue the houses by adjournment to such time as that reason might take the place of passion, and kind feelings those of hatred or malice. The governor alone could judge whether the public interest *then* demanded this exercise of power. He alone is made under the Constitution the judge of the exigency. The court cannot thus *collaterally question* or decide upon the *propriety* of *his conduct.* To say that he must delay action until after conferences are agreed to, is to interpolate article IV, section 13 of the Constitution by saying instead of "in cases of disagreement between the two houses," that in cases of disagreement *.after conference* or a parliamentary disagreement takes place with respect to the time of adjournment, &c., the governor shall have the power to adjourn the general assembly to such time as he thinks proper, &c., &c.

It is obvious that no such construction can be placed on the provision, because it is totally inconsistent with the privileges of the two houses, who are so entirely independent of each other that even committees of conference had their origin in the necessity of originally establishing some mode of communication between them. Either house may propose a committee, but for either to insist or demand of the other a committee would be deemed a breach of privilege. Cushing Parliamentary Law, 875.

V. The suit is in effect a suit against the State, and as such cannot be maintained. And mandamus is a process which

cannot be resorted to against the State without its consent. *Horner* v. *De Young*, 1 Texas, 764.

At common law, this writ could never be issued against the king or queen, because there would be an incongruity in the sovereign commanding itself, and also because disobedience to the writ must be enforced by attachment.

It does not lie to the crown, or its servants strictly, as such, being the depositors of the public moneys, either to pay over the money in its or their possession in liquidation of legal and valid claims. Tapping on Mandamus, p. 113.

On a review of the more technical grounds of the case, there is (1) no jurisdiction in the court to coerce the judgment of the auditor, and (2) there is no right in the relator to recover the extraordinary amount he seeks to recover, because (3) there is no evidence of a session of the general assembly on the journals of the house, and (4) the governor exercised a power to prorogue the general assembly on the 10th of June, 1863, to which the members assented, by dispersing to their several homes and producing a *de facto* adjournment, which the court is not at liberty to disregard or ignore.

Mr. MELVILLE W. FULLER, for the relator in the case against the secretary of State.

I. Where a party is entitled to a specific thing, and there is no other specific remedy by which the very right claimed can be secured, he is entitled, *ex debito justitiae*, to demand it by *mandamus*. Bac. Abr.. vol. 5, p. 418, tit. Mandamus.

The rule as to the allowance of this writ is variously construed and applied in the States of the Union, but in Illinois the practice is settled in favor of the utmost liberality. *People, &c.,* v. *Pearson,* 2 Scam. 189; *People, &c.,* v. *Killduff,* 15 Ill. 493; *People, &c.,* v. *Wilson,* 17 id. 123: *People, &c.,* v. *Matteson,* 17 id. 169; *People, &c.,* v. *Head,* 25 id. 325; *People, &c.,* v. *Rives,* 27 id. 246; *People, &c.,* v. *Hilliard,* 29 id. 413.

The application here is for a copy of the act in question, with the secretary's certificate that it is a law. The "very

right" claimed can be obtained in no other way, and although the corporation created by this law might be able to maintain itself by proof of the facts in any litigation thereunder, yet it ought not to be compelled in every law suit thus to establish its own existence, as it must if it does not obtain the properly authenticated evidence thereof, which a copy of its charter, duly certified, would be.

II.  The secretary of State, by section 5, chapter 96, R. S., is required to "make out copies of all laws, acts, resolutions, &c.," with "his certificate, &c." His certificate must be as to the *character* of that of which he gives a copy.

By section 1, chapter 96, R. S., the secretary is required to · keep "a fair register of all the official acts of the governor." From this he knows this act was presented to his excellency June 12th, 1863, and that it has not been returned to the house in which it originated. He has that knowledge which admits of no denial, of the termination of the session of the general assembly June 24, 1863. He therefore officially knows this act is a law.

III.  The secretary makes certain allegations of fraud in obtaining the passage of the act. These cannot be regarded, because: 1. They are general, and a general plea of fraud is inadmissible.  2. They are insufficient in and of themselves. 3. The secretary can neither inquire into, nor know nor be permitted to allege the circumstances under which any law receives the sanction of the general assembly.  4. Nor can fraud be averred or proven to impeach the validity of an act of the legislature.  *Wright* v. *Defrees,* 8 Ind. 298; *McCulloch* v. *State,* 11 id. 424; *Sanbury and Erie R. R.* v. *Cooper,* 33 Pa. 278; *Stark* v. *McGowen,* 1 Nott and McCord, 397. In case of the executive approval being given inadvertently, a law cannot be recalled after it passes out of the governor's custody.  *People, &c.,* v. *Hatch,* 19 Ill. 283.  The remedy, if any, in cases of alleged fraud, is by *quo warranto.  Como* v. *Breed,* 4 Pick. 460; *Charles River Bridge* v. *Warren Bridge,* 7 id. 344.  5. It is not charged that the Wabash Railway Company, or any agent or attorney thereof, or any one con-

nected therewith, knew of or participated in the alleged fraud.

IV. No "case of disagreement" existed on the 10th day of June, A. D. 1863, within the meaning of section 13, article IV., Const. Ill.

1. This clause was inserted in the Constitution to obviate the embarrassment which might arise under section 19, article III (which provides that "neither house shall adjourn for more than two days without the consent of the other"), in case one house should attempt to retain the other in session against its will, or the two houses should in good faith arrive at an irreconcilable difference of judgment as to the time of adjournment.

This is assigned as the reason for its insertion in the Federal Constitution. Story on Const., §§ 843, 1563; 3 Elliott's Debates, 367, 409. It was never supposed that the independence of the legislative branch was thereby submitted to "any encroachment on the part of the executive." Story on Const., §§ 843, 844. Even the veto power which the president may exercise as to resolutions as well as acts, is denied *expressly* as to resolutions of adjournment (Story on Const., § 892; Fed. Const., Art. 1, § 7, p. 3); and the same is true of several of the State Constitutions.

2. The word "disagreement" is applied in this connection to the proceedings of a legislative body, and can mean nothing else than a "parliamentary disagreement."

(*a.*) The result of a "disagreement" in ordinary legislation is the loss of the bill or resolution respecting which it arises. (Hatsell, Jefferson, Cushing, *ubi post*), and the effect is in no wise different in the case of a resolution of adjournment, a disagreement in relation to which cannot occur until final antagonistic action is reached, or all effort towards agreement abandoned.

It is only under such circumstances that executive interposition can be invoked, and then *not in hostility* to the general assembly, but acting as the umpire between the two houses, the governor fixes the time of adjournment for them. It is strictly a legislative, not an executive act.

(*b.*) The regular parliamentary progression to a disagreement consists of five steps, thus: First, the originating house non-concurs; second, the amending house insists; third, the originating house insists; fourth, the amending house adheres; fifth, the originating house adheres. Conferences of which, in this country at least two, and in England twice that number, are had during the progression, are parts of these five steps rather than the steps themselves. The only shorter method of reaching a disagreement is by dispensing with the "term of insisting." There can be no final action without an *adherence*. 4 Hatsell, 1–49, 330; Jefferson's Manual, § 39; Cushing's Law and P. Parl. Ass., §§ 853, 854, 865, 2231–2275.

(*c.*) In the case at bar but one of the steps (non-concurrence) had been taken. There neither was, nor could be, an "adherence." If this were a disagreement, then one house must instantly always agree to whatever the other chooses to propose.

The senate did not notify the house of the non-concurrence, but, on the contrary, abandoned its idea of adjournment at 6 o'clock on the 8th, by adjourning at 4 o'clock to the next day.

(*d.*) It is said, however, that "disagreement" is matter of intention, and if either house intends to bring about that state of affairs, it can do so without paying any attention to parliamentary law or legislative rules and regulations. It is sufficient to say that such an intention must affirmatively appear, which is so far from being the case here that *the contrary* is solemnly asserted on the record by a majority of each house.

2. No "disagreement" of any kind existed on the 10th of June. There could be no disagreement existing on the 10th as to whether there should be an adjournment on the 8th, and so far as the house proposition of the 22d, that being an amendment, shared the fate of the original resolution.

3. The governor was not officially informed of the "disagreement," if any existed.

Such information can be only given by order of both or one of the houses. The executive cannot take notice of what is passing in either house of the general assembly. Jefferson's Man., § 11; 2 Hatsell, 332, *et seq.*, and 425.

V.   It may be contended that the governor's determination that there was " a case of disagreement" cannot be inquired into. This is a government of laws and not of men, and hence in the division of its powers in our State Constitution (as in all the others) it is expressly provided that no person or persons constituting one of the departments shall exercise the powers of either of the others.   The union of all the powers of the government in one hand is despotism.   Story on Const., § 518, *et seq.;* Blk. Com. 146; Montesquieu, b. 11, ch. 6.   And the structure is so contrived that the several parts may keep each other in its proper place.   Federalist, Nos. 48, 49, 50.

Nothing can be clearer than that where a power is *contingent*, he who is to exercise it cannot determine, beyond inquiry, that the contingency has arisen, for this would be to turn a contingent into an absolute power, or in other words, in a case like this, to create a "disagreement" instead of to act when it occurs.

This is not the law; on the contrary, the legal validity of the act, in the present instance, depends upon the fact of an *actual disagreement* and not upon the governor's opinion or judgment of the fact.   *Page* v. *Hardin*, 8 B. Monroe, 648; *People* v. *Bissell*, 19 Ill. 229; *State* v. *Chase*, 3 Ohio (N. S.) 528; *People* v. *Forquer*, Breese, 104.

VI.   It is argued, however, that an actual dispersion of the legislature took place on the 10th or 11th of June, and terminated the session.

The record shows no proceedings in the senate from the 11th to the 23d, the house journal none from the 10th to the 23d.

1.   The journals of the two houses fulfill all the conditions of a record, and are universally recognized as such (Greenl. Ev. § 482), import verity, and can neither be varied nor contradicted, nor alleged omissions supplied by parol.   *State* v. *Moffit*, 5 Ohio, 358; *McCulloch* v. *State*, 11 Ind. 431; *Wright* v. *Defrees*, 8 id. 298; *Coleman* v. *Dobbins*, 8 id. 156; *Spangler* v. *Jacobs*, 14 Ill. 297; *Turley* v. *Logan Co.*, 17 id. 151; *Supervisors* v. *People*, &c., 25 id. 181; *Jones* v. *Randall*, Cowp. 17; 4 Coke's Inst. 23, 24, 25; Jefferson's Man., § 43, and cases cited.

So in *Covington* v. *Ludlow*, 1 Met. Ky. 295, held, that where the journal of a common council showed an ordinance had been *reported*, parol evidence to show that it passed was competent.

And in *Blaisdell* v. *Briggs*, 10 Shep. 123, an omission in a town record was not permitted to be supplied by parol. And see *Manning* v. *Fifth Parish, &c.*, 6 Pick. 6; *Cromwell* v. *Pearson*, 6 Shep. 344; *Saxton* v. *Minsus*, 14 Mass. 315. In *Taylor* v. *Henry*, 2 Pick. 397, the court refused to allow parol proof to be made of *the fact of an adjournment.*

Thus, also, in reference to the entries on the docket of a justice of the peace, they are, says Chief Justice CATON, "higher and more trustworthy than any parol evidence can be" (*Garfield* v. *Douglas*, 22 Ill. 100), and cannot be overthrown even though fraudulently made. 12 Vt. 657; 18 id. 594; 26 id. 494.

Is not a legislative record of as high a character as town meeting minutes and justices' dockets?

It is time that in some cases (3 Phil. Ev., Cowen and Hill's Notes, note 550, p. 799) it is held that "anything produced as a record may be shown to be *forged* or *altered*," or in other words to be no record at all, but no such position is or can be taken as to these journals. Here are the records of the two houses embodying their action in a permanent and authentic form, made up by the sworn officers of each house in the discharge of their duty, under the superintendence of members of each branch, and the respective speakers thereof, all acting under *their oaths of office*, and as such these records must stand as "the solemn truth." It is not contended that they are forgeries or alterations, but that a large portion of the members were off duty when the proceedings took place.

As to the silence of the journals between the 10th and 11th and the 23d, no presumption adverse to legislative existence can arise therefrom.

Upon such lapses in the record it has been held in a court of law that the presumption was that the court was in continuous session without adjournment, or that it did adjourn

from day to day, which need not appear upon the record. *State* v. *Martin*, 2 Iredell, Law 101. This on the principle that "the term of a court is in legal contemplation as one day," and "all its acts refer to its commencement." See also, that adjournments need not appear upon record, 1 Doug. Mich. 306; 9 Port. Ala. 213.

*A fortiori*, this would be the rule as to a legislative body.

2. Suppose the proof were competent and the fact could be established, this would not terminate the session.

The individual action of the members of the general assembly is not legislative action; the session can terminate only in one of three ways: By joint resolution; by the expiration of the term of office of its members; by the act of the executive. Jefferson's Man., § 45; 1 Black. Com. 186, *et seq.* "Dispersion" is unknown to the law as a mode of terminating the existence of an official body. An illustration may be borrowed from the creation of a vacancy which can only exist by death, resignation or removal from office for proper cause. 2 Cal. 212, 610; 2 N. H. 202; 8 B. Mon. 648.

And as neither house, under the Constitution, can adjourn without the consent of the other for more than two days, this dispersion doctrine is directly in the teeth of the fundamental law, as well as otherwise unauthorized.

It is preposterous to say that the unconstitutional act of vacating their seats by individual members can make an unconstitutional act of the governor valid; yet this is the position of the opposite counsel who say that the general assembly "acquiesced" in the act of the executive. Even if such an argument could reasonably be used, then it should be remarked that acquiescence is the result of *intention*.

Now the record is full of facts in direct *denial* of any *intention* of acquiescence. The protest, the resolution demanding a return of the voting members, the non-adjournment until the 24th, and the adjournment then, are all irreconcilable with this asserted "acquiescence," and the protest expressly states that the general assembly is "neither adjourned nor constitutionally dissolved."

If the alleged " dispersion " were the end of the session by the act of the legislature itself, then it is an adjournment *sine die*. If the governor's adjournment be valid, or made so by acquiescence, then the session is not now at an end.

The argument, *ab inconvenienti* are all in favor of relator's position. And finally, how can the rights of the relator be imperiled or destroyed by any dereliction of duty on the part of individual members of the general assembly?

VII. The purely technical objections may be grouped together.

1. *The veto.* The governor sent this bill to the lieutenant-governor June 19th, with a message stating his objections thereto. (*a.*) This is not a return of the bill to the house in which it originated. (*b.*) The lieutenant-governor having abandoned his duties on the 10th of June, and a speaker *pro tempore* having been elected, had ceased to be an officer of the senate. (*c.*) The secretary of State was the proper person, if any one, to have custody of the bill.

2. *Of the presentation.* It is objected that the date of presentation does not appear on the journals. (*a.*) This is not required by the Constitution or any law. If by a rule, that rule is not before the court, and would not control the Constitution if it were. (*b.*) The executive record shows the date, as is averred and not denied.

3. *Of the ten days.* It is claimed the governor did not have ten days for consideration. The rule excludes the day of presentation on Sundays. It was presented June 12th, and the adjournment was the 24th. This gives ten days, exclusive of the 12th and two Sundays. The Constitution means a parliamentary day. It is unreasonable to say the general assembly might sit from 12 o'clock midnight to 12 midnight.

Even in the case of the maturity of commercial paper, one must pay before bank closes on the last day. But the governor stated to the committee, as the record shows, that he had no communications to make.

Mr. W. K. McAllister for respondent Hatch.

It is conceded by the learned counsel for the relator that, if the act of the governor of the 10th of June is valid and effectual as an adjournment of the general assembly, then the writ should be refused ; but it is contended that a case had not occurred which gave authority to the executive to act ; that the evidence before the court is insufficient in strength to satisfy this court that there existed such a disagreement between the two houses as to the time of adjournment, as was contemplated by the framers of the Constitution, and the executive action in that behalf was therefore null and void.

The *power* in question is conferred by the Constitution in very plain terms. " In case of disagreement between the two houses, with respect to the time of adjournment, the governor shall have power to adjourn the general assembly," &c. Though the question here raised be new, yet it must be determined by principles old and well established.

The word *power*, as used in the Constitution, is but another term for jurisdiction. 23 Wend. 287. There are two classes of cases proper to be considered in solving the question raised by the relator's counsel. One of which is where an officer or tribunal is authorized to act upon certain facts being presented in a mode prescribed by the law itself. But this is not one of that class, for there is no mode of presentment required ; yet here the question arises collaterally, and even as to this class, where the question arises collaterally, if it appears that there was any evidence, however slight, tending to establish the requisite facts, the finding of their sufficiency by the officer or tribunal is conclusive. *The People* v. *The City of Rochester*, 21 Barb. 656 ; *Brittain* v. *Kinnaird*, 1 Brod. & Bing. 432 ; *Matter of Falkner*, 4 Hill, 602. It has never been claimed by any of the counsel for relator that the case shows *a total want* of evidence of a disagreement.

The other class of cases referred to (and the one I apprehend under which the question in this case falls) is where the law vests any person with the power to do an act, and constitutes him a judge of the evidence on which the act may be done, without prescribing any mode by which that evidence is to be

brought under consideration. In all such cases the officer must determine *in limine* the facts which authorize him to act, and his decision is conclusive.

In the case of *United States* v. *Arredondo and others*, 6 Peters, 729, Mr. Justice BALDWIN says: "It is a universal principle that where power or jurisdiction is delegated to any public officer or tribunal over a subject matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject matter, and individual rights will not be disturbed collaterally for anything done in the exercise of that discretion within the authority and power conferred."

So the Supreme Court of New York, in a case where the question was precisely the same in principle, say: "It is a general and sound principle that whenever the law vests any person with a power to do an act, *and constitutes him a judge of the evidence on which the act is to be done, &c.*, the person thus clothed with power *is invested with discretion* and is, *quoad hoc*, a judge. *Vanderheyden* v. *Young*, 11 Johns. 157; *Martin* v. *Mott*, 12 Wheat. 19; *Allen* v. *Blunt et al.*, 3 Story, 744.

The executive is a coördinate, independent branch of the State government. The power we are considering, and with which he is invested by the Constitution, is a political power, and, in the language of the late Chief Justice MARSHALL, "in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience, and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists and can exist no power to control that discretion. The subject is political. It respects the State, not individual rights, and, being intrusted to the executive, *the decision of the executive is conclusive.*" *Marbury* v. *Madison*, 1 Cranch, 137; *Hawkins* v. *The Governor*, 1 Ark. 586; *McAuley* v. *Brooks*, 16 Cal. 54; 1 Kent's Com. 287, note; *The People ex rel., &c.*, v. *Bissell*, 19 Ill. 229.

The court is bound to take judicial notice of all public acts of the executive, as well as what is statute law. *De Bow* v. *The People*, 1 Denio, 14; *Purdy* v. *The People*, 4 Hill

394; opinion of VERPLANK, Senator, in *Warren* v. *Beers*, 23 Wend. 131. By recognizing the proclamation of the governor as an effectual adjournment of the general assembly, a safe landmark in the proceedings of that body is ascertained, and all considerations of public policy fully answered.

Mr. C. BECKWITH, for respondent Hatch.

The relator, Harless, asks that the Secretary of State shall make him a copy of the bill to incorporate the Wabash Railway Company, and certify under the great seal of the State that the same is a law.

The twenty-first section of the fourth article of the Constitution provides, that " Every bill which shall have passed the senate and house of representatives shall, before it becomes a law, be presented to the governor; if he approve he shall sign it, but if not, he shall return it, with his objections, to the house in which it shall have originated; and the said house shall enter the objections at large on their journal, and proceed to reconsider it. If, after such reconsideration, a majority of the members elected shall agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered; and if approved by a majority of the members elected, it shall become a law, notwithstanding the objections of the governor; but in all such cases the votes of both houses shall be determined by ayes and nays, to be entered on the journal of each house, respectively. If any bill shall not be returned by the governor within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the general assembly shall, by their adjournment, prevent its return ; in which case, the said bill shall be returned on the first day of the meeting of the general assembly after the expiration of said ten days, or be a law."

The Constitution makes no provision for the authentication of bills not approved by the governor, but which are reconsidered and passed by the two houses after the return of such bills with the governor's objections thereto ; nor for the authentica-

tion of bills that become laws, because they are not returned to the house in which they originated by the governor, with his objections thereto, within the proper time.   And while the signature of the governor, with words signifying his approval, sufficiently authenticates as laws such bills as are approved by him, it will be noticed that there is no provision of the Constitution requiring the governor to deposit them in the office of the secretary of State.   The inquiry then arises, in what manner should bills which are not approved by the governor be authenticated so that they can be read in evidence or courts take judicial notice of them?   Independent of any statutes regulating and prescribing the manner in which such authentication shall be made, it would undoubtedly be proper for the two houses of the general assembly to cause them to be authenticated in accordance with the usage and practice of other legislative bodies in this country.   Cushing, in speaking of bills which have been reconsidered and passed by a requisite majority after their veto, says: " There seems to be no good reason why a bill which has been passed in this manner should not be authenticated by a certificate thereon of the proceedings with relation to the same in each branch, signed by the proper authenticating officers thereof respectively, and deposited at once, without the intervention of the executive, in the place or custody appropriated for the keeping of the laws.   But in one case it was thought necessary by congress to pass a joint resolution that the secretary of the senate be directed to present to the secretary of State the bill in question, with certified extracts from the journals of the senate and house, showing the proceedings in the two houses of congress respectively on the same bill, after the same had been returned to the senate by the president with his objections thereto."   Cushing, p. 925.

It will be noticed that both houses of the general assembly must be in session at the time when the authentication should be made.   The two houses of the general assembly having the power to cause a bill to be properly authenticated and deposited in the office of the secretary of State as a law, their will cannot be defeated unless it is by their own neglect.   Each

house has the power to ascertain whether bills passed, and not approved by the governor, have been properly authenticated, and if the two houses neglect to have the proper authentication made, it is to be presumed that such neglect was by design. There is no power in the government to compel the two houses to cause such authentication to be made, and it is submitted that such bills cannot be read in evidence as laws, nor can the courts take judicial notice of them as such, until they are properly authenticated.

As has been remarked, the governor, when he approves of a bill, is required to sign it, and there is no constitutional provision requiring him to deposit the same in the office of the secretary of State; nor does any law passed since the adoption of the new Constitution require of him that duty. But the Revised Statutes, chapter 96, section 7, required that all public acts, laws and resolutions that had been or should be passed by the general assembly should be carefully deposited in that office, and under the old Constitution this provision of the statute was held to require the governor to perform the duty of making the deposit. The new Constitution provides that all laws in force at the time of its adoption not inconsistent therewith shall continue in force.

After the adoption of the new Constitution, it was held that the duty required of the governor before that time was continued under it. *People* v. *Hatch*, 19 Ill. 287.

In like manner it is insisted the duties of the governor under the old Constitution, in regard to bills not approved by the council of revision, were continued and are in force. If the duty of the governor under the old Constitution in regard to one class of bills was continued under the new one, it would seem difficult to give any substantial reason why his duties in regard to other classes of bills are not also continued.

Under the old Constitution, the law provided (R. S., ch. 62):

"Sec. 2. Whenever a bill which shall have passed both houses of the general assembly shall be returned by the council of revision, with objection thereto, and upon reconsideration, shall pass both houses by the constitutional majority, it shall

be authenticated as having become a law, by a certificate thereon to the following effect: ' This bill having been returned by the council of revision with objections thereto, and after reconsideration, having passed both houses by the constitutional majority, it has become a law this    day of    ;' which being signed by the speakers of the senate and of the house of representatives, respectively, shall be deemed a sufficient authentication thereof; whereupon the bill shall be presented to the governor, to be by him deposited with the laws in the office of the secretary of State.

"Sec. 3.    Every bill which shall have passed both houses of the general assembly, and shall not be returned by the council of revision within ten days, having thereby become a law, shall be authenticated by the governor causing the fact to be certified thereon by the secretary of State, in the following form: ' This bill having remained with the council of revision ten days (Sundays excepted), and the general assembly being in session, it has become a law this    day of    . C. F., secretary of State.'

"Sec. 4.    Whenever the general assembly shall, by their adjournment before the expiration of ten days after the passage of any bill, render the return of such bill, by the council of revision, within that time, impracticable, and the same shall not be returned on the first day of the next meeting of the general assembly, and shall thereby become a law, the fact shall be authenticated in the manner provided in the preceding section."

The object of the law was to provide a mode of authentication of bills passed and not approved by the governor, and it will be seen that considerations of public policy imperatively demand there should be such an authentication in order that the people of the State may know whether such bills become laws or not. .It is not only necessary that the present generation should know whether such bills become laws, but succeeding generations should have the same information.

The present case suggests an illustration of the necessity of such an authentication.    Suppose a bill to pass both houses and be presented to the governor while the houses are in session,

and suppose the session to continue for forty days thereafter. The governor does not return the bill, and there is no record of the time when the same was presented to him. Now, how is the evidence to be preserved of the time when the bill became a law? There is no power to coerce the governor to make a certificate of the time when he received the bill, or even to show the bill to any one. How, then, are people to know when such bills become laws, or what they are? If such bills may be read in evidence as laws, and courts are to take judicial notice of them as such, without any authentication of them, a rule of conduct might be prescribed and the people have no means whatever of ascertaining what it is. The courts would be called upon to administer laws which they have no power to inspect, and the contents of which they are unable to ascertain. The lives and liberties of citizens might be endangered under laws, without any knowledge whether they were in existence or not, and public and private rights would have to be adjudicated upon without any knowledge or means of knowledge of the laws regulating them. To prevent such fearful consequences, courts should firmly adhere to the rule that they will look only to an authentic record to ascertain what laws are in force.

If a question arises whether a bill passed the two houses by a constitutional majority, courts may look to their journals to ascertain that fact; but courts will never inspect the journals if the bill has never been properly authenticated as a law.

II. The alternative writ alleges that the bill was presented to the governor on the 12th day of June, 1863. In the computation of the time given to the governor to return the bill, with his objections, the day on which it was presented to him is to be excluded. The 12th day of June was Friday, and it will be perceived that two Sundays occurred before the ten days allowed the governor elapsed. The governor was therefore entitled to the whole of the 24th day of June for consideration of the bill, and the two members of the senate and four members of the house, calling themselves the general assembly, could not deprive the governor of his constitutional right to

the whole of that day. Having concluded their deliberations at 10 o'clock A. M. on that day, the time had not then elapsed for the bill to become a law. The governor was therefore right, according to the relator's own showing, in not causing the bill to be authenticated as a law.

III. The statute provides: "That the secretary of State shall, when required by any person or persons so to do, make out copies of all laws, acts, resolutions or other records appertaining to his said office, and shall attach thereto his certificate under the seal of the State." He is not required to certify whether a bill in his office is a law or not. He is only to certify that his copy is a true and correct one of the bill, and it is for the courts to judge whether it is a law or not. Hence, the necessity of a proper official authentication showing that the bill has become a law.

The respondent's successors will be obliged to give the same certificate when required as the respondent would be obliged to give were the bill in his office, and how are they to know whether a bill has become a law unless it is properly authenticated as having become one.

The governor may require the secretary to authenticate a bill as having become a law, but the secretary cannot of his own mere motion do so. He is not at liberty to make such a certificate on a bill unless required so to do by the governor.

IV. Was there such a disagreement between the houses of the general assembly as authorized its adjournment by the governor?

The 13th section of the 4th article of the Constitution provides that "in case of disagreement between the two houses with respect to the time of adjournment, the governor shall have power to adjourn the general assembly to such time as he thinks proper, provided it be not to a period beyond the next constitutional meeting of the same."

It is not denied that there was a disagreement with respect to the time of adjournment in one sense of the word. There was a difference of opinion formally expressed, and such expressed difference of opinion constituted a disagreement.

But it is said that the word disagreement must be understood in some parliamentary sense, and that, in order to constitute a disagreement in that sense of the word, certain parliamentary usages must be observed. It may be well, therefore, to notice those usages which it is insisted should have been observed, as it is admitted that there was a disagreement unless their observance was necessary.

*First.* It is said that notice to the house of the non-concurrence of the senate in the amendment of the house was one of those usages necessary to be observed to constitute a disagreement. It would be singular, indeed, if a formal notice of a fact after it had transpired was necessary to create the existence of the fact itself, and an examination of the rules of parliamentary law will show no such absurdity to exist. A disagreement is one thing, and a formal notice of such disagreement to be made some time after it has taken place is quite another thing. Courtesy may require the notice to be given, but the fact exists whether the courtesy is observed or not. Cushing says, that notice by the non-concurring to the other house is a mere matter of courtesy, and if not observed the house to which such notice might have been sent has no right to complain. Cushing, § 2292; 1 Black. Com. 183.

*Second.* It is admitted that the house of representatives could not ask for a committee of conference for the reason that the resolution was not in its possession. Cushing, 328, 329.

*Third.* The senate could not ask for a committee of conference until a disagreement had actually taken place. The object of a conference is to reconcile a disagreement, and the same circumstances are requisite to give the right to ask for a conference as are necessary to authorize the governor to adjourn the general assembly. There must be a parliamentary disagreement before a conference can be asked, and it is only necessary that there should be a disagreement in that sense of the word to authorize the governor to act. What, then, is required in order to constitute disagreement in a parliamentary sense? It simply requires that the one house should refuse to concur in the action of the other. Cushing, 328, note.

*Fourth.* After the senate had refused to concur in the amendment of the house, it was entirely in the discretion of the senate whether it would ask for a conference or not. Each house is the sole judge of the order of its own proceedings, and the house had no right to complain of the senate for not asking for a conference. Even after a conference is asked for, each house is still the sole judge of the order of its proceedings, and may determine how far the conference shall proceed. Cushing, 329, 342, §§ 857, 858, 2292.

*Fifth.* No communication from the two houses to the governor was necessary to create a disagreement between them. The journals of the two houses are records open to the inspection of all citizens. Cushing, 291, § 736.

And they were published from day to day under authority of law, which publications are evidence. Rev. Stat. 1845, 422; *Davenport* v. *Young*, 16 Ill. 458.

The governor might satisfy himself as to the fact of a disagreement in the same manner as any other citizen might ascertain that fact, and the Constitution does not require any official notification of the fact of disagreement. It only requires the fact to exist, and it appears that the fact was certified to the governor by the speaker of the senate.

*Sixth.* The resolution of the house, stating that it desired to reconsider its action in amending the resolution of the senate, did not reconcile the disagreement between the two houses. If the resolution had been returned to the house, it could have taken such action thereon as it thought proper, and it was not obliged to concur with the senate, or in any manner further consider the resolution. The senate was under no legal obligation to return the resolution to the house, although it might have done so as a matter of courtesy. The mistake of the messenger of the house, in announcing the house resolution with the words "recede from" instead of the word "reconsider," cannot alter the resolution itself, and to determine what the resolution adopted was we must look at the house journal.

The governor was to hear and determine whether there was a disagreement or not. Evidence was laid before him upon

that subject. He was to judge whether the disagreement was to be a parliamentary one or not, and whether the evidence was sufficient to establish the disagreement required to exist. His judgment cannot be revised collaterally.

V. Literally, the word adjourn signifies to continue, but in this country an adjournment without day signifies the conclusion of the session. One question in the present case is, when did the twenty-third general assembly close its session? Cushing, 200.

1. According to parliamentary law, no question could be put without a quorum; not even that of an adjournment from day to day. Cushing, 147, 325, § 817.

The only way in which less than a quorum of a body governed by parliamentary rules can continue the body in session, is for the speaker or clerk to take the chair and declare the body adjourned until the next legislative day, without putting the question; and the only evidence of its continuance in session is the journal. The journal is an official record, like the record of a court, and from it alone it is to be determined whether the body was in session or not. The record is the only evidence of a fact to be proven by it, and where the record is silent it is considered that the fact does not exist because there is no evidence by which it can be proven.

2. In this State, power is granted to less than a quorum of each house of the general assembly to adjourn from day to day on question and to send for absent members. In other respects less than a quorum of the two houses are governed by parliamentary rules. While the Constitution grants to less than a quorum the power to perpetuate the sessions of the houses, it prescribes the mode in which the power shall be exercised and the evidence by which it is to be known whether it was done or not.

The only mode in which less than a quorum of either house can continue its existence is by an adjournment from day to day, and preserving the evidence of such adjournments on the journal.

Now, it appears by a joint resolution that both houses were

without a quorum on the 10th of June, after the prorogation of the governor, and as there was no adjournment by those members of the house who were present, until the next day, its session ended.   Those members of the senate who were present adjourned until the next day.   But the senate could not continue its sessions from day to day after the session of the house had closed.   Const., Art. III, § 19.

The only mode in which a quorum of an assembly can continue its sessions from day to day, is to meet and transact some business.   Where there is a standing order fixing the time of assembling at a particular hour on each day, and an adjournment takes place without naming the time to which the assembly adjourns, the sitting is resumed at the stated hour the next day.   In the absence of any such rule upon adjournment, the assembly stands adjourned until the next sitting day, or indefinitely.   Cush. § 368.

Where an assembly continues its session from day to day it may be presumed that the session of the one day continued until the session of the next day, but where there is no session on the next legislative day, the presumption, in the absence of a formal adjournment on the record, is that the session ended on the day on which the assembly ceased to transact business. Cush. §. 360.

Ingenious theories are advanced by the counsel for the relator, to show that there cannot be a close of a session by the action of the two houses without a formal adjournment entered on the journals.

It is insisted that the two houses respectively cannot do indirectly that which they cannot do directly.   As, for example, neither house can constitutionally adjourn without day without the concurrence of the other.   Therefore, neither is adjourned without such concurrence.   The argument is, that A. cannot legally kill B., and although A. has in fact killed B., yet B., in contemplation of law, is not dead, because A. could not legally kill him.   It is claimed, that all of the members of the two houses may entirely abandon all legislative proceedings, and such abandonment continue during the whole legislative

term of the members, and the legislature still remain in session for want of a formal joint resolution of adjournment. As a necessary consequence from this proposition, it follows that less than a quorum can never close a session. They have no power to disagree, so that the governor can adjourn them; no power to adopt a joint resolution adjourning *sine die*, or to a given time, and no power whatever to stop the existence of the assembly. Power is expressly granted to less than a quorum to preserve the existence of the assembly by adjournments from day to day; and why was this power granted, if its continued existence was inevitable from a law of its nature? It is claimed, that when an assembly is once shown to have been in session, such session continues in legal contemplation until it is shown that it was ended in some legal manner. Courts will take judicial notice that the progression of time is marked by the epochs of days. Parliamentary rules recognize this division of time. An assembly by rule may fix the time of the commencement of a legislative day, but where no time is fixed the legislative day commences with the natural day. Orders for a particular day expire with the termination of the legislative day. Cush. § 360.

So, a session of a particular day expires with the expiration of that period of time, where there is no formal adjournment. During the sitting of a day, there may be a recess not entered on the journal. The session of the day commences at its natural commencement, or at some time fixed by rule as the commencement cf the legislative day, and where there is no adjournment, it ends by the termination of the natural or legislative day. The session of a legislative day does not continue after the expiration of that time. Cush. § 360.

The session of a succeeding day is evidenced in the appropriate manner, and thus a continuous session from day to day is evidenced; the one session continuing until the next day, when it appears that another session commenced. A legislature's existence solely by presumption is a new idea. The law, for wise purposes, has prescribed a mode by which certain facts may be evidenced, and from considerations of public policy

allows no proof to establish them, unless it is made in the mode which the law prescribes.  The law requires a record to be kept of the proceedings of the two houses of the general assembly. If either house meets, a record is to be made of that fact.  If either house transacts any business, a record is to be made of it, and the only evidence of a meeting or that any business was transacted, is the record.  In fact, the houses may have met and transacted business, but if the journals are silent, these facts cannot be shown.  In contemplation of law, the facts do not exist because there is no evidence by which they can be shown.  The record is the only evidence of facts to be shown by it, and where the record is silent, it is conclusive evidence that the facts alleged do not exist.  There can be no presumption that anything was done, unless it is shown by the record to have been done.  1 Greenl. Ev. § 20.

The presumption sought to be established by the relator is one of fact, and all presumptions of that nature may be rebutted by parol evidence.  Thus, while the relator asks the court to hold that the journals are the only evidence of what was done, he seeks to establish a presumption, the effect of which would be to allow parol evidence to contradict it, and thus defeat the rule for which he contends, and make the existence of public laws depend upon parol evidence and the verdicts of juries.

The Constitution requires that the two houses of the general assembly shall keep a journal of their proceedings.  It may be admitted that this provision is in some respects directory, and that in all cases where it is directory, it need not appear affirmatively that the provision was complied with. 25 Ill. 181.

But in regard to other legislative acts, the Constitution is imperative, and the act is not valid if the Constitution is not complied with.  *Spangler* v. *Jacoby*, 14 Ill. 297.

A record is necessary to show that a quorum convened and were qualified in pursuance of constitutional authority in order to constitute a session.  Here the provision is imperative, for upon its being complied with, the validity of the commence-

ment of the session depends. So the provision must be held imperative in regard to the journals showing the continued existence of the two houses from day to day, for upon its being complied with, their continued existence depends.

Considerations of public policy require that the session should be held to close when the journals show that the assembly ceased to meet and transact business, without manifesting any intention so to do at a future time.

1. No bill can be presented to the governor when the legislature is not in session. Cushing, 919. It is important that the governor should know by an authentic record, when a bill is presented to him, whether the legislature is in session or not. If at that time the legislature is not in session, he is not required to consider the bill.

2. The governor is allowed ten days (Sundays excepted) to consider the provisions of bills presented to him if the legislature remains in session during that time, and if not, until the first day of the meeting of the general assembly after said ten days. It is important that he should be able to ascertain whether the general assembly is continuing its session or not. He may look at the record for ten successive days and find no evidence of a session, and after the time allowed him to consider and return the bill with his objections has elapsed, he and the people of the State are informed that by presumption the two houses were in session, and that an obnoxious bill in his hands has become a law because he did not take notice of a fact of which there was no evidence and which in truth did not exist.

3. All public laws take effect sixty days after the close of the session, unless otherwise specially provided, and courts ought to be able to ascertain from some record, when such laws take effect. The record of the existence of the session may cease and months elapse. In the meantime, criminals may be hung or imprisoned, and private and public rights may be adjudicated upon, under such laws, and after all these things have transpired, it is said that the wandering members may assemble and establish a presumption that the two houses were

in session from the time when the record shows their session to have ceased up to the time of their assembling, and thus fix a new date when the laws take effect, and annul all transactions under them prior to that time.   It may well be asked, how courts are to ascertain whether the members of the two houses will again assemble within their legislative term, or whether they have any intention of so doing?

4.   Each house has power to imprison for contempt, but neither has any authority to hold a person thus imprisoned after the close of the session.   No power in the State can compel either house to enter a formal adjournment on its journal; and can either house disperse without making an entry of a formal adjournment on its journal, and keep a person imprisoned in jail until the close of the legislative term of the members, upon the presumption that the house is still in session?

5.   Every member of the house is privileged from arrest, except for treason, felony, or breach of the peace, during the session of the general assembly, and it has been suggested that it would be wiser and safer for some of the members never to have a formal adjournment entered on the journals, as, thereby, the general assembly would be presumed to continue in session, and the members could draw their small *per diem* and be privileged from arrest during their legislative term.

6.   The secretary of State, auditor, public printer, and other officers, are required to perform duties within limited times after the close of each session, and it would be desirable for them to know when such duties are to be performed.

VI.   The two houses might have insisted that they had not disagreed, and then the question as to whether there had been a disagreement would have arisen, but after the assumption of a disagreement on the part of the governor, and an acquiescence therein by the two houses, the question cannot legally arise.   The two houses had power to admit that there was a constitutional disagreement, and their acquiescence in the act of the governor and ceasing to hold sessions was an admission that such a constitutional disagreement had taken place.

VII.   Courts are required to take judicial notice of the commencement and adjournment of sessions of the legislature. *The King* v. *Wilde*, 1 Lev. 296; *Perkins* v. *Perkins*, 7 Conn.

And it would reduce the law of the land to an uncertainty not contemplated by those who have characterized it as glorious, to establish a rule under which witnesses might be called to ascertain whether a public law was in force or not.

VIII.   Courts will not issue a mandamus to require the performance of a nugatory act.   If the bill is a law it is a public one, of which the court is required to take judicial notice, and why should a mandamus be granted to obtain evidence of a law of which the court will take judicial notice? The secretary of State was required to certify that the bill was a law when he had no knowledge or official information whether it was a law or not.   The relator did not demand a copy of the bill simply, but a copy of the bill and a certificate that it had become a law.

IX.   The bill was never in the custody of the respondent in his official capacity.   He is the mere custodian of the bill as the servant of the governor, and as such has no power or authority to make any certificate in regard to it, and cannot be required so to do.

Mr. A. W. ARRINGTON, for the relator in the case against the secretary of State.

I will first examine an objection made by the last counsel, an objection purely formal in its character: He urged that the secretary of State cannot certify this act to be a law, for the reason that it has not been authenticated in the manner prescribed by the law of 1826, incorporated in the Revised Statutes of 1845, as sections 2d and 3d of the 62d chapter, entitled "laws."   To this objection I answer:

1.   That the law in question has been repealed, *ex necessitate*, by the new Constitution.   The third section referred to defines the authentication to be a certificate in the following form:  "This bill having remained with the council of revision

ten days (Sundays excepted), and the general assembly being in session, it has become a law," etc.    But it is impossible to make that certificate.    There is no council of revision in existence. Hence, since the only form required by the statute has become impossible; and since neither the Constitution nor laws have provided any other method of authentication, it results that the act will be constitutionally valid whether certified or not.

2.    The opinion of this court in the case of Hatch, 19 Ill. 287, has treated the act of 1826 as not in force at all.    It will be observed that section 2 regulates the return of a different class of bills, namely, those to which the governor had made objections, and which were to be deposited by him in the office of the secretary of State, after certain other formalities had been complied with.    But in the case of Hatch, just alluded to, the court say that, although it is required that such an act be returned, yet the form of return has not been prescribed; that neither the Constitution nor any law declares by whom or how the return shall be consummated.    The court must, therefore, have considered the statute of 1826 as repealed.    For the first section of that statute required a law, after it had been passed, notwithstanding the objections thereto, to be deposited by the governor in the office of the secretary of State.    Yet the court say, in the opinion quoted, "that a law which has been vetoed by the governor, and subsequently passed by both houses with the constitutional majority, would properly be sent to the secretary's office from the house in which it was last passed."

Since, however, this would be in direct contradiction to the statute of 1826, the latter must be regarded as no longer in legal existence.

The decision of the court went further, and effectually overruled the objection of the counsel, in advance, by laying down the rule, "that although a formal practice had been observed in relation to the return of acts, yet, as the Constitution and laws did not prescribe any particular form, an act would be valid without following the usual practice."

3.    The bill is a law, under the Constitution, because it was not returned within ten days.    The language of the Constitu-

tion is explicit : "Every bill not returned within ten days shall be a law." It is a law at the end of ten days.. An unreturned bill becomes a law by virtue of a fact independent of all legislation.

4. But suppose the act of 1826 to be still in force. It is only *directory* to the governor. The act does not say *how* the governor is to cause the secretary to make the certificate. He may, therefore, well be considered as causing it when he simply delivers the bill to the secretary.

There is an irresistible reason, derived from another source, why this construction should be given. This court has decided that no *mandamus* can issue against the governor. Therefore, the court cannot compel the governor to cause the secretary to make his certificate. Hence, if the court cannot act upon the governor, it *must*, of necessity, act upon the secretary, or the Constitution and laws will both be defeated.

The alternative writ demands a copy of the law, and a certificate of the facts by which it became a law. But this is precisely what the act of 1826 requires the secretary to certify.

The objection, however, has been put in another shape, " that the secretary cannot certify this act to be a law, because he has no sort of official information as to the facts which gave it a constitutional vitality." If this were so, it would certainly be fatal to our case. The secretary has all the information necessary to establish the validity of the act as a law.

In the first place, he has in his office " the executive journal," which shows the day when the bill was presented to the governor. The fact is alleged in the writ, and the return does not deny it.

The executive journal is a record in the same way that the journals of the legislature are records ; because the law which commands the general assembly to keep a journal of their proceedings, also commands the secretary to keep a record of executive acts. And, although the private secretary of the governor, by custom, really performs this function, still the journal itself is deposited in the office of the secretary of State.

In the second place, the secretary concedes in his return, as is alleged in the writ, that he has possession of the bill, as coming into his hands from an agent of the governor, and not returned to the legislature.    He, therefore, knows officially that the bill has not been returned to the house in which it originated.

In the third place, the secretary must know what all courts of the country know, and what even the humblest citizen must take notice of at his peril; and no one can excuse himself from the performance of a duty, official or otherwise, by pleading his ignorance of the law.

Hence, the secretary has all the information which can be requisite to enable him to certify this to be a law.

5.    The secretary is required, under the statute, to certify copies of all "laws, resolutions, acts," &c.    But it is urged on the other side, that we ought to have applied to him for a copy; not a copy of the law, but a mere copy.    I am now supposing this to be a law under the Constitution.    If it is so, the secretary must certify it for what it actually is, and not for what it is not.    Either it is an unreturned bill with a veto message upon it, or it is a law.    He cannot certify it at all without stating what it is.    Therefore, if it is a law, in rendering us a copy he must certify that it is the copy of a law, and not of a bill or resolution.

A kindred objection is pressed, that the secretary holds the bill or law, as the mere custodian of the governor; and, therefore, that it is not in his possession as an official person. But the law has reached its place.    From the moment it touches the hand of the secretary, the statute constitutes him its keeper.    He cannot make himself the custodian of the governor.

Having thus disposed of the formal and technical objections, I will consider the leading questions in discussion.

The first and fundamental problem for solution is, whether, on the 10th day of June, there existed "a case of disagreement" between the two houses of the legislature, with respect of the time of their adjournment.    If there was such a case,

then the governor had the constitutional authority to prorogue them. If there was not, then his act was the nullity of a usurpation.

The subject has been treated in two aspects: 1. As to whether there was a disagreement according to the rules of parliamentary law; and, 2. As to whether there was a disagreement in any other and more general sense.

Now I deny the propriety of any division of the kind, and contend that the meaning of the term "disagreement" in common speech, and in parliamentary language, is one and the same. According to the fifth joint rule, the definition of a parliamentary disagreement is, that it is an *adherence* of both houses to the propositions respectively presented to each other. Because a bill or resolution is not lost, and, consequently, is only *in fieri* or in the state of negotiation, until such an adherence. To the same effect is Jefferson's Manual, p. 121. It can, therefore, never be necessary for one house to recede until the other adheres. I do not contend that it was indispensable for the houses to travel through the preliminary steps of "insisting." What I do maintain is, that there can be no disagreement, not even an apparent one, until one of the houses enunciates its adherence; and that there can be no final disagreement until an adherence by them both.

But is not the common signification of the term "disagreement" the same? I go into a store to purchase a hat. The salesman produces one, and says, "I will let you have this for eight dollars." That is only a proposal, and not an ultimate proposition expressive of a fixed determination. I reply by an offer of five dollars. That, too, is a mere proposal. There are two proposals, but, as yet, no sort of disagreement. Then the salesman may proceed to insist, by urging that he ought to get eight; and I, in my turn, may insist I ought to have it for five. But still there is no disagreement. The disagreement does not, and cannot, become a fact accomplished, until the one declares, "I will take no less," and the other responds "I will give no more."

No word can have more than one signification in the same

8 — 33D ILL.

place.   Thus the term "light" denotes the opposite of heavy; it also denotes the opposite of darkness.   But it cannot denote both meanings at once.   Therefore, I take it for granted that the term "disagreement" signifies but one thing in the place where it stands in the Constitution.

But it is argued, "that there can be no conference before a disagreement."   The rule is the reverse of that.   "A conference," says Jefferson's Manual, may be asked before the house asking it has come to a resolution of disagreement, insisting or adhering.   3 Hats. 269, 341.   In which case the papers are not left with the other conferees, but are brought back to be the foundation of the vote to be given, and this is the most reasonable and respectful proceeding; for, as was urged by the lords on a particular occasion, it was held vain and below the wisdom of parliament to reason or argue against fixed resolutions, and upon terms of impossibility to persuade.   3 Hats. 226.   So the commons says an *adherence* is never delivered at a free conference, which implies debate.   10 Grey, 137.

Hence, it is evident that an adherence is a disagreement in the sense of parliamentary law; and that nothing else is a disagreement.

I do not affirm the unconditional necessity of a conference before an adherence, although such is the customary and only courteous practice.   What I do assert is the necessity of an adherence to constitute a disagreement.

Then apply this definition to the facts of the present case; the senate dissents from the amendment of the house.   Can it, then, immediately adhere?   That would be impossible under the law just quoted.   The matter must go back to the other house in order to arrive at either an agreement or a disagreement; for, as yet, there is but an exchange of proposals.   Then the house may lack courtesy, and adhere to its amendment in the first stage.   The house may, therefore, send the resolution and amendment back to the senate, with an adherence.   And then the latter must recede or adhere also.   If it adheres, the disagreement is complete.   Thus, three steps were indispensable in this case before there could be a disagreement.   The

senate must have sent its disagreement to the house; then the house must have sent its adherence to the senate; and then the senate must have voted its own adherence.

Again, I maintain that there was no disagreement of any kind between the two houses, on the 10th of June, with respect to the time of their adjournment.

In the first place, a case of disagreement differs from that of mere non-agreement. The former is positive; the latter only negative. In the same way, disbelief differs from the mere absence of belief. A man does not believe that the moon is inhabited, if he has never thought upon the subject at all. And yet he cannot be said to disbelieve it; for there can be no disbelief where there is no thought.

A like distinction exists between agreement and non-agreement. If a case of non-agreement could be regarded as one of disagreement; the governor might well prorogue the legislature on the first day of the session; because the two houses are assuredly not then in a state of agreement as to the time of their adjournment. The subject has not entered into their minds at all, and, for the same reason, they are not in a state of disagreement.

Secondly, the disagreement which can justify an executive interference must be an existing one, and not one past, or in any manner adjusted.

Thirdly, the disagreement specified in the Constitution does not relate to opinion. It is a case of disagreement as to action, and to joint action on the part of both the houses. But all action implies the presence of will, and will implies possibility. No one ever yet willed that which he knew to be physically impossible.

Applying these principles to the case in hand, and it will be seen there could be no disagreement on the 10th of June, as to an adjournment on the 8th. The act was impossible in the very nature of things.

·Nor was there any disagreement as to an adjournment on the 22d. When the principal falls, the incident goes down with it. When the main resolution is annulled or withdrawn,

no action can be had upon the amendment. Hence, since the resolution of the senate had been rendered impossible, the amendment of the house became canceled as of course.

But more than this. The house had passed a resolution to reconsider their amendment on the very day it was made, and on the same day had given notice to the senate of the fact. Therefore, the house no longer desired to adjourn on the 22d; and, since the senate never had desired it, as was demonstrated by their refusal to concur in the amendment of the house, the two houses were consequently now of one mind, at least on the question of an adjournment on the 22d. There remained no disagreement between them on that subject.

But, if the existence of a present disagreement were conceded, it would not mend the matter, because the governor was not informed of it in a parliamentary way. No department of the government, no branch of the legislative organization, can take notice of what has transpired, or is transpiring, in any other, until the fact has been communicated in an official manner. James the First had censured a proceeding that had taken place in the house of commons; when the latter rebuked him with the indignant protest: "It is a breach of privilege for the king to give credit to the information of a thing done or said in parliament till he be informed by the house itself."

Let not the true point of our objection be mistaken; the breach of privilege did not consist in the governor's knowing what had occurred in the two houses, but in his taking official notice of it, without any official information communicated by the houses themselves, or, at least, by one of them.

The second question presented is: Did the legal session of the general assembly continue until the adjournment on the 24th of June?

That the session continued is clear. It is a maxim of parliamentary law, "that a legislative assembly, when duly convened, cannot be adjourned without day, or dissolved but by lapse of time, or in the manner provided by law." Cushing, § 254. Or, in the language of Blackstone, "The session is never understood to be at an end until a prorogation. 1 Black.

Com. 187; 4 Inst. 28.   A legislative session cannot be terminated except in some way prescribed by the laws.   The immediate corollary follows, that when a session of the legislature is once shown to have commenced, it must be presumed to have continued until the period of its legal termination, unless there be appropriate evidence to the contrary.   Indeed, this is a general presumption, applicable alike to all other things having any sort of permanence.   For, "when the existence of a person, a personal relation, or a state of things, is once established by proof, the law presumes that the person, relation, or state of things continues to exist as before, until the contrary is shown, or until a different presumption is raised from the nature of the subject in question."   1 Greenl. Ev. § 41.

The adverse counsel admit the presumption, but say it is a presumption of fact, and, therefore, liable to be rebutted by parol evidence.   But this cannot be.   The presumption is one *juris et de jure*, because it springs from a record; that is, from the journals of the legislature.   How, then, can it be rebutted from an inferior kind of evidence?

The counsel endeavor to escape from the legitimate conclusion, by insisting that, by our demurrer to the return, the truth of other facts, *de hors* the record, and which before rested in parol, is admitted; but the true rule is, "that a demurrer only admits the truth of such facts as it is competent to allege, and such as are sufficiently pleaded."

To return to the proposition that the journals are the only evidence: But the journals show no adjournment from the 10th to the 24th.   The inference, then, is that the legislature did not adjourn.

There is, however, an interval of some days when the journals are silent.   The journal of the house shows no adjournment from the 10th to the 23d, while the journal of the senate is also a blank from the 11th to the 23d.

On the 23d the journals show a meeting of both houses, and that they had regularly adjourned until the following day. On the 24th the journals also show a meeting of both houses,

and that they formally adjourned to a day mentioned in their joint resolution.

The evidence that the legislature continued in session from the 10th to the 24th is thus complete, for a twofold reason: 1. Because the record shows no adjournment between those days; and, 2. Because it does show sittings on both the 23d and 24th, and a legal adjournment on the 24th.

Even if the fact could be dragged into the case, that the sittings of the 23d and 24th were attended by only two members of the senate and four of the house, it would not matter; because the Constitution expressly provides "that a smaller number than a quorum" may not only meet, but "adjourn from day to day, and compel the attendance of absent members."

The proposition that the journals must be the exclusive source of information in the case results from a still more general rule of evidence, that "oral evidence cannot be *substituted* for any instrument which the law requires to be in writing, such as records, public documents," &c.   1 Greenl. Ev. § 86.

But the Constitution does require the legislature to keep journals of their proceedings.   Therefore, no oral evidence can be substituted for the authoritative record of the journals. They are the sole evidence whether they speak or remain silent.

Such is the doctrine of this court.   In *Spangler* v. *Jacoby*, 14 Ill. 300, the language was: "The journal is the evidence of the action of the house, and by it the act must stand or fall."   And in the case of *Supervisors, &c.,* v. *The People*, 25 Ill. 184, the court decided "that, where an act is required to be done by the legislature, it must be presumed that it was done, unless the journal shows affirmatively that it was not done."

But the journals are silent between the 10th and the 23d. They record no adjournment on any of the intervening days. The deduction is, the continuance or the close of the legislative session.   Both sides admit the premise, while they draw opposite conclusions from it.

The argument of our adversaries, if formulated syllogistically, would run thus :

1. If the houses adjourned, it was their duty to enter the resolution to adjourn on their journals.

2. But they did not enter any resolution to adjourn on their journals.

3. *Ergo*, they adjourned.

The inference from the premises given is just the reverse. The true syllogism on the subject is as follows :

1. If the houses adjourned it was their duty to enter the resolution for that purpose on the journals.

2. But they did not enter such a resolution.

3. Therefore, they did not adjourn.

A legislative body need not adjourn either every day, or at the end of any particular number of days. The whole session is, in contemplation of law, but one day, and, as all subsequent time has relation to the first day of the session, a legislature, · if the members choose so to do, may extend one sitting through the entire term.

But suppose the silence of the journals furnishes a presumption of adjournment, what sort of adjournment shall be presumed ? There are two kinds — one from day to day, and the other *sine die*. My brother Beckwith proved two things: *First*, that the general assembly could not adjourn for more than two days without a quorum ; and, *secondly*, that there was no quorum in either house on the 10th day of June.

Now, I accept both these propositions as true, but what follows ?

Why, clearly, that the two houses did not, because they could not, *adjourn* on the 10th day of June, either *sine die* or for more than two days.

If, therefore, the silence of the record is to afford the presumption of an adjournment, it must be of an adjournment from one day to another, and every day during the interval between the 10th and 23d of June ; and not that they adjourned *sine die*, or for a longer period than two days. Because they had full authority to do the former, but no power to do the latter.

One of the counsel referred to a section in Cushing, which speaks of an " indefinite adjournment," and he seemed to imagine the author to mean by that term, an adjournment *sine die.* A reference to Jefferson's Manual, p. 131, shows this to be a mistake. An adjournment without naming any day, and an adjournment expressed to be without day, are very different things. " A motion to adjourn, simply, cannot be amended as by adding ' to a particular day', but must be put, simply, ' that this house do now adjourn.' And, if carried in the affirmative, it is adjourned to the next sitting day, unless it has come to a previous resolution, ' that, at its rising, it will adjourn to a particular day,' and then the house is adjourned to that day." 3 Hats. 82. Thus, it is manifest that an adjournment without naming any day is exactly the opposite of one *sine die.*

The third point presented is, whether the bill was presented to the governor on the 12th day of June. These are the proofs: In the first place, the petition and alternative writ allege a presentation on the 12th, and the fact stands admitted in the return, on information and belief. Moreover, it is averred, the presentation appears on the executive journal in his own keeping and possession, and that fact is not denied in the return, and is admitted by this silence.

Again, the presentation is, in no parliamentary sense, a proceeding of the legislature, and, therefore, their journals could not be expected to show it.

Finally, the rule declared in 19 Ill. 287, settles the question: " That a formality not required or known to the Constitution or laws, is not necessary to the validity of a statute." Apply the rule to the present case. The Constitution directs that a bill, when passed, shall " be presented to the governor." But it does not specify the mode. It does not say *how* or *by whom.* Hence, if a bill be presented in any mode, it will be sufficient, and, of course, it must be sufficient if the evidence be of the same kind and degree as the presentation; for no court would demand record evidence of an act *in pais.*

The fourth question in debate is, did the governor return the

bill within ten days after its presentation on the 12th of June? It cannot be pretended that he did, for the reason that the bill has not been returned at all.

But it is objected, that the governor had the whole of the tenth day in which to return the bill; and, therefore, since the general assembly adjourned at 10 o'clock A. M., the constitutional time has not yet elapsed. The only question on this point is, whether the Constitution means natural or parliamentary days. If it means natural days, then the legislature must sit from midnight to midnight, on the tenth day at least, if not on all the others.

The Constitution obviously signifies a parliamentary day, and that is simply the time when the houses are sitting, whether it be long or short.

The fifth question is, did the general assembly, by their adjournment, *prevent* the governor from returning the bill? The Constitution says that the bill presented "shall be a law unless the general assembly shall, by *their* adjournment, *prevent* its return." Here, it will be observed, there is only *one* cause of prevention designated. It is immaterial what other cause or circumstance may have operated to prevent the return of the bill. It is a law, nevertheless, provided the legislature did not, by *their* adjournment, prevent its return. The Constitution has specified but a single cause, and no power has the competency to add another.

But the legislature did not, by *their* adjournment, prevent the return of the bill. They did not adjourn on the 10th nor on any other from that to the 24th.

They could not adjourn for more than two days, except by joint resolution. There is no evidence of any such resolution. The inference is, the legislature did not adjourn; and, consequently, *their* adjournment could not prevent the return of the bill.

The adverse counsel concede that the legislature did not adjourn, but contend there must be some method, other than an adjournment of terminating the session, as there was no quorum, and, therefore, no power to adjourn by joint resolution.

This is fallacious. In the first place, a less number than a quorum might adjourn even *sine die*, without a call of the houses, and thus the want of a quorum would not appear on the journals.

In the second place, less than a quorum can adjourn from one day to another, however distant, provided only that the day to which the legislature is adjourned falls within the legal session.

But it is urged that the members of the general assembly voluntarily dispersed, and that their dispersion *prevented* the return of the bill. A dispersion is not an adjournment; nor is a "voluntary dispersion" one of the causes mentioned in the Constitution which can avail to prevent the bill from becoming a law.

It is said, however, that the members of the general assembly acquiesced in the attempt of the governor to adjourn them, and that the fact completely legitimates the illegality of the executive's action. Can any acquiescence in an unconstitutional act have the effect to render it constitutional?

Moreover, how could the legislature acquiesce if they could not adjourn? And brother Beckwith has demonstrated that they could not do the latter, for the reason that they had no quorum.

Finally, the legislature had no power to acquiesce in the usurpation of the executive. So far as their individual rights were concerned, they might, indeed, acquiesce. But they had no authority to sacrifice the rights and dignity of the State on the altar of political ambition.

Besides, suppose the fact of the acquiescence to be conceded, and that it did terminate the legislative session, that would not prevent this bill from becoming a law, because " acquiescence " is not one of the causes of prevention specified in the Constitution.

In the last place, suppose the dispersion, or acquiescence, or both, to possess all the validity claimed for them; suppose them even equivalent to an adjournment; yet they did not, in fact, *prevent* the return of the bill. The governor cannot be said to have been prevented from doing an act where there was no desire or will to perform it.

Had the governor, then, any purpose or intention to return the bill within ten days, provided the legislature had not adjourned or dispersed? The negative is sustained by the proofs.

In the first place, he had, on the 10th, formally proclaimed the two houses adjourned until the last day of the legislative existence; thus expressing his determination to have no further official communication with them.

In the second place, he had, on the 19th, sent the bill to the lieutenant-governor, who was at his home two hundred miles from the seat of the government. So, if every member of the general assembly had attended the sitting of the 24th, the governor could not have returned the bill.

Finally, on the 24th of June, the last of the ten days given to executive grace, a committee of both houses waited upon his excellency, and informed him of their sitting, and that they were ready to receive any message he might wish to communicate. He not only failed to embrace this opportunity to return the bill, but denied the legal existence of the body which they represented.

If, then, the governor was not *prevented* from returning the bill, it is a law. And, if he was prevented from returning it by *his own* adjournment, it is also a law. Because, under the Constitution, it is a law "unless the general assembly shall, by *their* adjournment," and not by *his* adjournment, "prevent its return."

Mr. T. LYLE DICKEY filed a written argument on behalf of the relators, and

Messrs. STEPHEN T. LOGAN, O. C. SKINNER and E. M. HAINES for the respondents.

Opinion of Mr. JUSTICE WALKER, in the case of the People, on the relation of Keyes, against the Auditor:

The record in this case shows, that on the 8th day of June, 1863, the senate adopted a joint resolution, for a final adjournment at six o'clock in the afternoon of that day. It was sent

to the house, where it was taken up and amended, by inserting the twenty-second of June, at ten o'clock in the forenoon, as the time for adjournment, and thus amended it was adopted by the house. On the same day, as amended, it was returned to the senate, where it was taken up, and on the question whether the senate would concur with the house amendment, it was decided in the negative. During the afternoon of the same day, the house adopted a resolution, in the preamble to which they say they wish to reconsider their action in amending the resolution. By the resolution itself, they request the return of the joint resolution for reconsideration. This resolution seems to have been communicated to the senate immediately after the vote had been taken refusing to concur in the house amendment to the joint resolution, but it does not appear that the senate took any action upon this request, nor that either house took any further steps on the resolution to adjourn.

At four o'clock, in the afternoon of the eighth, the senate adjourned until ten o'clock the next morning. The house, on the evening of the same day, adjourned over until the tenth, in accordance to a previous resolution of that body. The senate met on the ninth and adjourned to the tenth, when it again met, and whilst in the transaction of business, the speaker read a proclamation from the governor declaring the general assembly adjourned until the first Monday in January, 1865, whereupon the speaker vacated the chair, a speaker *pro tem.* was elected, and a joint committee was appointed, who reported a protest against the action of the governor, which was adopted and spread upon their journals, and adjourned over until the morning of the eleventh, when there is entered a convening order, after which all entries cease upon the journals until the twenty-third of June.

The house met on the tenth, and in the course of their proceedings, the governor's proclamation was read to the house, after which they joined in the appointment of the joint committee to prepare the protest, which was also adopted by the house and spread upon their journals, but the house journals fail to show any adjourning order on the tenth, after which day

all entries cease until the 23d of that month. It also appears, that on the tenth, after a speaker *pro tem.* was elected by the senate, the roll was called and only twelve senators answered, when a call of the senate was ordered but was afterwards dispensed with.

It appears from the journals of both houses, that entries were made on the twenty-third, stating that the houses had convened, and afterwards that adjournments were had until the twenty-fourth. Convening orders appear on both journals on that day, and a joint resolution to adjourn both houses until the Tuesday after the first Monday in January, 1864, after which no more entries appear upon the journals of either house. The relator alleges that he was present in the discharge of his duties as a representative on these two last days. That he holds the certificate of the speaker therefor, which he presented to the auditor for a warrant on the treasury for the sum of two dollars alleged to be due, but, that the auditor refused to draw the same.

The return alleges that, after the governor's proclamation was received, on the tenth of June, the members of the two houses during that and the succeeding day, settled their accounts with the speakers; that they obtained from those officers their certificates of attendance, which were presented to the auditor, who drew warrants on the treasury for their several sums; that they obtained their pay, returned to their homes, and the doors of the halls were closed; that on the twenty-third of June two senators and four representatives met in their several halls, but denies that they were in session as a legislative body at that time, and that relator was not in attendance as a representative, and is, therefore, not entitled to compensation as such. It admits that the speaker's certificate was presented, and a warrant on the treasury was demanded and refused.

To this return a demurrer was filed, which presents the question as to the sufficiency of the return of the auditor.

The demurrer admits the truth of the facts set out in the pleading to which it is interposed. But it is contended that it

admits such facts only as are well pleaded, and as could be used as evidence on the trial. That such facts as could only be proved by record evidence, and which from the pleadings appear to exist only in parol, would not be admitted. If this is the true rule, which I deem unimportant to determine, still all facts necessarily existing outside of, and never appearing upon, the journals, so far as they would be proper evidence, would be admitted by the demurrer. The settlement of the accounts, the drawing their pay by the members, their return to their homes, and the closing of the halls, never appear upon the journals, and if such facts might be proved for any purpose, they would, under the rule contended for, be admitted by the demurrer. The inferences or conclusions of law stated in the return would, of course, not be admitted.

The governor's proclamation was issued under the thirteenth section of the fourth article of our Constitution. It is this: "In case of disagreement between the two houses with respect to the time of adjournment, the governor shall have power to adjourn the general assembly to such time as he thinks proper, provided it be not to a period beyond the next constitutional meeting of the same. The force of the argument on both sides of this case seemed to be to the point, whether the contingency contemplated by this provision had arisen, so as to authorize the governor to interpose his power to adjourn the general assembly. From the research and reflection that I have been enabled to give the case, I have arrived at the conclusion that there are other questions involved material to its decision. And I shall, having stated the facts and what I deem proper under the demurrer to be considered, proceed to give my views as concisely as the nature of the case will permit. I regret that an adjudged case cannot be found involving the same or a similar state of facts which could shed light on the question.

It is upon this state of facts the court is called upon to determine whether the general assembly was adjourned on the tenth or eleventh days of June last. If by the governor's proclamation, by the action of the two houses on those days, or if by the joint action of the governor and of the two houses,

the session was either adjourned or terminated, then there could have been no session on the twenty-third and twenty-fourth of June, and the relator would not be entitled to compensation.

It is not denied that the governor issued his proclamation under the thirteenth section of the fourth article of our Constitution. In doing so he claimed that the contingency therein provided for had arisen, and that he was authorized to act. And whether this be so or not, when we see, from the absence of all entries upon the journals, that the two houses ceased to hold further sessions, the members drew their pay, returned to their homes, and the halls were closed, this apparent acquiescence on the part of the members of the two bodies, to my mind, is satisfactory evidence that they designed to terminate the session. By this course of action it would unquestionably seem that they had determined to cease to meet, and whatever weight they may have attached to the governor's proclamation, they did in fact adjourn, or, at least, ceased to hold their daily sessions, according to the usual course of such bodies, and this cessation was, so far as the journals show, without day. And it seems that it was designed to adopt the act of the governor. Suppose the governor, without any pretense of a disagreement, had come into the houses, and had declared them adjourned *sine die*, and the speakers had so announced, and it had been entered on the journals of each house that on that day the general assembly had so adjourned and the members had dispersed and business had ceased, would any person contend that the session had not been terminated notwithstanding the want of a joint resolution?

Or, suppose the speakers, independent of all action by the governor, were to declare that the general assembly was adjourned *sine die*, and it should be so entered on the journals, and the members were to disperse and further meetings should cease, what would be the inevitable conclusion? While it is laid down by all writers on parliamentary law, that when such a body is once organized, the session can be terminated only by the expiration of the time for which the members

were elected, by executive action, or by resolution, they do not, so far as I can find, say that such a resolution must appear upon the journals. It is true that it is usually by such a resolution, that the sense of the two houses is obtained, but, if that sense were manifested in any other clear and satisfactory mode, no reason is perceived why it should not be as obligatory as if it were reduced to writing, and spread upon the journals. It is the agreement of the two bodies that would form the resolution, whilst the written resolve is only evidence of the joint concurrence of the two bodies. If acts of the two houses appear, which render it clear that it was their resolution to adjourn, I have no hesitation in saying that such would be the effect, although a joint resolution did not appear upon the journals. If, simultaneously, each house were to adopt a resolution, or simply vote that they would adjourn at the same time, and when the period had arrived, they were to act upon it, I am unable to perceive that the session would not be terminated.

It is true, that the joint rules of the two houses provide for an adjournment *sine die* by joint resolution. But this is not a constitutional requirement, and like all such rules it was adopted to facilitate the transaction of business, and doubtless, should be observed by the two houses. But will it be said, that, because this or any other rule is violated, an act not in contravention of the Constitution is void alone for that reason? Suppose a law should be adopted with all the constitutional and legislative requirements, but in violation of a joint rule, or a rule of one of the houses, can it be said that the law would be void? Our Constitution has prescribed no mode by which the sessions of the general assembly shall terminate. That is left to the two houses to determine. The only check it has imposed being a prohibition upon either house from adjourning for more than two days without the consent of the other. I am, therefore, of the opinion, that a joint resolution formally adopted and spread upon the journals is not indispensable to the termination of the session, by an adjournment without day.

Suppose the two houses were, in fact, to adopt such a resolution, and disperse on the day fixed, and suppose the clerks of the two houses, by accident or design, were to fail to enter it upon the journals, would the general assembly be adjourned? Or have the clerks the power to thwart the purpose of the houses, by continuing the session against the unanimous will, it may be, of the members? If such is the effect of their neglect, it would also give them the power to prevent laws regularly adopted and intended to take effect sixty days after the day agreed upon for an adjournment *sine die*, from going into operation. Also, to prevent the executive from returning bills to the house in which they originated, with his objections, within the period limited by the Constitution, and thus deprive the governor of his right to the employment of his limited veto power in the mode prescribed by the Constitution. If an adjournment without day cannot be effected, except by a resolution for that purpose appearing upon the journals, if nothing can be inferred from the absence of all entries for a long space of time, or if parol evidence cannot be received to prove the occurrence of acts and circumstances, outside of the journals, and which are never found upon them, from which inferences may be indulged, then the negligence of the clerks might produce all of these consequences.

As a matter of history in legislation it seems to be true, that when the hour arrives for adjournment, the members are usually not in the halls, and do not remain to see that the journals are made up, leaving that to be done by the clerks. It may be said that such an omission could be corrected by the houses when they again convene, but if the members never returned, it would not be corrected, nor could it generally be done in time to enable the governor to return bills placed in his hands within ten days before the adjournment. Nor is it probable that it could be proved by verbal evidence, that the resolution had been adopted any more than that a bill had passed which did not appear from the journals, or that a court had rendered a judgment, which the clerk had failed to record.

Again, it is a rule familiar to the profession, that when the

9 — 33D ILL.

legislative and executive branches of the government, by the adoption of an act giving a construction to a provision of the Constitution, if the construction thus given is only doubtful, the courts will not hold the act void. It is only in cases of its clear infringement that courts will interpose to hold the act nugatory. And it is for the reason that each coördinate branch of the government is under an equally solemn duty to support and maintain that instrument, and when they have performed the act, it must be presumed that they have not acted with a reckless disregard of so high a duty. Then applying ·this rule, when the governor asserted his right to adjourn the session, if the two houses acquiesced in it, the court would not say that it did not produce an adjournment, unless it was clear that such was not the effect. It is true that the session might terminate, and yet the governor have no constitutional power under the circumstances to adjourn the body. But the course of the two houses acting upon the governor's suggestions in dispersing and not again coming together, would show that both of these branches of the government understood the session to have terminated.

But suppose the case is considered on the subsequent acts of the two houses and the members. It was the manifest design of the framers of the fundamental law of the State to confer ample power upon the two houses of the general assembly to continue their sessions to the full extent of the necessity of its continuance. To effectuate this object they adopted the twelfth section of the third article of the Constitution, which is this: "Two-thirds of each house shall constitute a quorum; but a smaller number may adjourn from day to day and compel the attendance of absent members." The framers of that instrument no doubt supposed that they had conferred ample power, by this clause, to prevent the termination of their sessions by the reason of a want of a quorum, because they grant power to compel the attendance of absent members. If the members of the two houses who remained after the proclamation was announced, believed it was unwarranted, why was not this power invoked for the purpose of restoring a quorum?

It was suggested on the argument, that such an effort would have proved unavailing, but the court cannot assume that fact to be true. Each house being clothed with this power, and failing in its exercise, it would seem to indicate that they did not, on their final action, suppose their privileges were invaded. It would seem to be natural, that if they believed the act of the governor to be unconstitutional, they, to preserve the dignity of the house, to prevent the encroachment of executive power upon their rights, would have done some act to preserve the session, if not by the enforcement of the attendance of members, at least by adjourning from day to day, as authorized by the Constitution.

Why was the power given to a less number than a quorum to adjourn from day to day, if not to enable a minority to continue the life of the session? According to legislative usage, any number less than a quorum had no power to perform any legislative function. The framers of that instrument must have supposed that unless such power was conferred, an adjournment from day to day could not be had by less than a quorum, and that in such case the session must end. Otherwise why insert the provision? It must be supposed that those who adopted that instrument employed no language beyond what was necessary to express their ideas in the clearest and most unambiguous manner. Nor can it be supposed that they would delegate, by express provision, power already possessed. Every delegation of power to the officers of government or the legislature, was made to accomplish a purpose. And in this I am at a loss to perceive any other than to enable the body to prevent a termination of their sessions.

Again, by article III, section 13 of the Constitution, it is declared that "each house shall keep a journal of their proceedings and publish them." This requirement being peremptory, it must be presumed that the two houses will, when in session, observe and perform the duty. We have no right to suppose, or by any means conclude, that they will disregard the injunction. Then can it be inferred, when we find the journals blank for at least ten legislative days, that the two

houses were in session, and in violation of their obligation to the Constitution, were keeping no journals of their proceedings? Is it not more reasonable to presume that the houses were not in session? It may be said that they did no business, but we would expect to find convening and adjourning orders, at the very least, if they were in session. The almost uniform custom of such bodies is to note every day that portion of their proceedings if no other transaction. Then if they were not in session were they not adjourned? And if so, the minutes of the two journals having closed without an adjournment to any day, was it not an adjournment without day?

Whilst an adjournment from day to day is designed to, and does keep the session in life, an adjournment *sine die* is always understood to terminate the session. And to prevent either house from delaying or preventing the transaction of business and terminating the session before the two houses are ready to end it, the nineteenth section of the same article declares that "Neither house shall, without the consent of the other, adjourn for more than two days, nor to any other place than that in which the two houses shall be sitting." Under this provision, it will be seen that each house was powerless, without the consent of the other, to adjourn beyond two days. And the journals afford no evidence that consent was given by either for a temporary adjournment. Yet we do find from the fact that there is a blank in the journals indicating an entire suspension of all business, from which we must conclude that the two houses were not in session, and if not in session, the presumption must be that they were adjourned either to a particular day, or without day. And, as we find no order of adjournment on the journals to a day, it would seem to follow that it was *sine die*. Each house had the power without the consent of the other to adjourn from day to day, and if they had so adjourned it would be expected to appear from the journals.

It is but a reasonable presumption, when we find the two houses adjourned, or at least out of session, for more than two days, that it is by consent, rather than in violation of the

Constitution. And when the journals show no adjournment to a specified time, it must be presumed to be *sine die*. It is, however, said that when the body rises without coming to a resolution to adjourn, or to adjourn to a specified day, that it must be presumed that it was intended to be till the next legislative day. When the rising is followed by the body coming together on that day, the inference would be natural and proper. But when they fail to meet on that day the presumption is rebutted. And in this case the journals fail to show that they did meet on the next or succeeding day.

If this presumption is indulged, that this was not designed to be a final adjournment by consent of the two houses, then the session continued, and the body might come together at any time they choose, before the organization of the next house, and resume business. If this were so, who could know when laws took effect? Could it be possible that the members and officers of the two houses could draw pay during all that time? The fact that the people and officers of the law must know when laws take effect, renders it absolutely necessary that there should be a time, that might be certainly known, when laws became operative, and that can only be from the journals. If we find that the session has terminated in pursuance of a resolution, that is satisfactory and conclusive, or if we find that all business has ceased for a period of more than two days, without an adjourning order, and no entries are found, then the inference should be drawn that it was an adjournment *sine die*, and equally terminated the session.

In this case the last entry is found on the senate journal of the eleventh day of June, and it must be presumed that the session terminated on that day. If so, it cannot matter whether there were many or few members of the two houses came together on the twenty-third, as they had no power to revive the session already terminated, which could only be again brought together by executive proclamation.

The writ of mandamus is not a writ of right, but it is discretionary with the court whether it will be awarded. When

there is a complete remedy at law it will never be dispensed. To this effect is the uniform current of authority. Being discretionary, and the sum in this case being only two dollars, even if it were admitted to be just, I do not feel that justice would be promoted by entertaining jurisdiction, as substantial interests are not involved. It would be to encourage petty litigation to the expense of the State, and the delay of other more important interests. For this, if for no other reason, I should be inclined to refuse the writ; but I regard either of the various grounds discussed, as amply justifying the court in arriving at that conclusion. When the alternative writ was granted, all questions as to its sufficiency were reserved, and I am now satisfied that it was improvidently issued, and that there are no grounds showed for relief. The peremptory writ is therefore refused.

Opinion of Mr. JUSTICE WALKER in the case of the People, on the relation of Harless, against the Secretary of State:

The question presented in this case, is whether the bill to incorporate the Wabash Railway Company, under the requirements of the Constitution, became a law. It was passed by both branches of the general assembly, and was afterwards, on the 12th day of June, 1863, presented to the governor for his approval. He has not returned the bill to the senate, where it originated, either with his approval or his objections. The twenty-first section of the fourth article of the Constitution declares, that "every bill which shall be passed by the senate and house of representatives shall, before it becomes a law, be presented to the governor; if he approve he shall sign; but if not, he shall return it with his objections to the house in which it shall have originated," &c. "If any bill shall not be returned by the governor within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he signed it, unless the general assembly shall, by their adjournment, prevent its return; in which case, the said bill shall be returned on the first day of the meeting

of the general assembly, after the expiration of said ten days, or be a law."

It appears from the journals of both houses, that the general assembly was in session on the tenth day of June, but the journal of the house contains no entry after that date, until the twenty-third of that month. The last entry on the journal of the senate was on the eleventh until the twenty-third, when entries appear upon both journals. On that day amongst other entries on each is one of adjournment until the next day. It appears from both journals under date of the twenty-fourth, that a resolution was entered declaring the general assembly adjourned at ten o'clock A. M., until the first Tuesday after the first Monday in January, 1864.

Even if it was conceded that the general assembly was constitutionally in session, at the time the bill was presented to the governor, he was not required to return it with his objections within the ten days, to prevent its becoming a law, unless that body continued its session until the end of that period. The organic law has given him that period within which to determine upon his course of action. It is manifest from this provision of the Constitution, that the general assembly must be in an organized condition, acting as a general assembly at the end of that period, if not during the whole time, to require the governor to perform the act. If the members have dispersed, and the officers are not in attendance, he would not be able to return the bill to the house in which it originated. It neither requires or authorizes him to return the bill to the speaker of the house, to the clerk, or to any other officer, but declares that it shall be returned to the house, and that can only be as a body. Unless the body was in session, he would be unable to return the bill to it as required by this provision.

If on the tenth day the members and officers were absent, the governor would have until the first day of their next assembling to return the bill with his objections. To be required to act, there must be an organized body in session, at the place of holding its sessions. The executive is not required to seek the members as individuals, but to make his communications to a

collective body, constituting the house which, as such, originated the bill. When dispersed there is no such body to whom he can communicate. If it were otherwise the general assembly, unintentionally it might be, could effectually defeat the objects of this provision, and render it nugatory. But the intention of the framers of that instrument must, if it can be ascertained, be fully effectuated.

The convention which framed our Constitution designed to provide for the enactment and enforcement of salutary laws in the mode best calculated to promote the general welfare. They supposed, as one of the means of best attaining this end, that the executive of the State should not only be intrusted with the enforcement of all laws, but should also be vested with a voice in their adoption. In distributing the powers of government, they could, if they had chosen to do so, have authorized the general assembly to adopt laws independent of all executive action. But to prevent the evils of hasty, illy considered legislation, they conferred upon the governor the power to arrest the passage of a bill until his objections could be heard, and the bill be again considered and adopted. As the best means of accomplishing this, and of preventing the adoption of injurious measures, they gave to the governor ten days, exclusive of Sundays, in which to bestow that careful examination and consideration, so essentially necessary to determine the effects and consequences likely to flow from the adoption of a new measure. This is the duty imposed, and it is one that must be performed. And the time allowed for the purpose cannot be abridged, or the provision thwarted, by either accident or design. The use of the whole time given to the governor must be allowed. The Constitution has spoken and it must be obeyed. The Constitution in this case has allowed to the governor ten days within which to act, and they must be held to be full and complete days, not parts of days. When a given number of days are named, no one could understand that it was a less period of time than is embraced in the number mentioned. It may be proper, then, to ascertain what is the legal meaning of a day. Bouvier defines it to be "A division

of time.  It is natural, and then it consists of twenty-four
hours, or the space of time which elapses while the earth makes
a complete revolution on its axis; an artificial, which contains
the time from the rising until the setting of the sun, and a
short time before rising and after setting." Wharton, in his
Law Lexicon, gives the same definition, and further defines it to
include in the space of a day all of twenty-four hours, and that
the English and some other nations begin their day at mid-
night.  This is the popular sense as well as the legal.  And by
it the governor must have had the full period of ten days, of
twenty-four hours each, excluding Sundays, within which to
perform this constitutional duty.

It was, however, urged that the framers of the Constitution
intended legislative and not natural days.  That if on the last
day of this period, the legislature adjourned at the earliest
practical period, it should be regarded, and was designed to be
included in the computation.  It is not so expressed, and the
language employed seems to be so plain and explicit, that I am
at a loss to perceive how it will bear construction.  Its meaning
is plain and explicit.  The framers of that instrument seem to
have used every precaution and reasonable effort to avoid
obscurity, and as far as possible to avoid necessity for construc-
tion.  This is manifested in this very section, where Sundays
are in terms excluded from the computation, and yet in law
they would generally be excluded, as they are not judicial days,
or days upon which the law will require the performance of any
act.  No authority is referred to, nor am I aware that any exists
which limits the term to a shorter or different period of time
than its natural or popular meaning.  Chief Justice Marshall,
in *Gibbons* v. *Ogden*, 9 Wheat. 188, in the interpretation of
one of the provisions of the national Constitution, says: "As
men whose intentions require no concealment generally employ
the words which most distinctly and aptly express the ideas
they intend to convey, the enlightened patriots who adopted it
must be understood to have employed words in their natural
sense, and to have intended what they said." This is the only
safe rule in giving an interpretation to such an instrument.  If

departed from it would be in the power of the courts to enlarge or diminish powers conferred, to an injurious extent.

Nor does this requirement impose any great hardship upon the legislature. No inconvenience need ever occur to the public interests by observing the requirements. If a bill involving important interests, of an urgent character, is pending, there need be no great inconvenience in remaining in session until the period has elapsed. I can, therefore, perceive no argument arising from inconvenience or great injury.

The question as to the proper mode of computing time in this case then presents itself for consideration. This court has held that the correct mode of computing time, where an act is to be performed within a particular time after a specified day, is to exclude the specified day and to include that upon which the act is to be performed. A party is allowed twenty days after the rendition of a judgment by a justice of the peace, within which to file his appeal bond, and in computing the time the day the judgment was rendered is excluded, and the whole of the twentieth day thereafter is allowed. *Ewing* v. *Bailey*, 4 Scam. 420. So when publication in attachment cases is required to be made for sixty days before the term to which the writ is returnable, the day on which the first publication is made is excluded, and the first day of the term is included. *Varien* v. *Edmonston*, 5 Gilm. 270. So when an act is to be performed on a particular day the party has the whole of that day in which to perform it. *Walter* v. *Kirk*, 14 Ill. 55. According to these decisions, by excluding the twelfth day of June, which was Friday, and the two intervening Sundays, the last of the ten days was the twenty-fourth. And we have seen that the legislature, even if constitutionally in session, only remained so for a portion of that day. And the governor had all of that day within which to return the bill. He, therefore, has until the first day of the next constitutional meeting of that body to return it with his objections. By adjourning, even if the session of the 23d and 24th of June was regular, they prevented the governor from returning the bill. They had no power to abridge the time for even the shortest period.

I fully concur with my brother BREESE in the other views which he has presented in this case, as well as the conclusions at which he has arrived. I, therefore, rather incline to the opinion that the demurrer should be sustained to the alternative writ.

Opinion of Mr. JUSTICE BREESE:

To avoid unnecessary labor, I shall consider the cases before me as one. They are, in their origin, nature and object, inseparable. The theory of both is, that the general assembly was not adjourned on the 10th of June, but continued in session up to the 24th, finally adjourning on the day last named: hence, Keyes, being a member and attending on those days, is entitled to his *per diem* compensation allowed by law and appropriated by the act of 1861, to be paid out of the public treasury on the warrant of the auditor, to be issued on the presentation of the certificate of the speaker of the house as to such attendance; and the same fact of the session existing on those days, it is claimed by Harless, gives vitality to the bill in which he asserts an interest, entitled, "An act to incorporate the Wabash Railway Company." The prayer of Keyes is, that the auditor be compelled, by mandamus, to issue to him this warrant; whilst that of Harless is, that the secretary of State be compelled to make a true copy of that act, and certify the same, under the seal of the State, to be a law of the land, for the reason the governor did not return it to the senate, in which it originated, within ten days after it was presented to him, the senate being then in session. The same facts, then, sustain the claim of both relators, and there is, therefore, a manifest propriety in regarding them as one case.

The question which presents itself at the very threshold of the investigation is, is a mandamus the proper remedy? Waiving, for the present, any consideration of the matters presented by the returns, I will examine the question on the petitions and alternative writs alone. The writs stand as the declarations of the party, and must present a *prima facie* case, at least.

The writ of mandamus is a high prerogative writ, to be awarded in the discretion of the court, and ought not to issue in any case, unless the party applying for it shall show a clear legal right to have the thing sought by it done, and in the manner and by the person or body sought to be coerced, and must be effectual as a remedy if enforced, and it must be in the power of the party, and his duty also, to do the act sought to be done. It is well settled, that, in a doubtful case, this writ should not be awarded. It is never awarded, unless the right of the relator is clear and undeniable, and the party sought to be coerced is bound to act. *The People, &c.,* v. *Forquer,* Breese, 104, and cases cited in notes.

Testing the case of Keyes by these principles, has he shown a clear legal right to this compulsory process?

The petition and alternative writ allege the fact that the journals of both houses are silent as to any proceedings in either, after the morning of the 11th day of June, until the afternoon of June 23d, when, at the hour of 3 o'clock P. M. of that day, a certain entry appears on the journal. It is further alleged, that the journals do not show how many senators or representatives were present on that day.

The speaker certifies that the relator, Keyes, attended on those days as a member of the house; and it is insisted this certificate is conclusive—that the auditor must act on it, and issue the warrant.

The statute requires the speaker to give a certificate to each member of the amount of compensation to which he is entitled, on presenting which to the auditor, he is authorized to issue a warrant, for the amount specified in it, on the revenue fund. He is not authorized to pay a member in any other mode; but it does not follow he is bound to pay on that. Such a certificate would be a proper voucher for him on the settlement of his accounts, but he may take the responsibility of refusing to accredit the certificate, because he is bound to take notice of existing facts. He must know who are the speakers, and also who are the members of the two houses. He is bound to know who is the governor, who the secretary of State, treasurer and

judges of the courts, and also the fact of a session of the legislature at a particular time. Suppose a certificate should be presented to him of the attendance of a member on the first day of July, as at a session then held, would the auditor be justified in issuing a warrant, when the fact was patent to the whole world, there was no session on that day, nor for weeks previous? Suppose the certificate should embrace a service of one hundred days, and his own records informed him the session continued but forty-two days, for which he had settled with the members? No one will pretend that he could not act on his own knowledge of the facts. So the fact of a legislative session on particular days was in the cognizance of the auditor, and he had a right to act on that knowledge. It might have been clear to the speakers, that there was a session on the twenty-third and twenty-fourth days of June, but not clear to the auditor. He must act on his own knowledge of that fact, and take the responsibility of his action. I he decides wrong, a corrective may be found in this writ, if no other legal remedy exists. The silence of the journals from the eleventh to the twenty-third day of June was a significant fact, which the auditor was bound to consider, and the further fact, that a regular session of the legislature is open and notorious, patent to everybody. He cannot shut his eyes, and issue warrants on all the certificates that may be presented. He must act on existing facts. Viewing the allegations of the relator in the most favorable light for him, the case made by them is far from clear, and his right to this writ not unquestionable.

Now, as regards the relator Harless, what does he demand? He demands that the secretary of State shall be compelled to make a true copy of the bill, with his certificate thereto attached, under the seal of the State, that the same is a law *by reason* of the failure of the governor to return it with his objections to the senate, in which it originated, within ten days, Sundays excepted, after it was presented to him, and deliver the same to the relator.

It is not alleged in the pleadings of the relator, that these facts appear on the register which the secretary is required, by

the Constitution, to keep, of the official acts of the governor, or that they are among the records of the secretary's office.

. The question at once arises, is there any power vested in this court to compel the secretary to certify a bill, or an enrolled act, to be a law which is not among the archives of his office, and legally placed there as a law?

. How can this court compel the secretary to know that this bill was duly presented to the governor, remained with him ten days, and was not returned by him within the time required by the Constitution? His position, as secretary of State, does not, of itself, endow him with this knowledge. What right has the secretary of State to determine any particular bill or. act to be a law of the land?

What right has he to give a reason why it is a law? Can he, without the authority of law, arrogate to himself the high responsibility of declaring any writing in his possession, having the form of an act of the legislature, but bearing no marks of authenticity, is, for any reason his ingenuity or sense of right may suggest, a law of the land? If the fact was true, if the reasons alleged existed, beyond all dispute, I do not believe this court could compel the secretary to certify the bill to be a law. And why? Simply, because it is not his duty, under the statute prescribing his duties, so to do.

What is the statute on this subject? By section 5, chapter 96, Scates' Comp. 445, the secretary of State is obliged, when required by any person so to do, to make out copies of all laws, acts, resolutions or other records appertaining to his office, and attach thereto his certificate under the seal of State; and by section 7 it is provided, that all public acts, laws and resolutions, passed by the general assembly, shall be carefully deposited in his office, with the safe keeping of which in his office he is specially charged. Id. Now the alternative writ does not allege that the act in question is a law, act, resolution or other record appertaining to the office of secretary of State, nor that it has been deposited with the secretary as an act or a law passed by the general assembly; on the contrary, it is distinctly alleged in the writ that " on the 19th of June the governor prepared a

message with his objections to the bill, and sent the enrolled act, with his original message, by private hands to the lieutenant-governor." The relator further alleges that the lieutenant-governor, on the 13th of October, informed him that the bill was not in his possession, and on the 16th of that month the relator applied to the secretary of State to learn if the act was in his custody, and being informed that it was, thereupon the relator demanded a copy of it, &c. It is not alleged the act was deposited with the secretary as an act passed by the general assembly, and deposited in his office as such, nor is it anywhere alleged that the act is a public act, for it is only public acts, laws, &c., that this statute declares shall be deposited in the office of the secretary of State. It is very apparent, then, that the secretary of State, from the relator's own showing, is not in a position, with respect to this act, to be compelled to give a copy of it even, much less to be compelled to certify it as a law, for the reason alleged, or for any other reason.

The alternative writ stands in the place of a declaration—it is the declaration of the relator, and as in an ordinary case commenced by declaration, the plaintiff is bound to state a case *prima facie* good, so is a relator in this proceeding. His declaration, in my judgment, makes out no case at all, demanding any other plea or return than a general demurrer, and the demurrer to the return may have this operation. All the material facts being admitted, he shows no title to the relief claimed. It is a case barren of any merits, so far as the relator's right is concerned, connected with any duty the secretary is by law required to perform.

It will not do to say that this view of the case is technical, and the objections taken are of that character. When the nature of the process demanded is considered, the objections will be found to be substantial, and decisive against the right to the particular remedy sought. They do not touch the question whether or not this act is a law. The only question is, do the facts show the relator entitled to this process? It would seem to me, the other question cannot properly be raised on a mandamus. Suppose there was no doubt about the fact, that an

enrolled bill had passed through all the forms required by the Constitution, save that of approval by the governor, and he had suffered ten days to elapse without returning it with his objections, the legislature being all the time in session, is there any principle of the common law, or any statute in force in this State, requiring or empowering this court to compel the secretary of State, or any other officer, to certify it as a law? None can be found. He cannot be compelled to certify any act to be a law which does not come into his possession as such, under and by virtue of the law defining his duties, which I have cited. Such a use of the writ of mandamus is unknown to any court governed by the common law, and it is not allowed by any statute.

The inquiry naturally arises here, how and through what channel do laws, acts and resolutions of the general assembly get to the secretary of State, and become records or files of his office, so that he can be compelled to make certified copies of them?

I know of no other channel than the one marked out by chapter 62 of Revised Statutes, 337, title "Laws." The legislature has provided no other mode by which to authenticate a bill in the predicament this bill is alleged to be, as a law. The relator's counsel insist that this statute is no longer in force; that it is obsolete, by reason of the change in the Constitution, abolishing the council of revision. The statute has never been repealed, nor has the legislature enacted any other upon this subject; and if it be obsolete, then there is no mode prescribed. I do not find that this question has ever come before this court for examination. In the absence of any decision on this precise point, I am free to express my own opinion; and that is, that the council of revision, as such, as a power to revise all laws passed by the general assembly, is not abolished by the present Constitution of the State. The power, instead of being deposited with the governor and justices of the Supreme Court, is now deposited with the governor alone. He is, to all intents and purposes, if the design of such a power is regarded, and not a tenacious adherence to terms, the council of revision.

The sections of chapter 62, applicable to this subject, are as follows:

" Sec. 2.   Whenever a bill which shall have passed both houses of the general assembly shall be returned by the council of revision, with objections thereto, and upon reconsideration, shall pass both houses by the constitutional majority, it shall be authenticated as having become a law, by a certificate thereon, to the following effect: ' This bill having been returned by the council of revision with objections thereto, and after reconsideration, having passed both houses by the constitutional majority, it has become a law, this     day of     ;' which being signed by the speakers of the senate and of the house of representatives, respectively, shall be deemed a sufficient authentication thereof; whereupon the bill shall be presented to the governor, to be by him deposited with the laws in the office of the secretary of State.

" Sec. 3.   Every bill which shall have passed both houses of the general assembly, and shall not be returned by the council of revision within ten days, having thereby become a law, shall be authenticated by the governor causing the fact to be certified thereon by the secretary of State, in the following form: ' This bill having remained with the council of revision ten days (Sundays excepted), and the general assembly being in session, it has become a law this     day of     .  C. F., Secretary of State.'

" Sec. 4.   Whenever the general assembly shall, by their adjournment before the expiration of ten days after the passage of any bill, render the return of such bill by the council of revision within that time impracticable, and the same shall not be returned on the first day of the next meeting of the general assembly, and shall thereby become a law, the fact shall be authenticated in the manner provided in the preceding section."

By the first clause of the schedule of the present Constitution, as expressed in the preamble, in order that no inconvenience might arise from the alterations and amendments made in the Constitution, and to carry the same into complete effect, it is ordained and declared that all laws in force at

10 — 33d Ill.

the adoption of this Constitution, not inconsistent therewith, shall continue, and be as valid as if this Constitution had not been adopted.   In what respect is this act inconsistent with the Constitution?   The Constitution provides for a revision, by the governor, of all laws passed by the general assembly.   They are to be presented to him for such purpose, and he thereby becomes a council of revision.   There is no other revisory council now known to the Constitution and laws, but the governor.   Is there any act, in either of these sections, which that functionary is incompetent to perform?   I can perceive none, and by considering the governor the council of revision, which he truly is, no inconsistency can be alleged.   It is scarcely to be supposed that successive legislatures, under the present Constitution, knowing, as they must, the great necessity for some law of this kind, should, for fifteen years, have neglected to provide a law, had they not considered the one in question quite consistent with the Constitution and ample for the purpose.   This omission to legislate on the subject may be taken as a contemporaneous exposition of the law making power, that the want was fully supplied by this chapter.

Cases have come before this court, in which, by laws passed under the present Constitution, duties were devolved on the "County Commissioners' Court," or on the "Senior County Commissioners," and we have held, as the County Commissioners' Courts were no longer in existence as such, but that "County Courts" were substituted for them, the term "County Commissioners' Courts" should be applied to the County Courts, and the duties would inure to them.   The case of *Shute* v. *Ch. and Milw. R. R. Co.*, 26 Ill. 437, is one of that character; so is the case of *The People* v. *Thurber*, 13 Ill. 554.

I cannot discover wherein these sections of chapter 62 are in conflict, or inconsistent with the present Constitution.   They are calculated to give full and complete effect to the law making powers, by an uniform proceeding reaching every case, and they afford, what is a great public necessity, certain conclusive and uniform rules, by which it can be readily determined what acts of the legislature are laws.   The present Constitution does

not, nor did the old, execute itself in this particular. Legislation was necessary, and adequate rules are found in these sections. The people should not be left in doubt; they should know certainly what bills are laws. This knowledge they will have, if they are authenticated in the mode prescribed by this chapter, and they can regulate their conduct by them. Courts can judicially take notice of them, and they can be used in evidence as laws without question. A certain and proper mode of proof is furnished not sufficiently provided in, or omitted altogether from the Constitution, and it is not, in my judgment, inconsistent with any provision of that instrument.

But if this chapter is not in force, by reason of inconsistency, no mode is provided by which a bill not returned by the governor within ten days can be deposited in the office of the secretary of State as a law. The secretary cannot, *virtute officii*, decide what acts make a law. He has nothing to do with the working of the machinery by which laws are made.

If, then, it be assumed, that this bill must be considered as approved by reason it was not returned to the senate within ten days, then it should carry with it the certificate which the governor must cause the secretary of State to put upon it required by the statute, showing that the senate was in session during that time. Without such certificate, the bill could not be certified by the secretary of State, or be published as a law, nor in such case, could any duty, by any possibility, devolve on the secretary, if the bill was in his official custody, to certifiy it as a law, or to give a copy of it to the public printer to be published in the volume of laws. The only safe and practicable rule, then, it must be apparent, is to look alone to the bill, its authentication, and its proper place of deposit as a law, when called on to determine whether a bill is or is not a law. This authentication, by the statute, must be under the sanction of the executive, and the act must be deposited in the office of the secretary of State, and these make up the evidence and the only evidence of the existence of a law. By section 3, chapter 62, such a bill is required to be authenticated by the governor, *he* causing the fact to be certified on the bill by the secretary of State.

Until the governor acts, it is clear the secretary has no power, and no duty to perform.  The governor would have a duty to discharge, but this court has decided he cannot be coerced by mandamus to perform any duty.  *Bissell's Case*, 19 Ill. 229.

It may be, should the governor obstinately, and without reason, refuse to cause the secretary to place this certificate upon a bill so circumstanced, having passed through all the forms required by the Constitution, that this court might declare it to be a law, but not by a mandamus.  The question could only properly arise in a case brought before the court for adjudication, the foundation of which should be the assertion of a right or privilege claimed under and by force of such an act, and against one who may have resisted that right.  And this, it seems to me, is the only proper course to be pursued in such a case.

I am perfectly satisfied this case does not come within the reach of a mandamus; that writ can only be issued to compel a party to act, when it is his duty to act without it.  It confers upon the party against whom it may be issued no new authority. It can confer none, from its very nature.  *The People, &c.,* v. *Gilman,* 5 Gilm. 248.  This is the first time, in all judicial history, an application has been made for this writ, for the purpose of authenticating a law, and, in my judgment, it cannot be allowed.

But there is another objection to awarding the writ, on the relator's own theory.  He maintains that legislative proceedings can be shown only by the journals of the houses.  Assuming this to be so, the alternative writ nowhere shows by that species of evidence that this bill was presented to the governor for his approval during the session of the general assembly. The only allegation upon this head is, "that the record of the exicutive acts, as kept by his private secretary, and deposited in the office of the secretary of State, shows that the bill for an act to incorporate the Wabash Railway, was presented to the governor for his approval with other bills passed at the same session which have been approved, but said record is silent in regard to the disposition of said bill.  This allegation states no

time at which this bill was presented, nor that the fact of its presentation was entered on the journal of each house, nor is it alleged the legislature was in session when it was presented. What does the Constitution prescribe in this regard?

Section 21 of article IV provides, that every bill which shall have passed the senate and house of representatives, shall, before it becomes a law, be presented to the governor; if he approves he shall sign it, but if not, he shall return it, with his objections, to the house in which it shall have originated; and the said house shall enter the objections at large on their journals and proceed to reconsider it.   *   *   *   If any bill shall not be returned by the governor within ten days, Sundays excepted, after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the general assembly shall by their adjournment prevent its return, &c.

The tenth joint rule of the two houses requires, after a bill shall have been signed by the speakers of both houses, it shall be presented by the committee on enrolled bills to the governor for his approbation. The said committee shall report the day of presentation to the governor, which time shall be carefully entered on the journal of each house. That this rule has the force of a law, will not be questioned. It was made to give full operation to the Constitution, and, taken in connection with it, requires that the legislature shall be in session when a bill is presented to the governor; and the reason is obvious. When it is presented, the responsibility of the governor commences, and from the entry on the journal of the time when, the ten days are to be computed. If it is returned by the governor within ten days, then a new duty devolves at once upon the house to which it is returned. That house must enter the objections at large on their journal, and must proceed to reconsider the bill. Certainly, then, the houses must be in legislative session when the bill is presented to the governor, and when it is returned by him with his objections, else this clause of the Constitution is an idle provision, and the law of the two houses also. This court would not, of course, inquire, when an act has been approved by the governor and deposited in the office of the

secretary of State as a law, whether the legislature was in session or not when it was presented to him, nor whether the time of presentation had been carefully entered on the journal of each house.   There could be no propriety in instituting any such inquiry in regard to any act which has received executive sanction; but when it is asked of the court to declare an act to be a law which wants that sanction, has not been deposited with the secretary of State, and is not authenticated in any manner, in such case the requirements of the Constitution and law must be looked into and applied.

As to the entry of its presentation on the executive journal, kept by the private secretary of the governor, that is for the convenience of the governor alone.   I am not aware of any law requiring the governor to keep such a journal, nor any making it evidence anywhere.   By section 24 of article IV of the Constitution, the secretary of State is required to "keep a fair register of the official acts of the governor;" but this has no relation to duties a standing joint committee of the two houses is required to perform.   By the journal, and by that only, can the fact of presentation, *during a session of the legislature, be legitimately* established, and this on the relator's own theory; on his theory, this objection, if there were no other, would be fatal to his pretensions.

I have now examined the case on the showing of the relator only, without any reference whatever to the facts in the return, and here I might, with propriety, close, since by that showing no claim whatever is established to the process demanded.

The respect, however, which I sincerely entertain for the counsel who have managed the case, and who have presented arguments in its support, not only in the most plausible and persuasive form, but with a force and power seldom exhibited in any forum, impels me to a further examination of it, although it be supererogation, upon the facts presented by the returns, and admitted by the demurrer.

The auditor returns to the alternative writ, as cause why a peremptory mandamus should not issue, that there was no session of the general assembly on the 23d and 24th days of June;

that the general assembly had been adjourned by the governor on the tenth day of June, and that on that day the session closed, the accounts of the members and officers of both houses being certified to by the speaker of each house, as the law required, to the respondent, as auditor, the members, or a large proportion of them, received and receipted for their per diem compensation up to the tenth of June, since which time the journals are blank, and since then there has been no legislative session of the general assembly. He further returns that on the twenty-third and twenty-fourth days of June two members of the senate came together in the capitol, at the seat of government, and four members of the house, and then and there caused certain entries to be made on the journals of each house, which were false and fraudulent, no quorum of either house being then present, and they themselves acting without authority. To these allegations the relator demurs, the effect of which is to admit all the facts competent to be pleaded, and which are well pleaded, but not any legal inferences which may have been drawn from them. Thus the fact that the governor issued an order to adjourn the legislature on the tenth of June, is admitted, but not the inference which the auditor draws from it. The relator insists that the executive order was void, and therefore could not have the effect to adjourn the legislature. So, too, of the assemblage of two members of the senate and four members of the house on the days named, is admitted, but the inference that no session was held on those days is not admitted. Now, if it can be shown, by fair argument, that the legislature was adjourned on the tenth day of June, or terminated its session on that day, without providing for a session at some subsequent period, then the assemblage on the twenty-third and twenty-fourth days of June, as set out in the return, was of no validity, and consequently, the auditor should not be compelled to issue a warrant on the treasury, to the relator for his attendance on those days.

So in the case of the relator Harless. The real and only question in which he has any special interest, is, do the facts stated in the return of the secretary, and admitted by the

demurrer, make the bill in his possession, entitled, "An act to incorporate the Wabash Railway Company," a law of the land, or do any other facts legitimately appearing in the record, have that effect. In other questions discussed on the hearing, the relator has no interest, beyond that every citizen has, in the proper action of the functionaries of the government. If it be a law of the land, and in his possession as such, there can be no doubt of the power of this court to compel the secretary to certify a copy of it, under the seal of State, of which he is the keeper. What are the facts? The secretary returns, in substance, that the bill is not in his possession as secretary of State, as a law; that it has not been authenticated to him as such; that he received it from the lieutenant-governor with the written objections of the governor to its becoming a law, bearing date June 19, 1863, accompanying the same; that he was enjoined by the lieutenant-governor to keep the same safely, so that they could be produced on the first day of the next session of the general assembly, and then to be laid before the senate. If, then, he is not in possession of the bill as a law — if it has never been authenticated to him as such — if it has never come to his official knowledge and keeping as a law, how can a mandamus issue to compel the secretary to do that which it is impossible for him to do. The facts he has returned are the existing facts, on which the mandamus must operate, and the writ cannot change them. It is, in my judgment, entirely competent for the secretary to place himself on these facts. He has no duty to perform, in this regard, the performance of which we can enforce.

But waiving this, for the present, let us examine and see if the legislature did, by their adjournment, prevent a return of this bill to the senate, in which it originated.

What does the term adjournment mean, as here employed, in the Constitution?

Has it that restricted and technical meaning counsel are pleased to place upon it? What does the Constitution say? "If any bill shall not be returned by the governor within ten days, Sundays excepted, after it shall have been presented to

him, the same shall be a law in like manner as if he had signed it, unless the general assembly shall, by their adjournment, prevent its return." What is the object of the section of which this is an extract? Clearly to give to the governor time sufficient to revise all laws which may be presented to him for his approval, and that there shall be a body in legislative session, during the ten days, to which he can communicate his objections, if he has any.

The Constitution of 1818 used this phraseology: " unless the general assembly shall, by their adjournment, render a return of said bill in ten days impracticable." Although there is a slight difference in the language of the two instruments, I cannot think the sense and meaning is changed, or was intended to be changed, the object of both provisions being essentially alike. The meaning, then, is simply this. The governor shall have ten days for deliberation on the question of approval or disapproval of every bill presented to him, and during that time it shall be practicable to make a return of such as he may not approve to the house in which they originated. The framers of the Constitution did not intend to require of the governor a physical impossibility, but only to lay an injunction upon him to return, with his objections, every bill to the house in which it originated if he did not approve it, within ten days, if the general assembly was in legislative session capable of acting on such bills when so returned.

The object of giving this deliberation and qualified negative was to guard against hasty, improper, or unconstitutional legislation. By this provision, the governor has it in his power to compel closer scrutiny, and a more thorough examination into all bills about to become laws. This action of the executive is upon his official responsibility, from which the Constitution does not permit him to escape, for if he fails to act upon the bills presented to him, within the time prescribed, having the opportunity so to do, the bill is considered as approved by him. He is required to act by approval or disapproval, and to communicate the result of his deliberations to the house in which the bill originated, only, however, on the condition there be such a house

with whom it is practicable to communicate. If this be the true exposition of this provision, then it is very clear, if there be no such house in fact, at the expiration of ten days, Sundays excepted—no such deliberative body—no such visible organized assembly to receive the return of the bill with his objections, the return would be an impossibility. If the houses disperse, and abandon the capitol, leaving no existing legislative body in fact, capable of receiving the governor's communication, is not the effect, for all practical purposes, the same as if the legislature had adjourned in due form, leaving the evidence thereof on the journal?

If the house in which a bill originates may disperse, abandon their hall and legislative duties, and the members return to their homes, thereby rendering it impracticable for the governor to return a bill to such house, and by this means, pending executive deliberation, convert the bill into a law, then may such house nullify this clause of the Constitution, and practically destroy the qualified negative, or veto power, as it is called, of the governor. It must be conceded, the mere return of a bill is not of the substance of this constitutional provision. The passage of it by the two houses, according to the forms prescribed, the deliberation and action of the governor thereon, by approval or disapproval, and, in case of disapproval, the further consideration of the bill by both houses, and its passage there once more and by a majority of all the members elected of each house, are the great objects sought by the Constitution, and the return within the ten days is provided to fix executive responsibility in the making of laws, leaving him no way of escaping final responsibility.

Can it be that by a legal fiction the legislature will be deemed in session, when in fact there is no such organized or assembled body, and when the effect of such legal fiction is to nullify a part of the Constitution by a practical overthrow of the governor's negative. Fictions are allowed in support of rights claimed under law, not in derogation of them. If the governor had, within ten days, returned the bill to the senate, where it originated, without having acted on it, by approval or disap-

proval, such return would not have made the bill a law, and yet it is claimed, because the bill was not in fact returned to a house which had no actual existence, the bill became a law, though in due time acted upon, and negatived by the governor. This position, if sound, would enable one house of the general assembly to evade, at any time, the constitutional effect of his negative. To give full effect to this negative power of the governor in legislation, the adjournment which shall, practically, deprive the executive of the ability to communicate with the house in which a bill shall have originated, according to legislative or parliamentary usage, must, in my judgment, be taken as the adjournment contemplated by the Constitution. It is equivalent to it in all respects. If by reason of an insurrection, invasion, by pestilence or by mob violence, a legislative body is suddenly dispersed and broken up, leaving no adjourning order on the journal, and the governor be, thereby, prevented from making return of a bill with his objections in writing, within the ten days, will it be seriously said, the bill has thereby become a law? If so, when? at what point of time, and what would be competent evidence of its existence as a law?

By the Constitution, acts of the legislature of a public nature do not take effect as laws until the expiration of sixty days from the end of the session at which they are passed, unless in case of emergency the general assembly shall otherwise direct. Art. III, § 23. Hence, it becomes material, sometimes, to inquire, when did the session come to an end, and what certain uniform rules exist, by which it can be readily ascertained when bills become laws? Here, too, it would seem the end of a session is regarded the same as an adjournment; they are equivalent expressions for one and the same contingency.

Now, was there a senate, a legislative body in fact, at the place where the law directed the legislature to assemble, during any portion of the time allowed the governor for deliberation?

The return states the fact that there has been no legislative session of the general assembly since the tenth day of June, unless an assemblage, occurring on the 23d day of June, of

three members of the senate and four members of the house, shall be considered such session; that in the interval, no legislative proceedings were had in either house.  The relator insists that parol evidence of this fact, which is not denied by him, is inadmissible.  He insists, by the Constitution, each house is required to keep a journal of its proceedings, and having shown by the journals that there was a regular meeting of the general assembly at the time appointed by law, the presumption is, it continued in session until an adjourning order shall be entered on the journal.

Section 12, article III, of the Constitution, requires that each house shall keep a journal of its proceedings and publish them. The proceedings, then, constitute the journal; one can have no existence without the other, and in the absence of both, there can be no houses.  The journals must show proceedings to establish a legislative session.  The journals do not show any proceedings from the tenth to the twenty-third of June, consequently there was no legislative session during all that time. Nor do the journals show a meeting of a quorum of each house, on the twenty-third, nor that there was any vote taken on the tenth to adjourn to that day, nor do they show an adjournment from day to day by a less number than a quorum.  The journals must show these things affirmatively.  No presumption can be indulged against the journals.  By their very silence in these respects, they speak a negative too distinctly to be misunderstood.  If, then, there has been no general assembly in session since the twelfth of June, how was it possible for the governor to return the bill with his objections ?

The inquiry is pertinent here, if the houses were not in session, after the twelfth of June, what had become of them ? The record answers the question.

An attempt had been made, by joint resolution, passed by the senate, to adjourn both houses on the eighth of June.  When it came to the house, it was there amended by substituting the twenty-second for the eighth, in which the senate refused to concur.  On the next day no quorum appeared in the senate, nor in either house on the tenth, and no effort appears to have

been made to compel the attendance of absent members, as provided by section 12, article III of the Constitution.

Thus matters remained, no agreement of the houses on a day of adjournment, no quorum of either house, and, of course, no transaction of any legislative business, for that requires a quorum.   On the tenth, the governor, conceiving from these facts that a case of disagreement as to the time of adjournment had arisen, called into exercise section thirteen of article IV of the Constitution, providing: "In case of disagreement between the two houses with respect to the time of adjournment, the governor shall have power to adjourn the general assembly to such time as he thinks proper, provided it be not a period beyond the next constitutional meeting of the same."   This power the governor exercised in the form of a communication from the executive department, which was read, on the tenth, in each house.   It is not denied that on that day the accounts of all the members and officers of both houses were duly certified by the speaker of each house, as usual at the close of every session, and as by law required.   It further appears that nearly all the members of the house, and all the members of the senate except one, together with the officers, received and receipted for the amounts respectively due them.   Neither the executive order of adjournment, nor any adjourning order of either house, appears on either journal at this date.   The last entry on the house journal, prior to the twenty-third of June, is a protest against this act of the executive, reported from a special committee on the tenth, and on the senate journal the last entry is as follows:

"Thursday, June 11th, 1863.    Senate met pursuant to adjournment."

There is no house journal shown of any proceedings by that body after the tenth, until the twenty-third, nor any of the senate from the eleventh to the twenty-third.

Now, admitting the executive order was unwarranted by the Constitution, do not the journals show an abandonment of all legislative business, and a breaking up of the session immediately on its promulgation?   What does the protest declare?

It sets out by declaring while, on the tenth of June, 1863, the general assembly were in session, engaged in the discharge of their duties, the governor made an attempt to dissolve the body; which attempt, illegal, unconstitutional and outrageous as it is, must inevitably result in the cessation of any further legislation at this time. It charges, among other things, that by his adjourning order the governor has defeated the bill appropriating one hundred thousand dollars for the relief of the suffering soldiers; that he has defeated the bill for the sale of the coin in the treasury; that he has defeated the general appropriation bills; that he has defeated the general and local legislation of the State of pressing necessity, and has done all these things without the shadow of a legal pretext; that it was a scheme to block the wheels of government.

If this be so, then most clearly the general assembly ceased to be in legislative session, for if it continued in session, after the governor's communication, it could have passed all those bills in spite of the governor. His concurrence was not necessary for such purpose. The entire legislative authority of this State is vested in the general assembly. The executive cannot restrain, control or direct that body in the slightest degree in the passage of bills. His function is inert until the houses have acted, and then he cannot prevent a bill from becoming a law, if the majority of all the members elected in each house insist on making a bill a law.

If the members of the general assembly deemed the order of the governor illegal and outrageous, having no warrant in the Constitution, what was their plain duty? To submit to it, with a protest against it, which they did, or resist it, which they did not do? If the general assembly, having power by the Constitution to preserve its sessions, omit to exercise the power, and yield to an unconstitutional mandate of the executive, whose fault is it, and where is the remedy? The legislature was fully competent to decide upon the act of the governor, and they did decide upon it. They adopted it, ceased legislative business, and returned to their constituents.

By section 12 of article III, two-thirds of each house constitute

a quorum, but a smaller number may adjourn from day to day, and *compel* the attendance of absent members. Of the house, fifty-seven members made a quorum, forty-three of whom could pass a bill; of the senate, seventeen, any thirteen of whom could pass a bill. Fifty-six members of the house, and thirteen members of the senate, signed the protest. No effort appears to have been made to compel the attendance of one additional member of the house, and the requisite number of senators. Had it been made, legislative business might not have ceased, and all the bills specified in the protest, and all others the public exigencies demanded, might have been passed, and presented to the governor for his approval.

Was there any obstacle in the way? If the governor should have refused to receive them, and consider them, then the responsibility would have been fastened upon him, and it might be justly charged that he, by his arbitrary conduct, had "blocked the wheels of government," and defeated important public measures.

If he had no power to adjourn the general assembly, were not the members bound to remain in session? If, on the other hand, he had the power, and this was for the legislature to decide, they were bound to acquiesce, leaving the responsibility where it would justly belong, to the governor and to him only. The question was one for legislative decision, with which this court cannot interfere.

It will not be denied that, by the Constitution, the general assembly, in regular legislative session, has power to continue its session up to the time for which the members of the lower house are elected, and the further power to preserve the session, by the action of a smaller number than a quorum of each house. If they fail to exercise this power, cease their labors and disperse, on the unauthorized interference of the executive or otherwise, what is the inevitable consequence? Why clearly that the session is at an end. There are no other means recognized by the Constitution, by which the general assembly, when in session, can defeat the efforts of faction to terminate it, save by a resort to this power, bestowed for the very purpose of

keeping a quorum together.  But it is said our legislative history shows this provision of the Constitution is impotent for good.  Is this so?  Has it been proved by experience that this power is worthless?  Has any presiding officer of either house ever attempted to test it, to try the strength of the Constitution in this regard, when sessions heretofore have been broken up factiously by the willful absence and desertion of the members?  This power of "a smaller number than a quorum," which the house has fixed by one of its rules at fifteen, to adjourn from day to day and *compel* the attendance of absent members, is understood to be plenary, and to embrace not only the power of the officers attending upon the houses, but through them the *posse civitatis*.  It implies the power to arrest and imprison members, and to keep them *in arcta custodia*, so that they may have their bodies in the respective houses to which the fugitives may belong, to make up a quorum.  These efforts, under this grant of powers, may be continued *de die in diem*, up to the time of the expiration of the term of service of the members of the house, up to the period when the general assembly expires by lapse of time.  Fifty-six members of the house signed the protest; one more would have made a quorum of that body.  Thirteen members of the senate signed it; four more would have made a quorum there.  It was a question for these members to decide whether they should call into action this power, and preserve the session or close the session on the mandate of the governor.  They chose the latter, and perhaps wisely.  It may be, an attempt to exercise this power, under the then existing circumstances, might not only have proved fruitless, but have been productive of disastrous results, involving the peace of the country.  These were questions eminently fit for the members to decide.  They have decided them; have acted on the decision made; have made an informal adjournment, by closing the session, by ceasing to transact legislative business, by receiving their pay and by returning to their constituents, evincing, on their departure, no intention to resume their session at any future time.

But it is said this is not a recognized mode of terminating a

session; that the executive order being illegal and void, no legal consequences could flow from it, and therefore, the acquiescence and dispersion of the members was illegal and contrary to the Constitution.

This may all be admitted, still it does not affect the question. The deed was done, and no power on earth can undo it, nor can the error, if it was one, be corrected by this court. The members of the legislature are not amenable to this court, nor is the body itself. It cannot be denied that the general assembly had the right to determine for itself the alternative presented. It was a question put to them distinctly and directly, of power or no power, and they decided it by their action, and there is an end of it. This court has nothing to do or say in the premises, approbatory or condemnatory.

I am at a loss to perceive if this power to compel the attendance of absent members is suffered to remain dormant, how a session of the legislature can be preserved against the efforts of factionists and disorganizers to break it up, and in this manner "block the wheels of government."

Admitting then, that the act of the governor was, in the language of the protest, "illegal, outrageous and unconstitutional," both houses having adopted it and dispersed, they thereby put an end to the session, evincing at the time no intention to resume it. This, for all practical purposes, was an adjournment *sine die*.

It would have been quite parliamentary to have entered on the journal the governor's message adjourning them. The senate did so, it would appear. The neglect of the house to do so does not make the order less effectual. Its tone and style were well calculated to arouse feelings of indignation and resentment, containing, as it does, a covert censure on the conduct of the majority, in which the executive had no right to indulge. The majority was not responsible to him for their conduct; he was not placed over the legislature as their censor or master. It is not surprising, then, they should not have treated his communication with the respect one more decorous, emanating from the chief magistrate, would unquestionably have received.

11 — 33D ILL.

But suppose the governor had not interfered at all, had sent no communication to the house ordering an adjournment, and both houses, by their own voluntary action, without any proposition or vote, had unceremoniously abandoned their halls, the speakers of each house had certified to the accounts of the members and officers up to the day of abandonment, and they had received their compensation up to that day, and dispersed, leaving the hall deserted, and were never after that day seen together in session as an organized assembly, so that the governor could communicate with it, would it be a rational conclusion, that they were still in session as a legislative body, by mere force of the fact that they were at one time in regular session, and no adjourning order appeared on the journal of either house? Such a presumption would be destroyed by the fact that the journals would not show the entry of any legislative proceedings after the dispersion. Those proceedings, as I have before said, make the journal. If there are no proceedings, there is no journal, and if no journal, no legislative body in session.

But it is said, this is a question of intention, and the protest shows the houses did not intend to adjourn. The answer to this is, the intention must be gathered from the final fact, and that fact is, the session terminated by dispersal of the members, and that shows a change of intention, and especially when taken in connection with the other prominent fact, patent to the whole world, that since the 10th of June no organized legislative assembly has been seen in session. The only constitutional mode, of which I am advised, by which the houses could have made manifest their intention not to adjourn, was by making an issue with the governor, under the protecting shield of the Constitution. By rule 57 of the house, fifteen members of that body could have preserved its session, and a smaller number than a quorum of the senate could have preserved its session.

If, then, there was no senate in session, it was not possible for the governor to return the bill to them. What more could he do with it than is alleged in the return he did do to preserve his negative? Deliver it to the presiding officer of the

senate, to be by him laid before the senate at its next meeting; or he might retain it in his own custody, or so deposit it that he might preserve control of it, until such time as he should be enabled to communicate with the senate. In my judgment, this provision of the Constitution means no more than this : if the legislative session has not come to an end, at the time the ten days expire, the governor must return the bill to the house in which it originated, or it will be a law. If the session has terminated before that time expires, the governor can return the bill at their next session, and on the first day thereof, failing in this, the bill becomes a law. Is not this a reasonable and common sense view of the subject? The court, therefore, has a right to treat this bill as suspended by reason of there being no senate in session to whom the governor could return it. This is the condition of the bill, if the substance and spirit of the Constitution are to be regarded. If this is not so, then it must be conceded that the dispersion of the senate, howsoever produced, paralyzed the negative power of the governor, and nullified a plain and salutary requisition of the Constitution in making laws.

If there be no error in these views, it is impossible that I could consent to award any process to the secretary of State, to compel him to certify this bill to be a law—to give to a bill which, according to parliamentary usage, and our own system of law making, is yet *in fieri*, is yet in an unfinished state, the force and effect of a law.

The session having thus·terminated, it is needless to inquire if it could be resumed at a future day, without a previous vote of the two houses, or by the proclamation of the governor. Should a legislative body be dispersed by any sudden irruption, or insurrection, or by any external force, the power might, perhaps, remain, and the duty also, to reassemble without any previous vote for such purpose. When such dispersion is the result of its own action, I know of no mode by which it can be brought together again, as a legislative assembly, in the absence of such previous vote, without a call from the executive. Blackstone says, if, at the time of an actual rebellion, or

164 MT. VERNON,

imminent danger of invasion, the parliament shall be separated by adjournment or prorogation, the king is empowered to call them together by proclamation, with fourteen days notice of the time appointed for their reassembling. 1 Black. Com. 145, ch. 2. The spontaneous meeting of all the members, except in the case stated, at a time not appointed by law, and without a previous vote for such purpose, would avail nothing. The executive, if he desired, could not recognize it as a legislative body, nor could it perform a legislative act, having any binding authority. This being so, it follows, a less number than a quorum cannot meet and hold a legislative session, no matter under what convictions they may assemble, or what rights they may suppose they can preserve by such meeting. It would be a proceeding not sanctioned by our Constitution or laws.

I have now examined and discussed all the questions properly belonging to these cases, in view of the relief severally sought. With their political aspect, so far as it may be regarded as a controversy between the executive and legislative departments, this court can have no jurisdiction to interfere in its settlement. Nor could it be settled by any decision it might pronounce. What has been done this court cannot undo, nor has it the power to correct any errors that may have been committed, nor is it their province to sit in judgment upon the political action of either of those departments. The judicial department was never designed to be the arbiter of mere political controversies. Should it assume that unpleasant office, so incompatible as it is with its legitimate duties, its decisions upon them, however honest they might be, however well sustained by reason and authority, would fail to satisfy the public mind, excited as it always is, by the agitating topics which enter into such controversies. Partisans and demagogues on one side or the other of such questions, will not be slow to arouse resentment against the court, if the decision does not accord with their views of right and justice, and its members will be exposed to assaults, against which they cannot defend, if they have yielded alone to the suggestions of their

own judgments, and listened to no other monitor than their own consciences. The proper forum in which to settle such controversies, is in the great forum of the people. There it is perfectly legitimate to appeal, not only to reason, but to every passion and prejudice, and to the political sympathies also, of the tribunal whose judgment is invoked. That august tribunal is eternally sitting in judgment on the conduct of all public functionaries, and their judgments are recorded in public opinion.

The question, therefore, whether a disagreement existed between the two houses with respect to the time of adjournment, calling for the interposition of the executive, and authorizing it, is not for this court, on this application, to decide. Had the legislature remained in session, after the receipt of the executive communication of the tenth, and by a quorum of each house continued its legislative business by passing bills, and presenting them to the governor for his approval, and the governor should have failed to consider them, and return them as prescribed by the Constitution, on the plea that the general assembly was adjourned, then, in a proper case brought here for adjudication, the question of the constitutionality of his act would be distinctly presented, and would, of necessity, have to be decided. When such a case comes before me, I shall endeavor to be prepared to decide it.

In every view I have been enabled to take of this case, I am well satisfied the alternative writs should not have been awarded in the first instance, and I am further satisfied, by the facts stated in the several returns on which I have commented, and which are properly pleaded and not denied by the relators, that the demurrers to the same should be overruled.

I have purposely avoided all consideration of other matters presented by the return of the secretary of State, such as the procurement of the passage of the bill through the senate, by the fraud and misrepresentation of the senator having it in charge. The secretary does not pretend he has any actual knowledge of these facts, and if he had, and the bill had received the proper authentication, and had been deposited

with him as a law, I am not of the opinion he could use such facts, in justification of a refusal to give a certified copy of it. Nor have I discussed the question, whether the governor was allowed ten days within which to deliberate. I am inclined to concur with my brother WALKER in the views he has presented on this point, and to hold, with him, that a natural day was intended by the Constitution.